**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, . CRIMINAL NO. 1:17-mj-04063-DHH-1
     Plaintiff       .
                   . BOSTON, MASSACHUSETTS
         v.        . MARCH 22, 2017
                   .
GARY P. DeCICCO,      .
     Defendant      .
. . . . . . . . . . . . . .

TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
BEFORE THE HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:  UNITED STATES ATTORNEY'S OFFICE
                        BY: Kristina E. Barclay, AUSA
                        One Courthouse Way, Suite 9200
                        Boston, MA 02210
                        617-748-3371
                        kristina.barclay@usdoj.gov

For the Defendant:  Michael Kendall, Esq.
                        White & Case LLP
                        75 State Street
                        Boston, MA 02109-1814
                        617-979-9310
                        michael.kendall@whitecase.com

                        Alexandra Ioana Gliga, Esq.
                        White & Case LLP
                        75 State Street
                        Boston, MA 02109-1814
                        617-979-9338
                        alexandra.gliga@whitecase.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                         **I N D E X**

2 **WITNESSES**            **DIRECT    CROSS      REDIRECT     RECROSS**

3 **Government's:**

4 S.A. SANDRA LEMANSKI   4       27        93          97/108

5 **EXHIBITS    DESCRIPTION                      MARKED  IN EVIDENCE**

6 **Government's:**

7     1    Affidavit of SA Lemanski             6            6

8     2    Saugus PD Report                     8            8

9     3    Surveillance Tape from 1/11/15   11           11

10 **Defendant's:**

11     4    Short Sale Affidavit                68           68

12 **ARGUMENT** ......................................... 112

13 **RESPONSE** .......................................... 114

14

15

16

17

18

19

20

21

22

23

24

25

1  COURT CALLED INTO SESSION

2  (11:09:53 A.M.)

3          THE CLERK:  -- Massachusetts is now in session,

4  the Honorable David A. Hennessy presiding.  Court is now on

5  record in the matter of the United States vs. Gary P.

6  DeCicco, Criminal Action 17-4062.

7          Will counsel please identify yourself for the

8  record?

9          MS. BARCLAY:  Good morning, Your Honor.  Kristina

10 Barclay for the United States.

11         THE COURT:  Good morning.

12         MR. KENDALL:  Good morning, Your Honor.  Mike

13 Kendall and Alexandra Gliga.  We're filing a limited

14 appearance for purposes of detention.  Your Honor, we're

15 here for the defendant, Mr. DeCicco.

16         THE COURT:  Good morning.

17         I actually have this on for a preliminary hearing

18 as well as a detention hearing.  Is that your understanding,

19 Mr. Kendall?

20         MR. KENDALL:  Yes.

21         THE COURT:  Okay.  Go ahead.

22         MS. BARCLAY:  Your Honor, the government calls

23 Special Agent Sandra Lemanski.

24         THE COURT:  Okay.

25     SPECIAL AGENT SANDRA LEMANSKI, GOVERNMENT WITNESS,

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

4

1  SWORN

2          THE CLERK:  Please state your full name, spelling

3  your last name.

4          THE WITNESS:  Sandra Lemanski, L-E-M-A-N-S-K-I.

5          MS. BARCLAY:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7                      DIRECT EXAMINATION

8  BY MS. BARCLAY:

9  Q.    Ms. Lemanski, how are you currently employed?

10 A.    I'm a special agent with IRS criminal investigations.

11 Q.    And how long have you been a special agent with the

12 IRS?

13 A.    Approximately 22 years.

14 Q.    And what office are you assigned to?

15 A.    The Boston field office.

16 Q.    Have you been in Boston the whole time?

17 A.    Yes.

18 Q.    What are your duties and responsibilities, generally,

19 as a special agent with the IRS?

20 A.    To investigate allegations of criminal tax crimes,

21 bankruptcy act violations, and money laundering violations.

22 Q.    Have you been involved in an investigation related to

23 Gary DeCicco?

24 A.    I have.

25 Q.    And when did you become involved in that investigation

1 approximately?

2 A.   Approximately early 2015.

3 Q.   What other agencies are involved in that investigation?

4 A.   The FBI and Massachusetts State Police Special Service

5 Section.

6         MS. BARCLAY:  Your Honor, if I may approach the

7 witness?

8         THE COURT:  Yes.

9 Q.   I'm putting in front of you what's been marked

10 Government Exhibit 3.

11     Do you recognize that?

12 A.   I do.

13 Q.   And what is it?

14 A.   It's an affidavit that I prepared in preparation for

15 this hearing.

16         MS. BARCLAY:  Your Honor, if we could have Special

17 Agent Lemanski execute the affidavit before Your Honor?

18         THE COURT:  Sure.

19         Do you want to stand and raise your right hand?

20     SPECIAL AGENT SANDRA LEMANSKI, SWORN

21         THE COURT:  Do you solemnly swear the information

22 that's related by you in this affidavit is true and accurate

23 to the best of your belief, so help you God?

24         THE WITNESS:  I do.

25         THE COURT:  All right.  And is that the affidavit

1 that I've been provided a copy of this morning?

2          MS. BARCLAY:  Yes, Your Honor.

3          THE COURT:  Go ahead and sign your name.

4          Are you offering that?

5          MS. BARCLAY:  Yes, I am offering Exhibit 3.

6          THE COURT:  Do you object?

7          MR. KENDALL:  No, Your Honor.

8          THE COURT:  It's admitted.

9       GOVERNMENT EXHIBIT NO. 1, MARKED & ADMITTED

10 BY MS. BARCLAY:

11 Q.   Special Agent Lemanski, did that investigation involve

12 an alleged extortion attempt of an owner of a car dealership

13 by Mr. DeCicco?

14 A.   Yes.

15 Q.   And some of the facts related to that are detailed in

16 the affidavit which has been marked as Exhibit 3?

17 A.   That's correct.

18 Q.   And the victim in the affidavit is referred to as CW-1;

19 is that accurate?

20 A.   That's accurate.

21 Q.   And you've met the victim?

22 A.   I have.

23 Q.   What information, just in summary, did the victim

24 provide about the attempted extortion?

25 A.   That he purchased a piece of real estate from Mr.

1  DeCicco in approximately 2004/2005 time frame, purchased it

2  for approximately $750,000.

3      One of the contingencies of the purchase and sale

4  agreement was that Mr. DeCicco would assist him in obtaining

5  the necessary permits to build and open a car dealership,

6  that those permits were obtained with the assistance of Mr.

7  DeCicco, and in approximately 2013 he began construction on

8  that piece of property, and shortly after that he was

9  approached by Mr. DeCicco requesting if he could be partners

10 with him in that dealership.

11 Q.   And what did the victim report that his response was to

12 Mr. DeCicco?

13 A.   He reported that, although he had no intention of being

14 partners with him, he kind of said let me think about it.

15 Q.   And then did the victim receive other information about

16 Mr. DeCicco asserting an interest in the ownership?

17 A.   Yes.  Shortly after his conversation with Mr. DeCicco

18 about becoming partners, he had started to hear rumors and

19 other people, associates that Mr. DeCicco and both he had,

20 that Mr. DeCicco was saying that he was -- had an ownership

21 interest in that dealership.

22 Q.   And what, if anything, did the victim do in response?

23 A.   He sent messages through an -- to different associates

24 that he did not want Mr. DeCicco associated with his

25 dealership.

1  Q.   Okay.  And in August of 2014 did the victim report

2  anything with regard to Mr. DeCicco to the police?

3  A.   Yes.  He contacted the Saugus Police, because he was

4  receiving some threatening incidents.

5  Q.   Okay.  And what was the first incident that he reported

6  to the Saugus Police?

7  A.   On August 4 he had received a flower delivery with a

8  crystal cross and a message with that in a card.

9  Q.   If I could ask to you identify what's been marked as

10 Exhibit 1?  Do you recognize that?

11 A.   I do.

12 Q.   What is it?

13 A.   It's the police report prepared by the Saugus Police

14 Department of the victim's report.

15 Q.   And this police report in Exhibit 1 has been redacted

16 of identifying information; is that accurate?

17 A.   That's accurate.

18        MS. BARCLAY:  Your Honor, I'd offer Exhibit 1.

19        MR. KENDALL:  No objection, Your Honor.

20        THE COURT:  It's admitted.

21     GOVERNMENT EXHIBIT NO. 2, MARKED & ADMITTED

22 BY MS. BARCLAY:

23 Q.   Special Agent Lemanski, if you could turn to a few

24 pages in in the police report where there's a picture of

25 some flowers?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1      Pull it up on the screen here.

2      And these pictures were included in the Saugus police

3 report?

4 A.    They were.

5 Q.    And these were the flowers that the victim had told the

6 police were sent to his place of business.

7 A.    Correct.

8 Q.    Okay.  And was there anything with the flowers?

9 A.    Yes.  A card.

10 Q.    Turning to the next page of Exhibit 1.  Is that the

11 card?

12 A.    Yes, it is.

13 Q.    Okay.  And could you read the card?

14 A.    "Congrats, Gary.  We all know whose place that is.  We

15 hope the cross will help you get rid of that Muslim prick.

16 From all Route 1 auto dealers."

17 Q.    Okay.  And the next piece down on that page, has that

18 been redacted?

19 A.    It has.

20 Q.    And what did it have on there?

21 A.    The victim's first name handwritten on it.

22 Q.    Okay.  And --

23         THE COURT:  I'm sorry.  Where was the victim's

24 name written?

25 Q.    Was it on this card here, the middle of the card on

1 that page?

2 A.   Yes.

3        MS. BARCLAY:  And Your Honor, I do have an

4 unredacted version I can submit under seal.

5 Q.   And on the bottom envelope what was written there?

6 A.   It was -- that was typed, and it had the victim's first

7 name, the name of the victim's auto dealership and the

8 address to the dealership.

9 Q.   Okay.  And Special Agent Lemanski, is the victim's

10 first name Gary?

11 A.   It is not.

12 Q.   During the investigation did investigators learn who

13 sent the flowers, cross, and card depicted on Exhibit 1?

14 A.   Yes.

15 Q.   Who sent them?

16 A.   A girlfriend of Mr. DeCicco's.

17 Q.   And why did she send them?

18 A.   She was instructed by Mr. DeCicco to send it.

19 Q.   What about what's written on this card?  Who wrote

20 that?

21 A.   It's her handwriting, and it was dictated to her by Mr.

22 DeCicco.

23 Q.   And who paid for the flowers?

24 A.   Mr. DeCicco.

25 Q.   Jumping ahead to January 11, 2015.

1      What happened on that day with regard to the victim?

2 A.   The victim was assaulted in his dealership.

3 Q.   And did he report it to the police?

4 A.   He did.

5 Q.   Was the assault captured on video tape?

6 A.   Yes, it was.

7 Q.   And how was it captured on video tape?

8 A.   From the surveillance video inside the dealership.

9 Q.   Have you reviewed the video?

10 A.   I have.

11 Q.   Taking a look at what's been marked as Government's

12 Exhibit 2, do you recognize that as a copy of part of the

13 surveillance tape from January 11, 2015?

14 A.   I do.

15      MS. BARCLAY:  I'd offer Exhibit 2, as well, Your

16 Honor.

17      MR. KENDALL:  No objection, Your Honor.

18      THE COURT:  It's admitted.

19   GOVERNMENT EXHIBIT NO. 2, MARKED & ADMITTED

20      MS. BARCLAY:  Your Honor, with your permission,

21 I'd like to play a portion of Exhibit 2?

22 (Video played.)

23 BY MS. BARCLAY:

24 Q.   Special Agent Lemanski, I'm pausing just a few seconds

25 in to the video, and there are two figures in here; one

1 hooded figure on the left, and then someone who doesn't have

2 a hood on the right.

3      Could you identify who the person on the right --

4      Actually, I believe put it this way.

5      Is that the victim?

6 A.   That is the victim.

7 Q.   And I'm just going to jump ahead to about 53 seconds in

8 to the video.

9 (Video played.)

10        MS. BARCLAY:  And just stopping the video there

11 approximately -- I believe it's 2 minutes in to the video.

12 Q.   Special Agent Lemanski, did investigators identify and

13 interview the hooded assailant from this video?

14 A.   Yes.

15 Q.   And what did he say about the assault?

16 A.   He admitted to the assault, and he said he was hired to

17 perform the assault by who's been identified in my affidavit

18 as CW-3.

19 Q.   And was he told anything about who he was being hired

20 to assault the victim for?

21 A.   Yes.

22 Q.   What was he told?

23 A.   A mobster in Nahant.

24 Q.   And how did he know when to commit the assault?

25 A.   CW-2 was contacted by CW-3 a couple months before when

1 he was asked to do it, and then on the day of the assault

2 CW-3 contacted him by phone and told him, you know, the

3 victim was alone, and it would be a good time to do it.

4 Q.   And was CW-2 --

5          THE COURT:  Let me just stop you there for a

6 moment.  Do we have a grand jury return?

7          UNIDENTIFIED WOMAN:  Yes, Your Honor.

8          THE COURT:  I'll take it right now.  You can just

9 stay where you are.

10     (Court recessed from 11:23:51 a.m. to 11:34:55 a.m.)

11                         AFTER RECESS

12          THE COURT:  Ms. Barclay, the last question I have

13 here:  How did CW-2 know to commit the assault at that time?

14 Contacted by CW-3 on the day of the assault.

15          MS. BARCLAY:  Thank you.

16 BY MS. BARCLAY:

17 Q.   Turning back to what CW-2 told investigators, did he

18 tell investigators whether he was paid?

19 A.   Yes.

20 Q.   And how much was he paid, and where was he paid?

21 A.   He was paid a thousand dollars in cash at the Porthole

22 Restaurant in Lynn.

23 Q.   And did investigators ultimately identify and interview

24 CW-3?

25 A.   Yes.

14

1  Q.   And what did he say about the assault?

2  A.   He admitted that he had hired CW-2 to commit the

3  assault.

4  Q.   And why did he hire CW-2 to commit the assault?

5  A.   He was asked to find someone or himself to commit the

6  assault by the individual identified as CW-4 in my

7  affidavit.

8  Q.   Okay.  And did CW-4 tell CW-3 who this beating was

9  being performed for?

10  A.   Yes.

11  Q.   Who?

12  A.   An associate of his who lived in Nahant and was a

13  neighbor of the victim.

14  Q.   Okay.  And just taking a look at Exhibit 3 which is in

15  front of you, paragraph 18, and let me ask you this.

16       Do you remember whether CW-4 told CW-3 that the assault

17  was going to be on behalf of Gary DeCicco?

18  A.   Yes.

19  Q.   Okay.  Did investigators ultimately identify and

20  interview CW-4?

21  A.   Yes.

22  Q.   And what, in sum and substance, did he say about the

23  assault?

24  A.   He admitted to being the go-between between Mr. DeCicco

25  and CW-3.

1  Q.   And did Mr. DeCicco tell CW-4 anything about how much

2  he would pay for the beating?

3  A.   Yes.

4  Q.   And what did he say?

5  A.   He said a thousand dollars -- and I'm not sure of the

6  exact words -- if it was good, and two thousand if it was --

7  the beating was really good.

8  Q.   And did Mr. DeCicco, according to CW-4, also provide

9  CW-4 with information about where the victim worked and give

10  a description of the victim?

11  A.   He did.

12  Q.   And did Mr. DeCicco also tell CW-4 when it would be a

13  good time --

14        MR. KENDALL:  Objection, Your Honor.  Could we

15  have the agent testify, not the prosecutor?  I think there's

16  a little too much leading.

17        THE COURT:  Okay.  Don't ask leading questions.

18        MS. BARCLAY:  I'm happy to do that, Your Honor.

19  BY MS. BARCLAY:

20  Q.   How did CW-4 find out when the beating should happen?

21  A.   CW -- I'm trying to think -- sorry.  Trying to get

22  everyone straight.

23      So CW-4 was notified by Mr. DeCicco that it would be a

24  good time.

25  Q.   And after the assault what did CW-4 do?

16

1  A.   He contacted Mr. DeCicco, advised him that the assault

2  had taken place, and he met Mr. DeCicco at his house.

3  Q.   And what happened there?

4  A.   Mr. DeCicco gave him a thousand dollars in cash to pay

5  CW-2.

6  Q.   And did CW-4 --

7       What did CW-4 do with the money?

8  A.   He brought it to the Porthole Restaurant in Lynn and

9  gave it to CW-2.

10 Q.   Did any other money change hands in connection to this

11 extortion attempt?

12 A.   No.

13 Q.   Why only a thousand dollars and not two thousand

14 dollars according to CW-4?

15 A.   According to CW-4, Mr. DeCicco had learned that the

16 beating wasn't good enough.

17 Q.   And did Mr. DeCicco tell CW-4 why he wanted the victim

18 beaten up?

19 A.   Yes.

20 Q.   What did he say?

21 A.   Some harassment of either a girlfriend or an ex-wife.

22 Q.   Did he say anything about a daughter?

23 A.   Yes.

24 Q.   What did he say about --

25 A.   It was one of the -- a daughter or an ex-girlfriend.

1 Q.   And did Mr. DeCicco tell CW-4 anything else about the

2 victim's business?

3 A.   Yes, that he used to own it.

4 Q.   Has the investigation, to date, also included the

5 identification of assets connected to Mr. DeCicco?

6 A.   Yes.

7 Q.   And is one of those assets the property -- a property

8 in Nahant?

9 A.   Yes.

10 Q.   And what's the address of the property in Nahant?

11 A.   321 Nahant Road.

12 Q.   And what did you learn about that property?

13 A.   That it was purchased by Mr. --

14      Well, originally it was purchased --

15          MR. KENDALL:  Objection, Your Honor.  Can we get

16 some foundation?

17          THE COURT:  Go ahead.  Ask a foundation question.

18 Q.   How did you learn about the information that's in your

19 affidavit with regard to this property?

20 A.   I personally researched the registry of deeds, I

21 reviewed records that have been subpoenaed pursuant to a

22 grand jury, and I've interviewed witnesses.

23 Q.   And what did you learn about the property?

24 A.   That it was initially purchased approximately 2004, I

25 believe, in the name of Mr. DeCicco's girlfriend, identified

1  as Girlfriend 2 in my affidavit.

2  Q.   And based on your investigation and your interviews of

3  multiple witnesses and review of reports prepared by other

4  law enforcement officers, how long was Mr. DeCicco with

5  Girlfriend 2?

6  A.   At least approximately 19 years.

7  Q.   And at least as late as what date?

8  A.   May of 2016.

9  Q.   And based on your investigation, did you know whether

10 they lived together?

11 A.   Yes.

12 Q.   For approximately how long at least?

13 A.   Approximately 19 years.

14 Q.   Until at least what date?

15 A.   May of 2016.

16 Q.   And do they have any children together?

17 A.   Yes, one.

18 Q.   And based on your review of the records, was there a

19 mortgage on the property?

20 A.   There was.

21 Q.   And what was the outstanding mortgage balance as of

22 December 2016?

23 A.   Approximately 1.1 million.

24 Q.   And what happened to the property in December of 2016?

25 A.   It was purchased by Mr. DeCicco in a short sale.

19

1  Q.   For how much?

2  A.   $610,000.

3  Q.   And what is a short sale?

4  A.   It's when the mortgage company agrees to approve the

5  sale of a house for less than the balance on the mortgage.

6  Q.   So the mortgage company essentially agrees to take a

7  loss?

8  A.   Yes.

9  Q.   And what was the loss to the mortgage company?

10 A.   Approximately $600,000.

11 Q.   Did the mortgage company have to approve this sale?

12 A.   They did.

13 Q.   And among other things, what did they require in order

14 to approve the sale?

15 A.   That the buyer and the seller complete a arm's length

16 affidavit.

17 Q.   And did Girlfriend 2 and Mr. DeCicco sign such

18 affidavit?

19 A.   Two of them.

20 Q.   And were those affidavits signed under pains and

21 penalties of perjury?

22 A.   They were.

23 Q.   And based on the investigation, did those affidavits

24 contain any false representations?

25 A.   Yes.

1 Q.   Okay.  And what was the false representation?

2 A.   That the buyer and the seller, Girlfriend 2 and Mr.

3 DeCicco, had no association or affiliation by family or

4 business.

5 Q.   And you testified that they were together for at least

6 19 years and had a child together.

7     Did they also have a business relationship?

8 A.   Yes.  They were both listed on several limited

9 liability companies.

10 Q.   Okay.  And based on your investigation -- or during the

11 investigation did you learn that Mr. DeCicco was at some

12 point advised that this information, his relationship with

13 Girlfriend 2, was material to the mortgage company?

14 A.   Yes.

15 Q.   How did you learn that?

16     How did he learn that, as far as your investigation?

17 A.   From the attorney who was going to do the -- initially

18 do the closing for the short sale.

19 Q.   And who did the attorney tell?

20 A.   I believe he told --

21     He may have told Mr. DeCicco, but he definitely told

22 the realtor.

23        MR. KENDALL:  Again, Your Honor, can we get a

24 little just foundation?  Is this her interview?  Is this

25 reading a report?  Just to figure out what's this based on.

1          THE COURT:  Sure.

2    BY MS. BARCLAY:

3    Q.   Did you interview the closing attorney?

4    A.   I did.

5    Q.   And did you interview the realtor?

6    A.   I did.

7    Q.   And the closing attorney, at the very least, told the

8    realtor that this couldn't go forward.

9    A.   Yes.

10   Q.   And what, in particular, did the closing attorney tell

11   the realtor about the mortgage company?

12   A.   When they were doing the title search before the

13   closing, their research came across information that showed

14   that Mr. DeCicco and Girlfriend 2 had a business

15   relationship; and therefore, didn't feel comfortable going

16   forward with the closing based on the arm's length

17   affidavit.

18        He advised that he would not move forward unless Mr.

19   DeCicco and Girlfriend 2's relationship was -- both business

20   and personal was disclosed to the mortgage company, and if

21   after that they -- you know, the mortgage company approved

22   it, then he would do the closing.

23   Q.   And did the realtor tell you whether he relayed that

24   message to Mr. DeCicco?

25   A.   He did.

1  Q.   And what was Mr. DeCicco's response according to the

2  realtor?

3  A.   He refused to notify the mortgage company.

4  Q.   And what did he do instead?

5  A.   Found a new closing attorney.

6  Q.   And did the sale ultimately close?

7  A.   It did.

8  Q.   And have you interviewed an employee or employees with

9  Nationstar, the mortgage company?

10  A.   I have.

11  Q.   Mortgage servicing company?

12  A.   I have.

13  Q.   And they're the ones that approved the short sale?

14  A.   They were.

15  Q.   And would the mortgage company have approved the sale

16  if it had known there was a personal and business

17  relationship between Girlfriend 2 and Mr. DeCicco?

18  A.   They told me they would not approve it had they known,

19  one, of the personal relationship; and two, of the business

20  relationship.

21  Q.   Ms. Lemanski, as far as you know, when did Mr. DeCicco

22  find out that he was under investigation by the IRS and the

23  FBI?

24  A.   I believe Agent Elio and myself made contact in April

25  of 2015.

1 Q.   And around that time only over part of the

2 investigation was what?

3 A.   The financial --

4 Q.   Okay.

5 A.   -- piece.

6 Q.   And do you have any reason to believe that Mr. DeCicco

7 knew about the extortion piece of the investigation before

8 he was arrested on March 17?

9 A.   Potentially maybe mid February he may have -- that's

10 when we believe he may have initially learned of it.

11 Q.   And --

12         THE COURT:  Mid February of?

13         THE WITNESS:  2017.  I'm sorry, Your Honor.

14 Q.   Based on the investigation, what information do you

15 have that he may have learned at that time about the

16 extortion investigation?

17 A.   CW-4 was contacted by CW-3 and advised that the FBI was

18 looking at the extortion piece, and CW-4 said he had a

19 conversation with Mr. DeCicco relative to that.

20 Q.   During the investigation, Special Agent Lemanski, did

21 you identify any assets that Mr. DeCicco owns?

22 A.   I did.

23 Q.   And is there anything owned by Mr. DeCicco in his name

24 exclusively?

25 A.   One that I know of.

1 Q.    And what is that?

2 A.    It's the 321 Nahant property.

3 Q.    Okay.  And have you listed some of the assets that you

4 identified in your affidavit that's been marked as Exhibit

5 3?

6 A.    I did.

7 Q.    Okay.  If you could turn to page 16, paragraph 50, of

8 your affidavit?

9      You've identified four real properties, first, in

10 paragraph 50, and what is your understanding about Mr.

11 DeCicco's interest in those real properties?

12 A.    That he owns those properties.

13 Q.    Okay.  Are there any mortgages on those properties

14 based on your review of records gathered during the

15 investigation?

16 A.    No.

17 Q.    And when did he buy those properties?

18 A.    The Shelton Road was believed purchased in September of

19 2016, the Foster Street was purchased in December of 2016,

20 the Nahant Road was also purchased in December of 2016, and

21 the condo in Florida was purchased in January of 2017.

22 Q.    So within the last six months?

23 A.    Yes.

24 Q.    And you've identified four other properties there in

25 paragraph 50 a little bit lower down.

1    Could you just briefly explain why you included those

2 properties?

3 A.   These properties are held in LLCs which I believe Mr.

4 DeCicco has an ownership interest in.

5 Q.   Does Mr. DeCicco have any vehicles registered to him in

6 the Commonwealth of Massachusetts?

7 A.   He does not.

8 Q.   And did agents executing the arrest warrant at Mr.

9 DeCicco's residence notice any vehicles at his house?

10 A.   Yes.

11 Q.   How many and what kinds?

12 A.   There was five.  There were four in the garage, two

13 Lamborghinies, I believe, and two Porsches; and there was a

14 Range Rover parked in the driveway.

15 Q.   Okay.  And the Porsches and the Lamborghinies, are

16 those registered to Mr. DeCicco?

17 A.   I could not find any registration for those.

18 Q.   Okay.  Are they registered in the name of Girlfriend

19 No. 2?

20 A.   No.

21 Q.   What about the Range Rover?

22 A.   The Range Rover, I believe, is registered in the name

23 of Girlfriend 2.

24 Q.   And during your investigation did you learn anything

25 about Mr. DeCicco and how he comes to possess these

1 vehicles?

2 A.   I did.

3 Q.   What was that?

4 A.   He has a local dealership in which he uses their dealer

5 license to purchase vehicles in the dealership's name using

6 -- but Mr. DeCicco pays for them, and then he has the -- he

7 had the use of a dealer plate from that same dealership.

8 Q.   So he used his own money to buy the cars.

9 A.   Yes.

10 Q.   And then what's the sort of end result of doing that,

11 and it not showing up on his registration?

12 A.   It allows him to conceal his ownership in the vehicles.

13 It allows him to avoid, you know, registering and insuring

14 and paying sales tax and excise tax.

15 Q.   Did you identify any other assets during the

16 investigation?

17 A.   Yes.

18 Q.   What were they?

19 A.   He currently -- we believe currently owns approximately

20 like a 60-foot cigarette boat called *Thunder Cat*; and he

21 has, I believe, 100,000 shares in a concert venue in New

22 Hampshire.

23 Q.   During the investigation did you learn whether Mr.

24 DeCicco has access to cash?

25 A.   Yes.

1  Q.   How did you learn that, and what did you learn?

2  A.   CW-4 mentioned that he pays half his rent in cash.

3  Q.   And who does he rent from?

4  A.   Mr. DeCicco.

5  Q.   Okay.

6  A.   And Girlfriend No. 1 said that she receives cash from

7  Mr. DeCicco, and that he uses that cash do pay for her

8  monthly rent on her apartment.

9  Q.   Does Mr. DeCicco currently owe the IRS any back taxes?

10 A.   Yes.

11 Q.   What's his obligation right now?

12 A.   At least $350,000.

13        MS. BARCLAY:  No further questions, Your Honor.

14        MR. KENDALL:  Your Honor, at this time I'd like to

15 move for the production of all Jencks material.

16        THE COURT:  Did you turn it over?

17        MS. BARCLAY:  I turned it over.  Yes, Your Honor.

18        THE COURT:  Go ahead, Mr. Kendall.

19        MR. KENDALL:  Shall I get started, Your Honor?

20        THE COURT:  Yes.

21        MR. KENDALL:  That was a good start.

22                    CROSS-EXAMINATION

23 BY MR. KENDALL:

24 Q.   Good morning, Agent Lemanski.

25 A.   Good morning, Attorney Kendall.

1 Q.   I want to go through several topics with you.  And I'll

2 tell you the topic I want to cover, we'll go through it, and

3 we'll move to the next one.  Is that okay?

4 A.   That's fine.

5 Q.   First, I'd like to cover with you a little bit of what

6 you've learned about Mr. DeCicco's personal background.

7      You know he was born in Revere; correct?

8 A.   I'm not sure where he was born.

9 Q.   Born in the Boston area.  You know that?

10 A.   Yes.

11 Q.   And he's lived virtually his whole life in Boston;

12 correct?

13 A.   I believe so.

14 Q.   He's got a family in Boston; correct?

15 A.   Correct.

16 Q.   He's got two sisters here that he's quite close to.

17 A.   I know one sister.

18 Q.   Okay.  You don't know the second sister?

19 A.   Right.  Well, although, Mr. DeCicco gave me her name on

20 the day he was arrested.

21 Q.   And you also know that he's got two daughters.

22 A.   I do.

23 Q.   They're actually just outside the courtroom; correct?

24 A.   I don't know where they are.

25 Q.   You didn't see them when you came in?

29

1  A.   I saw them, but I saw them in the courtroom.

2  Q.   Okay.  We've asked them to step outside for the

3  hearing.

4       But you know he has two daughters.

5  A.   I do know that, yes.

6  Q.   And they're from different mothers; correct?

7  A.   Correct.

8  Q.   But they're quite close, the two girls.

9  A.   That's my understanding.

10 Q.   He's raised them as sisters, in fact; correct?

11 A.   I don't know how he's raised them.

12 Q.   But you've been following him around and studying him

13 for the last two years; correct?

14          MS. BARCLAY:  Objection.

15          THE COURT:  Grounds?

16          MS. BARCLAY:  Lay the foundation.

17          MR. KENDALL:  She conducted an investigation of

18 him for the last two years, she's already testified.

19          THE COURT:  All right.  Well, following him, and

20 studied him for two years.

21 Q.   In your investigation of Mr. DeCicco, have you learned

22 about him having a close relationship to his daughters?

23 A.   I don't know about their relationship.  I know that he

24 has contact with them.

25 Q.   He has frequent contact with them; correct?

30

1  A.   I don't know what his contact is.

2  Q.   You also know he's been involved in the real estate

3  business for decades in the Boston area; is that correct?

4  A.   Yes.

5  Q.   He's a college drop-out; correct?

6  A.   I don't know.

7  Q.   But you know he's been an entrepreneur putting together

8  real estate deals; is that right?

9  A.   I know that he's been involved in real estate deals,

10  yes.

11  Q.   And would you agree with me he's been involved with

12  many very reputable people in his real estate deals?

13        MS. BARCLAY:  Objection.

14        THE COURT:  You can answer.  Do you know are they

15  reputable people?

16        THE WITNESS:  Some of them.

17  Q.   Yes.  So let's go through them.

18        There's a lawyer in Boston at Morgan Lewis; formerly at

19  Bingham, Dana; first name Lawrence; correct?

20  A.   Yes.

21  Q.   You brought him in; correct?  You've interviewed him.

22  A.   Yes.

23  Q.   Do you remember his name?

24  A.   Yes.

25  Q.   What's his name?

1 A.    Lawrence Silverstein.

2 Q.    Right.

3     Mr. Silverstein both represented Mr. DeCicco, correct,

4 in many real estate transactions.

5         MS. BARCLAY:  Objection to the relevance, Your

6 Honor.  This is trying to boot strap his defendant by the

7 witnesses she's interviewed.  I don't see what the relevance

8 is.  It's basically fishing.

9         MR. KENDALL:  Your Honor, I'd like to be able to

10 spend a few minutes to show Mr. DeCicco is not a mobster

11 from Nahant, but a real estate developer that has been

12 active in the Boston real estate community for decades.

13 He's assembled a portfolio of properties that he has various

14 involvements through, numerous legitimate appropriate

15 relationships, and this goes directly to the issues they've

16 raised about flight.

17         THE COURT:  Well, you know, I mean, the character

18 of the people he's dealing with; it's marginal.

19         MR. KENDALL:  It will take me less time than we've

20 spent discussing it, Your Honor.

21         THE COURT:  If you can do that, okay, go ahead.

22         MS. BARCLAY:  Your Honor, I would also object to

23 asking Special Agent Lemanski what the character of these

24 people are.  She as no basis for that information.

25         THE COURT:  I'll hear that as it comes.  Go ahead.

32

1  BY MR. KENDALL:

2  Q.   So Mr. -- is it Silverberg or Silverstein --

3          THE COURT:  Silverstein.

4          MR. KENDALL:  Silverstein.  Thank you.

5  Q.   Silverstein, he both represented Mr. DeCicco in real

6  estate transactions; correct?

7  A.   I believe so, yes.

8  Q.   And he lent him $500,000 to finance some real estate;

9  correct?

10  A.   Yes.

11  Q.   There's another person by the name of Alexander

12  Steinberg; correct?  He's been a partner of Mr. DeCicco.

13  A.   Technically, I believe he's a partner of Girlfriend No.

14  2 on paper.

15  Q.   Thank you.  He's been a partner of Girlfriend No. 2,

16  and Mr. DeCicco's been involved in real estate that's been

17  owned by Girlfriend No. 2; correct?

18  A.   Correct.

19  Q.   Okay.  And Mr. Steinberg is one of the very prominent

20  successful real estate investors in Boston; correct?

21          MS. BARCLAY:  Objection.  Her basis for knowing

22  this, Your Honor.

23          THE COURT:  Do you know Mr. Steinberg?

24          THE WITNESS:  I've interviewed him, but I don't

25  know anything more than that.

 1              THE COURT:  All right.

 2  BY MR. KENDALL:

 3  Q.   You know he's a real estate --

 4              THE COURT:  Next question.

 5  Q.   -- investor in Boston; correct?

 6  A.   I know that he had real estate investments, yes.

 7  Q.   And you also know he has a partner by the name of

 8  Phillip Baldi; is that correct?

 9  A.   Mr. Steinberg?

10  Q.   No.  Mr. DeCicco.

11  A.   Yes.

12  Q.   Okay.  Mr. Baldi's a former executive of the Flatly

13  Company; correct?

14  A.   Yes.

15  Q.   The Flatly Company is a major prominent real estate

16  company in the Boston area; correct?

17  A.   Yes, it's located in Boston.

18  Q.   Have you heard of the Flatly Company?

19  A.   I have.

20  Q.   Okay.  And they're a prominent real estate company;

21  correct?

22              THE COURT:  Do you know whether they're prominent?

23              THE WITNESS:  No.

24              THE COURT:  Okay.

25  Q.   You never heard of Tom Flatly?

1  A.   I have.

2  Q.   Okay.  He's a very prominent real estate investor --

3        THE COURT:  All right.  She's answered the

4  question.  Let's move on.

5  Q.   Now, I want to move over to the issue of the -- what

6  you claim is an extortion effort relating to the beating

7  that was shown on the video tape.

8        The extortion victim is a used car dealer; is that

9  correct?

10 A.   He's a car dealer, yes.

11 Q.   Okay.  He sells primarily used cars, isn't it?

12 A.   I believe so, yes.

13 Q.   You said in paragraph 3 of your affidavit that you're

14 not aware of any information that would adversely affect his

15 credibility.

16      Do you remember saying that under oath?

17 A.   Yes.

18 Q.   Okay.  So you're vouching for his believability;

19 correct?

20 A.   I'm saying I have no information that --

21 Q.   And have you taken steps to try to determine whether or

22 not he has credibility?

23 A.   I have not.

24 Q.   Okay.  So you don't have any information to question

25 it, but you did not look for any information; correct?

1      Is that what you're telling us?

2  A.   I have had conversations with law enforcement officials

3  that have had contact with him, and they have no adverse

4  information.

5  Q.   Okay.  And do you review any reports as part of

6  determining this vouching for him that you've put in your

7  affidavit?

8  A.   I have reviewed one report.

9  Q.   Okay.  Has that report been produced?

10 A.   No.

11 Q.   Okay.  Who's the author of that report?

12 A.   An FBI agent named Jessie -- I'm going to screw his

13 name up -- Tazmini (phonetic).

14         MR. KENDALL:  Your Honor, may we get a copy of

15 that report?

16         MS. BARCLAY:  It's not Special Agent Lemanski's

17 Jencks, Your Honor.

18         MR. KENDALL:  She just said she's reviewed it as

19 part of giving her testimony, so she's adopted it, Your

20 Honor.

21         MS. BARCLAY:  No, it's not a statement of Special

22 Agent Lemanski's.  And if that were true, we'd be producing

23 all discovery three days after the person was arrested, Your

24 Honor.

25         THE COURT:  Well, did you review this report in

1  connection with your preparation of this affidavit?

2            THE WITNESS:  Yes.

3            THE COURT:  Okay.  I think it should be turned

4  over.

5  BY MR. KENDALL:

6  Q.   This used car dealer, he's been an FBI informant for

7  about six, seven years; is that correct?

8            MS. BARCLAY:  Objection.

9            THE COURT:  Grounds?

10           MS. BARCLAY:  Basis of knowledge.

11           MR. KENDALL:  I hope she knows, Your Honor.

12           THE COURT:  Well, she works for the IRS.

13           MR. KENDALL:  Yes.  But the affidavit filed for

14  the probable cause for the arrest last week --

15           THE COURT:  Let's do this.  Ask the question.

16  Just ask the foundation question, the same thing as you

17  wanted on the direct.

18           MR. KENDALL:  All right.

19  BY MR. KENDALL:

20  Q.   Do you have any knowledge if he's been an informant for

21  the FBI?

22  A.   I don't know what his technical --

23       I know he has a relationship with the FBI.

24  Q.   Okay.  He has a relationship with the FBI.

25       For how many years do you know he's had a relationship

1  with the FBI?

2  A.   I know he had a prior relationship, and he has a more

3  recent one.

4  Q.   Okay.  How many years total?

5  A.   As I sit rear right now, I'm sorry, I don't know.

6  Q.   Did you read the affidavit that was filed last week to

7  give probable cause for the arrest?

8  A.   I did.

9  Q.   Special Agent Elio's affidavit from the FBI.

10 A.   Yes.

11 Q.   Do you remember that his affidavit filed with this

12 Court last week said he's been a source or informant for the

13 FBI for about eight years?

14 A.   I don't believe --

15      Not a total of eight years, no.

16 Q.   Okay.  How long do you believe he's been an informant

17 for the FBI?

18          THE COURT:  Mr. Kendall, I have the affidavit.

19          MR. KENDALL:  Fair enough, Your Honor.

20 Q.   How many cases has he assisted the FBI on?

21          MS. BARCLAY:  Objection.

22          THE COURT:  Grounds?

23 A.   I have no knowledge of that.

24 Q.   Do you know what type of cases?

25 A.   I know about -- I know of this case.

38

1  Q.   What about any other case?

2  A.   I have no knowledge of any other case.

3  Q.   Do you know if he's been an informant for any

4  corruption investigations going on on the North Shore?

5       MS. BARCLAY:  Objection, Your Honor.  First of

6  all, this information is not discoverable at this stage of

7  the investigation, and we'd object to it being produced

8  publicly.

9       THE COURT:  Why is it relevant?

10      MR. KENDALL:  There may be other people that

11  wanted to do this beating of this individual than my client,

12  Your Honor; and if we can raise some evidence that there

13  were other people that had a motive to assault him, I think

14  that goes directly to how you make your findings.

15      MS. BARCLAY:  If I could be heard, Your Honor?

16      THE COURT:  Yes.

17      MS. BARCLAY:  We have three people who all say

18  that this beating was arranged by Mr. DeCicco, and if he

19  wants --

20      If Mr. Kendall would like to ask Special Agent

21  Lemanski if she has information as to whether there's

22  someone else who would have wanted this beating, that's a

23  perfectly acceptable question.  But getting in to source

24  information at this stage of an investigation -- or this

25  stage of a proceeding is just not appropriate.

39

```
 1              THE COURT:  I think I agree.  I'll let you --
 2              I'll give you some latitude on motive.  Let's keep
 3  it focused.
 4  BY MR. KENDALL:
 5  Q.   Have you done any investigation to see if other people
 6  had a motive to assault the used car dealer?
 7  A.   I have not.
 8  Q.   Okay.  Has anybody, as part of your investigation,
 9  looked in to that issue?
10  A.   I believe that there were statements made to the Saugus
11  Police that there may have been someone that -- other people
12  that had -- a former employee that had an issue with the
13  victim.
14  Q.   Well, let's start with that former employee.
15       What the used car dealer told the Saugus Police was
16  that he thought one person who might be responsible for some
17  of the harassment of him was a former employee what had
18  worked for him for about five or six weeks; is that correct?
19  A.   Correct.
20  Q.   Okay.  This former employee was a salesman; correct?
21  A.   I believe so, yes.
22  Q.   And they had some type of business dispute?
23  A.   Yes.
24  Q.   Okay.  And he thought that this former --
25       This former employee also is of Arabic ancestry;
```

1 correct?

2 A.    Yes.

3 Q.    And he told the Saugus Police that this former employee

4 that he thought was a cause of the harassment was an

5 associate of the leader of Al-Qaeda; is that correct?

6 A.    That's what the police report says, yes.

7 Q.    Yeah.  So it wasn't just any member of Al-Qaeda; he

8 said that this salesman that he was having a beef with was

9 actually associated with the number one leader of Al-Qaeda,

10 Zawahiri, the Egyptian cleric.

11     Isn't that what he told the Saugus Police?

12        MS. BARCLAY:  Objection to what he told the Saugus

13 Police.  Exhibit 1 speaks for itself, Your Honor.  I believe

14 that's actually mischaracterizing it.

15        MR. KENDALL:  Your Honor, Exhibit 1, I believe

16 it's page 3, you'll see he told the Saugus Police that the

17 man he had a dispute with was a former roommate of the

18 nephew or close relative -- I won't pronounce it correctly

19 -- it's Zawahiri who is the number one leader of Al-Qaeda.

20        MS. BARCLAY:  Your Honor, he said that the person

21 claimed to have been a roommate, not that he was.

22        THE COURT:  All right.  I'm going to stop you

23 there, Mr. Kendall.

24        Do we have a grand jury return?

25     (Court recessed from 12:04:55 p.m. to 12:09:55 p.m.)

41

AFTER RECESS

1

2  BY MR. KENDALL:

3  Q.   Agent Lemanski, did anybody ever follow up on the

4  allegation that the used car dealer made about his salesman

5  having an association with the family of the leader of

6  Al-Qaeda?

7  A.   I'm not aware.

8  Q.   Okay.  Did you think it was a credible allegation?

9            MS. BARCLAY:  Objection.

10           THE COURT:  Sustained.

11 Q.   Well, you've testified earlier that you're not aware of

12 anything that would adversely affect his credibility.

13      Did you think his accusation that some used car

14 salesman was involved with the family of the number one

15 leader of Al-Qaeda, did you think that affected his

16 credibility?

17           MS. BARCLAY:  Objection to the characterization --

18           THE COURT:  Sustained.

19           MS. BARCLAY:  -- again.

20           THE COURT:  Let's move on.

21 Q.   The FBI got involved in this investigation about the

22 alleged extortion in September of 2014; is that correct?

23 It's in the Saugus Police report.

24 A.   I'm not sure.  That's --

25      That is in the Saugus Police report, but I'm not sure

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1  if that's accurate.

2  Q.   It would be fair to say the FBI got involved in

3  investigating Mr. DeCicco with the assistance of the used

4  car dealer prior to the January beating.

5  A.   Can you repeat that?  I'm sorry.

6  Q.   It was a bad question.  I'm sorry.

7       The beating that's at issue here occurred in January of

8  2015.  Is that --

9       January of 2015; correct?

10 A.   Correct.

11 Q.   Okay.  Prior to that the used car dealer was already

12 assisting the FBI in investigating Mr. DeCicco; correct?

13 A.   I'm not sure about your assisting him -- them

14 investigating.  I'm not sure.

15 Q.   In the Saugus Police report it states that prior to the

16 January 2015 beating, the used car dealer was reporting some

17 level of harassment; correct?

18 A.   Correct.

19 Q.   And that it was turned over to the FBI.

20 A.   Correct.

21 Q.   So the FBI started investigating whether Mr. DeCicco

22 was harassing the used car dealer by about September of

23 2014.  That's the date I'm talking out of the Saugus Police

24 report, Exhibit 1.

25            THE COURT:  Mr. Kendall, a couple of things.  I'm

43

1 going to read the evidence, and I'm going to give you a

2 chance to argue.  But asking a witness what a report says is

3 not a good use of my time.

4          MR. KENDALL:  No, no, Your Honor.  I'm trying to

5 lay a foundation.  I'll move on to the point.

6 Q.   The point I want to have is federal law enforcement has

7 been looking at possible harassment of Mr. DeCicco of the

8 used car dealer since September of 2014; correct?

9          MS. BARCLAY:  I would just object to "looking at,"

10 Your Honor.  This is a very --

11          The fact that it was reported to the FBI doesn't

12 --

13          And also the basis for Special Agent Lemanski's

14 knowledge.

15          MR. KENDALL:  She's read the report, Your Honor.

16 I'll move to the point I'm trying to make.

17 Q.   The point I'm having is from September 2014, the date

18 in the Saugus police report, up until the arrest of March

19 17, federal law enforcement took no action to try to protect

20 the used car dealer from Mr. DeCicco; correct?

21 A.   Took no action?

22 Q.   Yeah.  They live down the street from each other;

23 correct?

24          THE COURT:  Wait.  I want her to answer your

25 question.

1            MR. KENDALL:  Thank you.

2            THE COURT:  Remember?  You wanted to ask it.

3            To your knowledge, since the time that the FBI got

4  involved, has the FBI taken any steps to protect the person

5  identified as CW-1?

6            THE WITNESS:  I haven't -- I haven't had contact

7  -- I don't have any personal knowledge.

8            THE COURT:  Okay.

9  BY MR. KENDALL:

10 Q.   And we do know from September -- we knew --

11     The used car dealer and Mr. DeCicco live in the same

12 cul-de-sac in Nahant; correct?

13           MS. BARCLAY:  Objection to telling everyone where

14 the victim lives, Your Honor.

15           THE COURT:  Do you know where the victim lives?

16           THE WITNESS:  I do.

17           THE COURT:  Do they live near each other?

18           THE WITNESS:  They do.

19 BY MR. KENDALL:

20 Q.   Their houses are four houses apart; correct?

21           MS. BARCLAY:  Objection.

22           MR. KENDALL:  This goes -- is directly relevant,

23 Your Honor.

24           THE COURT:  Okay.  But this --

25 BY MR. KENDALL:

1  Q.   They're four houses apart; correct?

2           THE COURT:  They're close to each other.  Ask your

3  next question.

4  Q.   And from September 2014 until the unfortunate events in

5  January of 2015, the assault, they lived next to each other,

6  and there was no incidence; correct?

7       There's no incidents of violence between of two of them

8  prior to that assault that you're aware of; correct?

9  A.   No incidents of what?

10 Q.   Of violence between the used car dealer and Mr. DeCicco

11 prior to January 15, 2015; correct?

12 A.   Correct.

13 Q.   There's an allegation that Mr. DeCicco's involved with

14 the January 15 incident, but let's go from January 16 to

15 March 17.  That's 22 months; correct?

16 A.   If you say so.

17 Q.   Okay.  In those 22 months federal law enforcement took

18 no steps to try to protect the used car dealer from Mr.

19 DeCicco; correct?

20 A.   Mr. Kendall, it's our practice to basically inform the

21 victim if they feel there is immediate threat to call 911

22 and then notify federal law enforcement after that point.

23 That's a standard -- standard practice.

24 Q.   Other than to tell him to call 911, did you take any

25 other steps to protect him from Mr. DeCicco?

46

1  A.    I did not.

2  Q.    Did he ask you to take any --

3        Did he ask the federal law enforcement to take any

4  steps to protect him from Mr. DeCicco?

5  A.    I can only tell you that he didn't ask me.

6  Q.    Okay.  And he continued to live a very short distance

7  to Mr. DeCicco's house for 22 months; correct?

8  A.    Correct.

9  Q.    Without incident.

10 A.    Correct.

11 Q.    Okay.  Now let's go to the cooperating witnesses that

12 are assisting you in the investigation of the assault.

13       There's a person we call CW-2.  He claims he did the

14 assault.

15       And he's the hooded person; correct?

16 A.    Correct.

17 Q.    And he claims he went there to do it for a mobster from

18 Nahant was his description; correct?

19 A.    Correct.

20 Q.    What promise, rewards or inducements has the government

21 given CW-2?

22 A.    I'm not aware of any.

23 Q.    So he's just cooperating on his own without -- strike

24 that.

25       He's cooperating without any promise, rewards or

1  inducement from the government?

2  A.   None that I'm aware of.

3  Q.   Okay.  Have you made it your point to find out if any

4  were made?

5  A.   I have -- yes.

6  Q.   Have you discussed it with other members of the

7  investigative team?

8  A.   I have.

9  Q.   Okay.  And so is it your understanding that he expects

10 to get some sort of reward in the future?

11 A.   It is not my understanding, no.

12 Q.   So he's just going to testify and get no benefit from

13 it is your understanding.

14 A.   I don't know of any promises that have been made to

15 him.

16 Q.   I'm not asking about promises; I'm asking about

17 expectations.

18 A.   I don't know what his expectations are.

19 Q.   Okay.  He's presently incarcerated; correct?

20 A.   Correct.

21 Q.   How long is his sentence?

22 A.   I don't know.

23 Q.   Okay.  What is his sentence for?

24 A.   I believe he is currently in related to an unrelated

25 armed robbery.

48

1  Q.   And how did he come to federal law enforcement with

2  this information that he performed the beating?

3  A.   He didn't come to law enforcement; law enforcement went

4  to him.

5  Q.   Okay.  So he was identified, and who are the people

6  that approached him?

7         MS. BARCLAY:  Objection to the relevance, Your

8  Honor.

9         THE COURT:  Do you mean the agents who approached

10 him?

11        MR. KENDALL:  I'm just curious.  Was it the State

12 Police? the FBI?

13        THE COURT:  What agency approached him?  You can

14 answer that question, if you know.

15 A.   At least FBI.  I'm not sure.

16 Q.   And is Agent Elio part of the group that approached

17 him?

18 A.   I'm not sure.

19 Q.   Okay.  Did they approach him with the specific purpose

20 of asking him if he had been hired by Mr. DeCicco to do the

21 beating?

22        MS. BARCLAY:  Objection to her basis for

23 knowledge.

24        THE COURT:  Sustained.

25 Q.   Okay.  Do you know anything that was said to this CW-2

49

1  before he claimed he did it for a Nahant person?

2  A.    I wasn't present during --

3  Q.    Okay.  My question was do you know anything that was

4  said to him, not whether you were present.

5  A.    Not from memory, no.

6  Q.    Okay.  Did you review something on this topic before

7  you took the stand today?

8  A.    I've reviewed a report.  I just can't recall when.

9  Q.    Reviewed an FBI 302 of the contact with CW-2?

10 A.    I believe so, yes.

11 Q.    And that forms part of the basis for your writing your

12 entries in the affidavit that was filed today?

13 A.    It was part of the investigation.

14        MR. KENDALL:  Your Honor, we'd move for production

15 of that 302, as well.

16        MS. BARCLAY:  Your Honor, same objection.  If

17 we're going to give Mr. Kendall every piece of the

18 investigation that Special Agent Lemanski relied on for her

19 affidavit, he'd essentially have discovery today.

20        That's not a statement of Ms. Lemanski's.  She's

21 actually not --

22        You know, she --

23        As said in her affidavit, that she's not aware of

24 any information that would negatively --

25        Actually, I think with respect to CW-2 it's laid

1 out in your affidavit exactly what his charges are.

2          MR. KENDALL:  Your Honor, I'm allowed to test the

3 credibility, and I'm certainly entitled under the Jencks

4 Acts for anything that she's adopted.

5          MS. BARCLAY:  The Jencks Act --

6          MR. KENDALL:  And she's --

7          THE COURT:  I can only hear one of you at a time.

8          Go ahead.

9          MR. KENDALL:  I'm certainly entitled under the

10 Jencks Act to anything she's adopted as part of her

11 testimony.

12          THE COURT:  Well, is she entitled to --

13          Are you entitled to production of things that she

14 reviewed in anticipation of her testimony?

15          MR. KENDALL:  In preparation of her testimony and

16 affidavit I believe so, Your Honor.

17          MS. BARCLAY:  Your Honor it's statements that

18 she's --

19          Her statements or statements she's adopted, and

20 she hasn't adopted the statement of --

21          THE COURT:  I'm asking a slightly different

22 question now.  If she reviews something in anticipation of

23 testifying, is the government required to produce that as

24 3500 material?

25          MS. BARCLAY:  It is not my understanding that

1  that's required under the Jencks Act, Your Honor.

2          I also don't think it's clear that Ms. Lemanski

3  reviewed that in preparation for her testimony as opposed to

4  just as part of the general investigation in to this matter.

5          MR. KENDALL:  Your Honor, if I may be heard?  She

6  testified she relied on it from other paragraphs in the

7  affidavit that she filed today.  She's clearly adopted the

8  contents of what she read, because she relied on it,

9  incorporated it into her affidavit.

10         THE COURT:  That was my understanding.

11         Did you review 302 in preparation for your

12  affidavit, Exhibit 3?

13         THE WITNESS:  I reviewed it but not necessarily in

14  preparation for my affidavit.  As part of my investigation

15  -- joint investigation with the FBI, I am provided with

16  their 302s of contacts with witnesses that I'm not present

17  to.

18         THE COURT:  Did you review that 302 in connection

19  with your testimony today?

20         THE WITNESS:  I -- I reviewed it again, yes.

21         THE COURT:  And in anticipation of testifying?

22         THE WITNESS:  And when I was preparing the

23  affidavit.

24         THE COURT:  Okay.

25         THE WITNESS:  To make sure that my statements were

52

1  --

2          THE COURT:  I don't know.  I think that falls in

3  to what needs to be produced.

4          MS. BARCLAY:  Your Honor, again, I think that's an

5  expansive view of the Jencks Act at this stage of the

6  proceedings.  I mean, she, umm --

7          MR. KENDALL:  Your Honor --

8          MS. BARCLAY:  You know, she has not adopted the

9  statement --

10          THE COURT:  One person at a time.

11          MR. KENDALL:  Excuse me.

12          THE COURT:  Don't talk over anybody.

13          MR. KENDALL:  I apologize, Your Honor.

14          THE COURT:  Go ahead.

15          MS. BARCLAY:  Again, Your Honor, at this point in

16  the game, this is not a statement that Ms. Lemanski made or

17  adopted, and I don't --

18          I guess I'm just relying on the statement, does

19  that necessarily turn it into Jencks material.

20          THE COURT:  Right.

21          MS. BARCLAY:  Is the -- the question I don't -- I

22  -- I --

23          THE COURT:  I don't remember.

24          MS. BARCLAY:  I think the answer is --

25          MR. KENDALL:  Your Honor, I have a copy of the

1 Jencks Act, if you'd like me to give it to you.  Just that

2 it's readily available.

3          MS. BARCLAY:  I'm looking at 3500(b) --

4          MR. KENDALL:  If I may call people's attention to

5 (e)(1), Your Honor.

6          THE COURT:  Okay.  Give me a second.

7          You think it's under (e)(1), a written statement

8 made by said witness and signed or otherwise adopted or

9 approved by him?

10          MR. KENDALL:  Excuse me.  Actually, umm, umm --

11          THE COURT:  Did you say (e)(1)?  Maybe I

12 misunderstand you.

13          MR. KENDALL:  No.  Excuse me.  That was a mistake,

14 Your Honor.

15          THE COURT:  Okay.  Mr. Kendall, it's your motion.

16 Where am I on this?

17          MR. KENDALL:  Your Honor, the way I would read it

18 is they have read something, and they're adopting it as

19 their own statement.  Even if it was originally authored by

20 another person, once they adopted it, once the witness

21 adopts it as their statement, then I think it comes within

22 Jencks.

23          THE COURT:  Yeah, I don't think that that's a

24 radical reading of the rule at all.  I think that's what it

25 is.  In other words, a police officer writes out a

1 statement, the witness reads it and says, "That's what

2 happened," and signs it; that's the witness's statement.

3          MR. KENDALL:  And if somebody writes out a report

4 and the officer says, "I'm going to testify to this topic, I

5 believe this is what is truthful, and I'm presenting this as

6 valid and accurate testimony to the Court," whether they

7 have personal knowledge or not, they still adopted it.  If

8 they're adopting it based upon their confidence in hearsay,

9 they're still adopting it as their own statement.

10          THE COURT:  Yeah, I don't know that that's --

11          I'm going to need the case law to tell me that.

12          MR. KENDALL:  Okay.  We can do some research and

13 get it to you, Your Honor.

14          THE COURT:  All right.  Let's move on to the next

15 topic.

16 BY MR. KENDALL:

17 Q.   With respect to CW-2, his testimony -- his testimony --

18 your understanding is his version of events is the beating

19 was done for only one purpose, and that's because of some

20 type of insult or improper treatment of a woman; correct?

21 A.   That's what he was told, yes.

22 Q.   And he's had no contact with Mr. DeCicco at all;

23 correct?

24 A.   Correct.

25 Q.   Didn't even know his name?

1  A.   Correct.

2  Q.   CW-3, which is the next person in the chain, also is

3  cooperating with the government.

4       Is he incarcerated?

5  A.   No.

6  Q.   Has any promise, rewards, or inducements been made to

7  him?

8  A.   Not that I'm aware of.

9  Q.   Okay.  And have you checked to see if any were?

10 A.   I've asked.

11 Q.   And you were told that none had been made to him?

12 A.   Correct.

13 Q.   Okay.  And who did the interview of CW-3?

14      Was it you, or was it somebody else?

15 A.   The initial interview was someone else.

16 Q.   And did you participate in a subsequent interview?

17 A.   I was present during a subsequent interview.

18 Q.   And for the subsequent interview was a report written?

19 A.   I believe so.

20 Q.   Have you reviewed that report as part of preparing your

21 affidavit?

22 A.   I have not.

23 Q.   Okay.  Did you review that report at all?

24 A.   I don't believe so.

25 Q.   But is that report a memorialization of an interview

1  that you attended?

2  A.   I was in attendance at that second meeting.

3  Q.   And for the summary of what was said by CW-3, what is

4  your basis for that?

5  A.   Conversations that I had with the investigative team.

6  Q.   And who on the investigative team gave you this

7  information?

8  A.   Special Agent Elio.

9  Q.   And was he present with you at the subsequent

10 interview?

11        MS. BARCLAY:  I object to the relevance of this

12 line of questioning, Your Honor.

13        THE COURT:  Where are we going with it?

14 BY MR. KENDALL:

15 Q.   Okay.  CW-3, he says the same thing as CW-2, that the

16 beating was done over some type of insult to a woman;

17 correct?

18 A.   That's what he was told.

19 Q.   Neither one mentions a car dealership at all; correct?

20 A.   I can't say he didn't mention a car dealership.

21 Q.   Excuse me.

22      A car dealership as the motive for the beating;

23 correct?

24 A.   Correct.

25 Q.   Okay.  Now lets go to CW-4.

57

1    CW-4, in your affidavit you said he made some

2 statements on March 17; correct?

3 A.    Correct.

4 Q.    Okay.  That was the day Mr. DeCicco was arrested.

5 A.    Correct.

6 Q.    Last Friday.

7 A.    Correct.

8 Q.    Prior to March 17 how many contacts with CW-4 did law

9 enforcement have on this issue?

10 A.    I'm not aware of any.

11 Q.    Well, aren't you aware that your investigative team

12 sent CW-3 to him with a recording device and tried to record

13 a conversation?

14 A.    Yes.

15 Q.    Okay.  And in that tape recording CW -- did CW-4 admit

16 that he was involved in the beating?

17 A.    He didn't deny it.

18 Q.    Did he admit it?

19 A.    Silence.  He didn't object when the CW-3 discussed the

20 beating, didn't act like he didn't know what he was talking

21 about, did not say, "What are you talking about?  I don't

22 know what you're talking about."

23 Q.    And have you reviewed the transcript for that

24 recording?

25 A.    I have.

1  Q.   Okay.  And after that interaction when the recording

2  was made, was there any further contact with CW-4 prior to

3  March 17?

4  A.   Not that I'm aware.

5  Q.   Has any promise, rewards, or inducements been made to

6  CW-4?

7  A.   Not that I'm aware of.

8  Q.   CW-4 -- did you participate --

9       If I asked you this and I forgot, I apologize.

10      Did you participate in the March 17 interview of CW-4?

11  A.   I did not.

12  Q.   Okay.  And you agree with me CW-4 said that his

13  understanding of the purpose for the assault was some insult

14  to a woman.

15  A.   Correct.

16  Q.   Okay.  He did not say a car dealership had any role at

17  all in the assault -- any role as a motive for the assault?

18  A.   Correct.

19  Q.   So you agree with me that the only jurisdiction -- the

20  only element you have to make this a federal crime is the

21  allegation that the motive involved a car dealership.

22            MS. BARCLAY:  Objection.

23            THE COURT:  Sustained.

24  Q.   Would you agree -- you're testifying --

25       As part of your testimony here you're giving probable

1 cause that there are a federal offense that was committed

2 with this assault; correct?

3 A.   Correct.

4 Q.   And your basis for saying it's a federal offense and

5 not a state offense is the claim that the object of the

6 assault was extortion over the car dealership; correct?

7          MS. BARCLAY:  Objection.

8          MR. KENDALL:  May I be heard, Your Honor?

9          THE COURT:  All right.

10          MR. KENDALL:  It goes directly to the strength of

11 their case, Your Honor.

12          THE COURT:  You're certainly permitted to argue

13 it.

14          MR. KENDALL:  I just want to make sure the agent

15 agrees with the fact basis.

16          THE COURT:  Even if the agent doesn't agree, I

17 have to make the decisions here.

18 BY MR. KENDALL:

19 Q.   Would you agree, Agent Lemanski, that the only person

20 who claims that the motive for the assault was a dispute

21 over ownership of the dealership is the used car dealer

22 himself?

23 A.   The only individual that claimed?  I think that the

24 card that was sent with the flowers indicates that, as well.

25 Q.   I'm asking you the only witness, the only human being,

1  that claims that the motive for the assault was a dispute

2  over ownership of a car dealership is the used car dealer

3  himself; correct?

4  A.   He said that was the motive for the threats back in

5  December of 2014 before the assault.

6  Q.   Okay.  But --

7  A.   He's continued to say that.

8  Q.   He's the only witness to say that.

9  A.   He's the one who was receiving the threats.

10  Q.   And the threats you talk about, he's never actually

11  discussed them with Mr. DeCicco; correct?

12  A.   Not that I'm aware of.

13  Q.   So what you really are saying is the only witness is

14  the used car dealer who infers that's the motive for the

15  assault; correct?

16  A.   That's what he believes.

17  Q.   And do you agree with me that long before March 17,

18  2017, Mr. DeCicco knew that the used car dealer was

19  assisting federal authorities in investigating Mr. DeCicco?

20        MS. BARCLAY:  Objection.

21        THE COURT:  Can I just have the question again?

22  Long before March 17th of 2017, the arrest, Mr. DeCicco knew

23  CW-1 was cooperating?

24        MR. KENDALL:  I'll rephrase it.

25        THE COURT:  All right.

61

1  BY MR. KENDALL:

2  Q.   You interviewed the used car dealer on January 17,

3  2017; correct?

4  A.   Correct.

5  Q.   And yet you wrote up a memorandum of interview;

6  correct?

7  A.   Correct.

8  Q.   And during that interview the used car dealer told you

9  that he had a conversation with people in the Saugus area

10 about Mr. DeCicco; correct?

11 A.   In the Saugus area?

12 Q.   Yeah.  Paragraph 25 in your report --

13        MS. BARCLAY:  I'm sorry.  Just, what's the date of

14 the report.

15        MR. KENDALL:  It is her January 17, 2017, report

16 at 105.  Paragraph 25.

17 Q.   The used car dealer is friendly with a guy named

18 Charlie Lightbody; correct?

19 A.   He knows Charlie Lightbody, yeah.

20 Q.   He has conversations with him?

21 A.   Yes.

22 Q.   He chats with him.

23 A.   I don't know the extent of their relationship.

24 Q.   Okay.  And well, the used car dealer told you about a

25 conversation he had with Charlie Lightbody about Gary

1 DeCicco; correct?

2 A.   I'm not sure what you're referring to.  If you want to

3 show me the excerpt from my report, I'd be glad to review

4 it.

5 Q.   Okay.  I'd like to see what your memory is before I

6 show you the report.

7 A.   Okay.

8 Q.   Didn't the used car dealer tell you on January 17 that

9 he had a conversation with Charlie Lightbody where he

10 accused Gary DeCicco of being involved in the assault?

11 A.   Yes.

12 Q.   Okay.  And Charlie Lightbody told him that Gary DeCicco

13 knows you're an informant against him with federal

14 authorities.

15 A.   I don't think that's -- that he said he knows.

16 Q.   Well, what is your memory of what he told that

17 Lightbody said about DeCicco knowing that the car dealer was

18 assisting federal law enforcement against DeCicco?

19 A.   I believe he said something to the effect that Mr.

20 DeCicco believes the reason the IRS is looking at him is

21 because of the victim.

22 Q.   Is because the victim is assisting the IRS, giving

23 information to the IRS.

24 A.   I'm not sure that's what that states.

25 Q.   Well, what would it mean "because of the victim," other

63

1 than the victim is somehow giving information to federal law

2 enforcement?

3          MS. BARCLAY:  Your Honor, the report --

4          It's being misrepresented what was said during

5 this conversation.  I think it's unclear.

6          MR. KENDALL:  Your Honor, I'm asking for her

7 testimony, Your Honor.  That's all.

8          THE COURT:  Well, I think you testified that

9 Lightbody said to CW-1 DeCicco thinks the IRS is looking at

10 him because of -- looking at DeCicco because of CW-1.  Is

11 that your --

12          THE WITNESS:  That's --

13          THE COURT:  -- recollection?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.

16 BY MR. KENDALL:

17 Q.   Do you know what he meant when he said because of the

18 used car dealer?

19          THE COURT:  Do you know what who meant?

20 Q.   Do you know what the used car dealer meant when he said

21 that they were looking at him because of the used car

22 dealer?

23          THE COURT:  He didn't say that.  Lightbody said to

24 --

25          MR. KENDALL:  Right.

64

1          THE COURT:  -- CW, this is what DeCicco thinks.

2          MR. KENDALL:  Right.  And then the used car dealer

3 related to her.

4 BY MR. KENDALL:

5 Q.   And so did the used car dealer expand on or discuss

6 what he understood to be the meaning of that statement?

7 A.   No.

8 Q.   With respect to the used car dealer, has he ever been

9 paid by the FBI for his work with them?

10 A.   Not that I'm aware of, no.

11 Q.   And have you made inquiries?

12 A.   I believe, yes.

13 Q.   Has he received any type of benefit from the federal

14 government for assisting the FBI?

15 A.   Not that I'm aware of.

16 Q.   Has he had any help with legal problems?

17 A.   Not that I'm aware of.

18 Q.   Now, as part of this investigation, did you look to see

19 if he had enemies out there that would have been motivated

20 to do this assault other than Mr. DeCicco?

21 A.   Did I?

22 Q.   Did the federal investigation.

23 A.   Not that I'm aware of.

24 Q.   Okay.  So there was no effort to find if there were

25 former employees who had reasons to be upset with him?

1          THE COURT:  Didn't we go through this?

2          MR. KENDALL:  I'm going beyond that, Your Honor.

3          THE COURT:  Didn't you testify that he said a

4   former employee may have -- disgruntled employee may have

5   done it?

6          THE WITNESS:  That was a statement he had made to

7   the Saugus Police Department, but I have not been privy to

8   any of those conversations.

9          THE COURT:  Oh, okay.  Sorry.

10  Q.   Did you look to see if there were any other former

11  employees that had disputes with him?

12  A.   I have not.

13  Q.   Anybody from the federal investigation?

14  A.   I'm not aware of any.

15  Q.   Anybody from the federal investigation to see if he had

16  any business disputes, owed people money or similar such

17  situations?

18  A.   I have no knowledge.

19  Q.   When you arrested Mr. DeCicco, fair to say there was no

20  problems; no resistance or violence?

21  A.   I didn't arrest him.

22  Q.   Did you participate in the arrest?

23  A.   I didn't participate in the arrest.

24  Q.   Okay.  For the arrest team you're not aware of there

25  being any incident, no trouble with the arrest; correct?

1 A.    I'm not aware of any.

2 Q.    And there was no weapons were found; correct?

3 A.    Not that I'm aware of.

4 Q.    How did the federal law enforcement find CW-3?

5       Did you seek him out, or did he seek you out?

6 A.    We sought him out.

7 Q.    Was that after you had the contact with CW-2?

8 A.    Yes.

9 Q.    You said in your testimony on direct that with respect

10 to the dealership issue, that the used car dealer said to

11 two associates that he did not want Mr. DeCicco involved.

12      Who were the two associates?

13 A.    The --

14      MS. BARCLAY:  Uh -- oh, go ahead.  Sorry.

15 A.    The architect and Peter Burro (phonetic).

16 Q.    I want to go now to the topic of the short sale.  What

17 your --

18      I think the sum of your testimony is that you think Mr.

19 DeCicco conducted some type of fraud on this bank that gave

20 a mortgage, and it was sort of consummated in 2016; is that

21 correct?

22 A.    Yes.

23 Q.    Okay.  Now, let's actually take a look at that for a

24 minute.

25      There was a short sale affidavit that was actually

67

1  executed; correct?

2  A.   There were two.

3  Q.   There were two, but only one was submitted to the bank

4  to actually effect the sale; correct?

5  A.   No.

6  Q.   There was one that was executed in November, but that

7  wasn't the basis of the sale.

8       It was the December one; correct?

9  A.   The November one was submitted to the bank, as well.

10  Q.   But the bank didn't rely on that.  They had a new one

11  submitted in December.

12  A.   I'm not sure what the bank relied on.  They were in

13  possession of both, the November one and the December one.

14  Q.   Okay.  And I take it you looked at the short sale

15  affidavit.

16  A.   I have.

17       MR. KENDALL:  Your Honor, I'd like to mark that as

18  our next exhibit.

19       MS. BARCLAY:  Which date?  Which one?

20       MR. KENDALL:  The December one.

21  Q.   Agent Lemanski, if you could take a look at Exhibit 4,

22  what's been marked as Defendant's Exhibit 4, and tell us if

23  that's a short sale affidavit that was the second of the two

24  that were executed.

25  A.   Yes.

1  Q.   And let's get a little background on this.

2       You interviewed the first attorney that was involved in

3  this transaction that didn't conclude it; correct?

4  A.   Yes.

5  Q.   You interviewed the broker?

6  A.   Yes.

7  Q.   Did you interview a second attorney, as well?

8  A.   Yes.

9  Q.   Okay.  Now, with respect to the first attorney and the

10 broker, did they both tell you that they had a conversation

11 about the contents of this short sale affidavit and how it

12 applied to Mr. DeCicco?

13 A.   I'm not sure I understand your question.

14 Q.   Okay.  Well, let's take a look at paragraph A on the

15 first page.

16          THE COURT:  Are you offering this?

17          MR. KENDALL:  Oh, yes, Your Honor.  I'd like to

18 offer it into evidence.

19          THE COURT:  Any objection?  Ms. Barclay, any

20 objection?

21          MS. BARCLAY:  No objection.  I'm sorry, Your

22 Honor.

23          THE COURT:  Okay.  It's admitted.  What paragraph

24 are you looking at?

25       DEFENDANT EXHIBIT NO. 4, MARKED & ADMITTED

1          THE COURT:  So what paragraph are you looking at?

2          MR. KENDALL:  Paragraph A of the first page.

3          THE COURT:  Paragraph what?

4          MR. KENDALL:  Paragraph A, the first two lines of

5 paragraph A.

6 BY MR. KENDALL:

7 Q.   It says, "Unless state law permits otherwise, the sale

8 of the property is an arm's length transaction between

9 sellers and buyers who are unrelated and unaffiliated by

10 family, marriage or commercial enterprise."

11      You see that, don't you?

12 A.   Yes.

13 Q.   And you see it says "who are unrelated."

14      Are is present tense; correct?

15 A.   "Who are unrelated."  I'm not sure what you're asking.

16 Q.   The verb "are" refers to the present, not the past.  It

17 doesn't say they were related; it says they are related.

18 A.   That's what it says.

19 Q.   And "are," you understand, is a present tense verb.

20 A.   Yes.

21 Q.   Okay.  And it says they are unrelated and unaffiliated

22 by family.

23      You agree --

24      With marriage or commercial enterprise.

25      You agree with me Mr. DeCicco was never married to

1  Girlfriend No. 2; correct?

2  A.   That's my understanding, yes.

3  Q.   And they weren't part of the same family.  They're not

4  cousins or relatives or anything else.  There's no legal

5  family connection between the two of them.

6  A.   He's the father of their daughter.

7  Q.   Yes.  But does that put --

8       Is there any legal family relationship that you're

9  aware of between him and Girlfriend 2?

10          THE COURT:  All right.  I'm not going to entertain

11  an argument between you all about what family is.  If you

12  want to make your argument when we get to the end of the

13  case, I'll give you that chance.  Just ask questions that

14  the witness can answer.

15  Q.   Other than having a child --

16       Well, they have a child, but putting that aside they're

17  not in the same family.  They're not cousins.  They're not

18  sisters.

19       They're not any type of family relation as those terms

20  are used; correct?

21          MS. BARCLAY:  Your Honor, I guess I would just

22  object to the generality here.

23          MR. KENDALL:  I'll withdraw the question, and I'll

24  ask a different one.

25  Q.   The broker told you that they discussed this term with

1 Mr. DeCicco; correct?

2 A.   They discussed what term?

3 Q.   This specific part of the short sale affidavit, whether

4 or not they're related by family, marriage or commercial

5 enterprise.

6 A.   The broker discussed it with Mr. DeCicco.

7 Q.   Well, there was a series of discussions.  Didn't the

8 broker say he discussed it with the first attorney, and he

9 also discussed it with Mr. DeCicco?

10 A.   The first Attorney 1?

11 Q.   Yeah.

12 A.   Yes.

13 Q.   And didn't the broker tell you that the broker,

14 Attorney 1, and Mr. DeCicco all agreed that they satisfied

15 the provisions of family and marriage in this affidavit,

16 that they weren't related by family or marriage?

17 A.   My understanding is they thought it was a gray area.

18 Q.   Let's go back a little bit.  I'll come back to this in

19 a minute.

20     The broker told you that the property had been listed

21 for about nine months; correct?

22 A.   Since December of 2015, I believe.

23 Q.   December 3, 2015, to August 2016.

24     Does that sound familiar to you?

25 A.   I think it came off in June and then went back on.

72

1  Q.   Right.  So it was listed for about nine months, and

2  they did not receive any offers other than Mr. DeCicco's;

3  correct?

4  A.   That's what the broker said, yes.

5  Q.   And the property was pretty run down, wasn't it?

6  A.   I don't know the status of the property.

7  Q.   Didn't you get some appraisals for the property?

8  A.   Did I get appraisals for the property?

9  Q.   Did the federal investigative team get appraisals for

10 the property?

11 A.   I haven't requested appraisals for the property.

12 Q.   Don't you remember getting an email from Ms. Barclay

13 telling you about some of the comps, which are comparables,

14 appraisals for the property?

15 A.   I don't recall that email.

16        MR. KENDALL:  If I could just approach the

17 witness, Your Honor?

18 Q.   Page No. 58.  Let's see if this refreshes your

19 recollection.  If you look to the section that I highlighted

20 in yellow?

21        MS. BARCLAY:  Your Honor, if she could be allowed

22 to read the whole email for context.

23        MR. KENDALL:  She may.  I'm just --

24        THE COURT:  The question is going to be does this

25 refresh your recollection that you had an email from Ms.

1  Barclay that made some mention of comparable properties for

2  what was being listed.

3          THE WITNESS:  I recall that.

4  BY MR. KENDALL:

5  Q.   Okay.  And did you look at the --

6          THE COURT:  Sorry.

7          It does refresh your recollection?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Go ahead.  Ask your next

10 question.

11 BY MR. KENDALL:

12 Q.   Are you aware of the investigative team getting some

13 type of appraisal or comparables for the property?

14 A.   No.

15 Q.   It's fair to say you got an email saying two had been

16 received?

17         MS. BARCLAY:  I think -- Your Honor, if I could

18 attempt to --

19         Could we ask the question a different way as

20 opposed to did -- did law enforcement request the appraisal

21 or did they receive it in the course of the investigation?

22 I think that's perhaps a sticking point.

23 Q.   Did law enforcement receive any comparable appraisals

24 as part of the investigation?

25 A.   Yes.

74

1  Q.   Okay.  Do you remember what was the value that the

2  appraisals put on the property?  Ball park number.

3  A.   I don't recall.

4  Q.   Did you, at one point, read those appraisals?

5  A.   I believe I reviewed them.

6  Q.   Okay.  But you don't remember the numbers?

7  A.   No.

8  Q.   Do you remember that it was substantially below a

9  million dollars?

10  A.   I don't recall.

11  Q.   Well, anyways, the property was on the market for nine

12  months, and nobody made an offer other than Mr. DeCicco;

13  correct?

14  A.   That's my understanding, yes.

15  Q.   And the bank's alternative --

16       As part of your investigation, you spoke with one of

17  the senior lawyers at the bank; correct?

18  A.   Correct.

19  Q.   Okay.  You interviewed him yourself?

20  A.   Yes.

21  Q.   And he told you that the alternative for the bank was

22  either to accept Mr. DeCicco's offer or put it in

23  foreclosure.

24  A.   Correct.

25  Q.   And by accepting Mr. DeCicco's offer, the bank made

1   more money than it would have received if it had put the

2   property in to foreclosure.

3   A.   He believed that would be the case.

4   Q.   Yes.  So the victim's view is they made more money from

5   the short sale than they would have made from the

6   foreclosure, their only other alternative; correct?

7   A.   The victim's statement is they would never have agreed

8   to that.

9   Q.   If you could answer my question, please.

10      The victim, the senior lawyer for the bank, told you

11   that they made more money from Mr. DeCicco's offer than they

12   would have made if they put it in to foreclosure; correct?

13   A.   They didn't make any money.  They lost money.

14   Q.   They received money back.

15      They received purchase proceeds; correct?

16   A.   Yes.

17   Q.   And it was financially a better deal in terms of the

18   amount of money they received to sell to Mr. DeCicco than to

19   sell it through foreclosure; correct?

20   A.   That's what he believed would be the case, but he has

21   nothing to compare that to.

22   Q.   He didn't say he has nothing to compare it to.

23   A.   Well, that's what he saying, yes.

24   Q.   He told you they got more money by selling to Mr.

25   DeCicco than by selling in foreclosure without any

1 qualification; correct?

2 A.   He said he believed that the sale -- that the reason

3 why they agreed to that sale, not knowing that they were

4 related, is because the potential was that they would make

5 more money -- they would receive more money from a short

6 sale from an unrelated party than if they had to proceed

7 with foreclosure and pay expenses related to foreclosure.

8           THE COURT:  Mr. Kendall, hang on.

9           Mr. Kendall, how much more do you have to go?

10          MR. KENDALL:  I'll want to continue after the

11 break, Your Honor.  I don't know exactly how much, but I've

12 got a bit more to do.

13          THE COURT:  I understand that.  I need to know.

14          MR. KENDALL:  I think, just guessing, 45 to 75

15 minutes.

16          THE COURT:  All right.  I'm going to be give you

17 30.

18          Has your client been interviewed by Pretrial

19 Services?

20          MR. KENDALL:  My client was interviewed Friday.  I

21 was out of the country.

22          THE COURT:  Okay.

23          MR. KENDALL:  Ms. Gliga attended.  We wanted to

24 supplement some of the information with pre-trial and Ms.

25 Duscal (phonetic) wasn't able to interview him subsequently,

1 but what we would --

2          THE COURT:  I don't have a Pretrial Services --

3          Do I have a Pretrial Services report?

4          THE PROBATION OFFICER:  (Inaudible).

5          THE COURT:  Oh, right.  Thank you.

6          MR. KENDALL:  And we do have a proposal for

7 conditions of release, Your Honor, at some point

8 (inaudible).

9          THE COURT:  Okay.  All right.  I have to sign a

10 warrant at one.  We'll resume at 1:30.

11          I'm going to give you 30 minutes to get through

12 whatever cross you have, and then we'll hear the parties on

13 probable cause and on detention.

14          We're recessed until 1:30.

15          THE CLERK:  All rise.

16      (Court recessed from 12:59:12 p.m. to 1:37:38 p.m.)

17                          AFTER RECESS

18          THE CLERK:  We're back on the record in the matter

19 of the United States vs. Gary P. DeCicco, 17-4063.

20          THE COURT:  I don't want to inconvenience anyone,

21 but if we could have counsel here, it would be really

22 helpful.

23          MS. GLIGA:  Yes.  I'll just step out for a second.

24          MR. KENDALL:  I apologize, Your Honor.

25          THE COURT:  Go ahead.

1 BY MR. KENDALL:

2 Q.   Agent Lemanski, I think you testified before that your

3 understanding that the relationship between the second

4 girlfriend and Mr. DeCicco ended by May 2016.

5      Did I catch that right?

6 A.   My understanding is that's the last time they were

7 observed together at the 2 Nectar Place.

8 Q.   In fact, you interviewed the car dealer about this

9 topic in your January 17 interview of this year; correct?

10 A.   About what topic?

11 Q.   About his relationship with Girlfriend 2.

12 A.   I don't recall that specific.

13 Q.   Let me see if I can refresh your recollection.

14      Do you remember the car dealer told you on January 17,

15 2017, that he used to see Girlfriend 2 walking every morning

16 the dog in the neighborhood where they both live where their

17 houses were close together, but he said over a year ago he

18 stopped seeing her walking the dog?

19      Do you remember he told you that?

20 A.   I don't recall his response.  I recall --

21 Q.   Do you want me to --

22      Would it refresh your recollection to look at the

23 report?

24 A.   It would.  Thank you.

25 Q.   And the point I'm trying to make here is the evidence

1 you've received indicates that the relationship appears to

2 have ended prior to the execution of that affidavit.

3          MS. BARCLAY:  Your Honor, I would object just to

4 the fact that it's not probable cause to believe that there

5 was a wire fraud committed.  Now we're on detention, and

6 this is sort of far afield.

7          MR. KENDALL:  Your Honor, they're accusing him of

8 a fraud based upon an affidavit, and there's evidence to

9 indicate it wasn't fraudulent.  If they think it's relevant

10 to prove a fraud, I think it's relevant to prove it wasn't

11 fraud.  That's all.

12          THE COURT:  Why isn't detention relevant?

13          MS. BARCLAY:  Your Honor, the evidence -- the fact

14 that he's lied to the mortgage company on release is just

15 one sort of factor to be considered in the detention

16 picture.

17          But I guess I would ask the Court to limit this a

18 little bit, because this is not a probable cause hearing on

19 the mortgage fraud, on the wire fraud; this is a probable

20 cause hearing on the extortion and then a detention hearing.

21          MR. KENDALL:  We're disputing --

22          THE COURT:  Okay.  I'm going to allow the

23 question, but just remind me what the question is.

24          MR. KENDALL:  I'm referring to an interview she

25 conducted of the car dealer on January 17, 2017.

80

1           THE COURT:  Right.

2 BY MR. KENDALL:

3 Q.   The car dealer, I think you've agreed, told you that he

4 saw Girlfriend 2 who's part of the short sale event, he used

5 to see on a regular practice walking her dog in the morning.

6 A.   Yes.

7 Q.   In their shared neighborhood; correct?

8 A.   Correct.

9 Q.   And he also told you that he stopped seeing her over a

10 year ago; is that correct?  Do you remember that?

11 A.   I don't remember his exact.

12 Q.   Okay.  I'd ask you if you could look at a copy of the

13 January 17, 2017, memo you wrote on the interview and ask

14 you if this refreshes your recollection looking at paragraph

15 29.

16 A.   Yes.

17 Q.   Does that refresh your recollection now that he told

18 you he used to see her walking the dog regularly in the

19 neighborhood, but he hadn't seen her for over a year?

20 A.   He hadn't put physical eyes on her, yes.

21 Q.   He said he --

22      Well, the way he phrased it --

23      Well, the way you phrased it in your report was he

24 hadn't seen her in over a year; is that correct?

25 A.   My -- when -- the discussion he had with us relative to

1  that is that he hadn't seen her.  Him, himself, did not

2  acknowledge that she was not living there anymore.

3  Q.   Right.  He told you he used to see her on an almost

4  daily basis walking the dog, but that had not occurred for

5  over a year; correct?

6  A.   Correct.  Just like most neighbors at this time of the

7  year that you don't see them regularly.

8  Q.   If you could just answer my question, please.

9       That's what he told you; correct?

10 A.   He said he hadn't seen her in the neighborhood.

11 Q.   For over a year; correct?

12 A.   Correct.

13 Q.   And prior to that he'd seen her on almost a daily basis

14 walking the dog?

15          MS. BARCLAY:  Objection.

16          THE COURT:  What's the objection?

17          MS. BARCLAY:  He's misrepresenting what the report

18 says.  He's taken it away, and now he's misrepresenting it.

19          MR. KENDALL:  I just want her memory of what she

20 was told by the -- in the interview.

21          THE COURT:  Let's do this.  Just tell me what you

22 remember him telling you in the interview about her walking

23 a dog.

24          THE WITNESS:  I was asking the question in

25 relation to her schedule, and he said that this is the time

1  of day that I used to her, but I haven't seen her at that

2  time of the day in a long time.  And it was not in a

3  conversation.  He did not preempt that of saying that

4  they're no longer together.  He had no knowledge that they

5  were no longer together.

6          THE COURT:  So he hadn't seen her walking a dog

7  for over a year.

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  And this is what he said

10  January 17th of '17.

11          THE WITNESS:  Right.  But he has also provided

12  information that he had seen her more recently than that.

13          THE COURT:  Okay.  Well --

14  BY MR. KENDALL:

15  Q.   That wasn't in your report that he'd seen her more

16  recently in the neighborhood, was it?

17  A.   Not in that report, no.

18  Q.   Is there any report where you memorialized that he said

19  he'd seen her more recently in the neighborhood?

20  A.   No.  That was a conversation that was provided --

21       That information was provided me to one of the

22  investigative agents.

23  Q.   Okay.  So it wasn't the car dealer we're talking about;

24  it was some agent relayed that information to you.

25  A.   Correct.

83

1 Q.   Okay.  Now, in your affidavit you also discuss

2 conducting an investigation into a tax case; correct?

3 A.   Correct.

4 Q.   False statements to the IRS?

5        MS. BARCLAY:  Objection.  It's not a part of the

6 affidavit, Your Honor.

7        THE COURT:  Is it, or isn't it?

8        MS. BARCLAY:  It's not -- it's not, Your Honor.

9        THE COURT:  Okay.  Let's do this.  Just tell me

10 what you're referring to, Mr. Kendall.

11 Q.   If you read -- let me show you your affidavit.  Go to

12 page 56.  Or just show to the Court are other references,

13 but one is page 56, facing the possibility of a significant

14 --

15        THE COURT:  I have a 19-page affidavit.  Are we

16 talking about the same document?

17        MR. KENDALL:  Paragraph 56 on page 18.

18        THE COURT:  Paragraph 56.

19        MR. KENDALL:  Yeah.

20        THE COURT:  Okay.  Go ahead.

21 BY MR. KENDALL:

22 Q.   When you made your conclusions --

23      Well, you conclude that there was a risk of flight,

24 because he's under tax investigation; correct?

25 A.   No.

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1  Q.    That's not your conclusion?

2  A.    No.

3  Q.    So you think the tax investigation has no impact on his

4  risk of flight; correct?

5  A.    I think it's a part of it, but I don't think that's the

6  driving factor.

7  Q.    Okay.  So you think it is one factor.  He could be a

8  risk of flight that he's under tax investigation.

9  A.    I think a combination of all the charges put together

10 is a more accurate statement.

11 Q.    Okay.  But in one of those charges is the tax charges.

12 A.    Which have not been charged yet.

13 Q.    Right.  And he's known about those tax charges since at

14 least April of 2015; correct?

15 A.    He's known of my investigation since that time.

16 Q.    And you're aware that -- and in order to --

17        THE COURT:  Hang on one second.

18        And your investigation is what?  Wire fraud or a

19 tax investigation?

20        THE WITNESS:  Well, my initial part is the tax

21 part, and then subsequent to that I discovered the wire

22 fraud.

23        THE COURT:  All right.  So what he has known since

24 April of '15 is that he's been investigated for possible tax

25 violations.

85

1              THE WITNESS:  Correct.

2              THE COURT:  Go ahead.

3 BY MR. KENDALL:

4 Q.   And then to draw this conclusion that you think the tax

5 investigation contributes to the risk of flight, you're

6 basing that upon your review of the various financial

7 records and documents relevant to that tax investigation;

8 correct?

9 A.   Can you repeat that, please?

10 Q.   Sure.  In order --

11      Let me rephrase it.

12      You draw the --

13      Your testimony is that the strength of this tax case is

14 one factor that will encourage a risk of flight.

15 A.   I believe it's one piece overall, but I --

16 Q.   That's part of what you're saying in your affidavit;

17 correct?

18 A.   Well, we wouldn't be moving for detention if it was a

19 tax case, Mr. Kendall.

20 Q.   I understand that.

21      But you just testified it's one of the reasons why you

22 think there's a risk of flight; correct?

23 A.   It's one o f many, yeah.

24 Q.   And in order to reach that conclusion, you reviewed

25 various documents relevant to the tax investigation;

1 correct?

2 A.   Yes.

3 Q.   And your conclusion is based upon those documents;

4 correct?

5 A.   Not just those documents.

6 Q.   Okay.  And in fact, in paragraph 2 of the affidavit you

7 specifically say you reviewed numerous -- you didn't say

8 numerous, but you reviewed documents as part of the

9 investigation, and that's part of the basis for your

10 affidavit; correct?

11 A.   Correct.

12 Q.   Okay.  And that includes bank records?

13 A.   Yeah.

14 Q.   Mortgage records?

15 A.   Yes.

16 Q.   Statements to the IRS in the IRS Form 433?

17 A.   Yes.

18 Q.   As well as electronic interceptions of phone

19 conversations of Mr. DeCicco?

20 A.   Yes.

21 Q.   And you're adopting all of that as part of your

22 testimony that you think there is a basis for flight because

23 of the tax case.

24          MS. BARCLAY:  Objection.  Your Honor, we're going

25 far afield here.  There's one phrase in paragraph 56 that

1 says that the possibility of he may have tax charges adds to

2 the risk of flight.

3          At this point I believe Mr. Kendall is laying the

4 foundation for getting discovery of the entire tax

5 investigation based on this.  I mean --

6          THE COURT:  Is that where you're going with this?

7          MR. KENDALL:  Your Honor, I think there has been a

8 deficient production of Jencks material, and I want --

9          THE COURT:  Would that be a yes?

10          MR. KENDALL:  Yes.

11          THE COURT:  Okay.  I'm not buying in to the

12 argument that because in preparing this she may have --

13 she's familiar with this investigation that she's adopted

14 everything that's in it.  I'm not going to entertain a

15 Jencks motion on the basis of that statement.

16          MR. KENDALL:  If I could, I didn't do myself

17 justice, Your Honor.

18          If you could take a look at the same affidavit on

19 page 16, paragraph 49.  There's a --

20          THE COURT:  All right.  I just want you to know

21 something.  I'm happy to hear you on a Jencks issue, and if

22 you want to burn your time in front of me on Jencks, you go

23 ahead and do it.  Don't complain to me, though, when you get

24 to the end of your cross, and you haven't asked questions

25 that you want regarding release or detention.

1          MR. KENDALL:  Your Honor, I'll move that to a

2    later time period.

3          THE COURT:  It's entirely up to you.

4          MR. KENDALL:  I think it's an excellent

5    suggestion, Your Honor.

6          THE COURT:  Okay.

7    BY MR. KENDALL:

8    Q.   Now, you know Mr. DeCicco did some type of -- strike

9    that.

10        You know there was some type of transaction with the

11   Polaski Street building; correct?

12         MS. BARCLAY:  Objection.  Again, not part of the

13   detention.

14         MR. KENDALL:  Yes -- Your Honor, it goes directly

15   to risk of flight and the resources she claims he has for

16   flight.  If I could just have a few questions?

17         THE COURT:  Go ahead.  Polaski?

18   Q.   You're aware there was some type of transaction

19   involving the building in Peabody on Polaski Street;

20   correct?

21   A.   Do you want to be more specific?

22   Q.   Yes.  The building that he an Phillip Baldi were

23   involved in.  There was a refinancing with Eastern Bank.

24   You're aware of that.  It was sold, I believe, to Mr. Baldi.

25        I'm not trying to get you with the details of a

1 transaction.

2      You're aware there was some type of transaction

3 involving the building on Polaski Street in Peabody financed

4 by the Eastern Bank; correct?

5 A.   Yes.

6 Q.   Okay.  And there was a lot of cash available after that

7 transaction; correct?

8 A.   To?

9 Q.   To whoever was involved in it, whether it's Girlfriend

10 2 or Mr. DeCicco, however you want to attribute it, there

11 was a lot of cash available; correct?

12 A.   There was proceeds from the sale.

13 Q.   Yes, that's --

14 A.   Is that what you're referring to?

15 Q.   -- my point.

16      There's proceeds from the sale; correct?

17 A.   Yes.

18 Q.   You testified a little while ago when Ms. Barclay was

19 asking questions that Mr. DeCicco's bought a series of

20 pieces of real estate from late 2016 through December;

21 correct?

22 A.   January.

23 Q.   January.  Thank you.

24      There's at least four pieces you're aware of; correct?

25 A.   Correct.

1  Q.   Do you know what the total purchase price of those four

2  pieces of real estate were?

3       If I were to suggest to you a million four, would that

4  seem ball park to you?  Florida condo, 400,000.  610 for

5  Nahant Street.  There's the other building Foster Street

6  that he had to pay taxes on and forgive a mortgage.  Then

7  there's the fourth piece, I think, Shelton Street?

8  A.   Yes.

9  Q.   Okay.  I'm not going to hold you to the exact number.

10      Certainly well over a million dollars; correct?

11 A.   Correct.

12 Q.   Plus, he's got to put some money in to the expenses for

13 closing, fixing it up, whatever else is involved; correct?

14 A.   I would believe so, yes.

15 Q.   So you agree with me then in the last six months Mr.

16 DeCicco has been taking liquid cash and putting it into

17 Boston real estate?

18 A.   Yes.

19 Q.   And he's expanded the amount?

20 A.   Well, Florida as well.

21 Q.   Excuse me?

22 A.   Florida.

23 Q.   Florida and Boston.

24      But he's taking cash, and he's buying real estate;

25 correct?

1  A.   Yes.

2  Q.   And you also agree with me that he was involved in

3  multiple real estate projects; correct?

4  A.   I believe so, yes.

5  Q.   And there're at various stages.  Some are being

6  developed, and they're trying to put a building up.

7  A.   I'm not sure which one you're referring to.

8  Q.   Are you aware of any projects in which they're trying

9  to do construction?

10  A.   I am not.

11  Q.   Are you aware of projects where he's trying to sell

12  property?

13  A.   I am not.

14  Q.   You're not aware of him trying to sell any of -- the

15  house on Nahant Street?

16       Didn't he tell the broker he'd give him the listing to

17  sell it?

18  A.   I think that was an enticement to assist him with the

19  short sale.

20  Q.   So you're not aware of any attempts to sell Nahant

21  Street?

22  A.   No.

23  Q.   Or the Florida condo?

24  A.   No.

25  Q.   So as far as you know, he's bought real estate, and

1 he's going to hold on to it.

2 A.   I don't know what his intent is.

3 Q.   You agree with me that if Mr. DeCicco's incarcerated,

4 there's nobody to manage all of these real estate projects

5 that he's involved in with other partners and investors;

6 correct?

7 A.   No.

8 Q.   You're not aware of anybody else who's really part of

9 the overall real estate business as a manager or developer,

10 are you?

11 A.   Mr. Baldi.

12 Q.   Okay.  Mr. Baldi's a partner in some projects; correct?

13 A.   Yes.

14        MR. KENDALL:  If I may have a minute to just check

15 my notes?

16        THE COURT:  Yes.

17        MR. KENDALL:  I'm making a lot of progress.

18        If I may have one moment to confer with my client,

19 Your Honor?

20        THE COURT:  Yes.

21        MR. KENDALL:  I think we're pretty close to the

22 end.

23        Your Honor, no further --

24        If I may just confer one second?

25        No further questions from this witness.  We are,

1  Your Honor, as you graciously allowed us, to reserve our

2  rights on the Jencks issue.

3          THE COURT:  Okay.  Any redirect?

4          MS. BARCLAY:  I just have a couple of quick

5  questions, Your Honor.

6                   REDIRECT EXAMINATION

7  BY MS. BARCLAY:

8  Q.   Special Agent Lemanski, Mr. Kendall just asked you

9  about these properties in paragraph 50 that Mr. DeCicco

10 bought in the last six months, and they were over a million

11 dollars.

12 A.   Yes.

13 Q.   And so he had cash of over a million dollars in the

14 last six months.

15 A.   Yes.

16 Q.   And did he pay his $350,000 IRS bill?

17 A.   No.  He's made a $3,000 payment.

18 Q.   With regard to --

19      You were asked some questions about looking for other

20 perpetrators of the assault.

21      The card with the flowers, whose name was on that in

22 terms of --

23      It was addressed to someone --

24          MS. BARCLAY:  And if I can approach, Your Honor,

25 and give her Exhibit 1?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

94

1          THE COURT:  Uh-huh.

2   Q.    Whose name is next to "Congrats"?

3   A.    "Gary."

4   Q.    And the defendant's first name is Gary; right?

5   A.    Yes.

6   Q.    And with regard to the card and the flowers, Girlfriend

7   No. 1 admitted that Mr. DeCicco had her send those and write

8   the card?

9   A.    Yes, she did.

10  Q.    And CW-2, the assailant in the video, he said he was

11  hired by CW-3 to perform the beating for a guy from Nahant?

12  A.    Yes.

13  Q.    And CW-3 said that DeCicco hired him through CW-4, so

14  you have DeCicco's name there too; right?

15  A.    Yes.

16  Q.    And then CW-4 specifically said that it was DeCicco.

17  A.    Yes.

18          MR. KENDALL:  Again, I'd ask that the agent

19  testify and not the prosecutor.

20          THE COURT:  Sure.  Just don't ask leading

21  questions.

22          MS. BARCLAY:  Sure.

23  BY MS. BARCLAY:

24  Q.    And Special Agent Lemanski, is it your understanding --

25          Did you look at phone records in this case?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1 A.    I did not.

2 Q.    Okay.  Did you discuss with other agents the fact that

3 there were phone records gathered during this case?

4 A.    Yes, I did.

5 Q.    And what, if anything, did those phone records do on

6 July -- I'm sorry -- January 11, 2015?

7       What did they show?

8 A.    They corroborate the statements of the cooperating

9 witnesses.

10 Q.    Okay.  And with regards to the card with the flowers

11 that's Exhibit 1, the specific --

12       If you could just read where it says, "Congrats, Gary,"

13 and then read the specific language?

14 A.    "We all know whose place that is.  We hope this cross

15 will help you get rid of that Muslim prick.  From all Route

16 1 auto dealers."

17 Q.    And it doesn't say anything in there about harassing a

18 girl?

19 A.    It does not.

20 Q.    Or a girlfriend or an ex-wife or anything like that?

21 A.    It does not.

22 Q.    It talks about the auto dealership --

23       MR. KENDALL:  Objection, Your Honor.  The document

24 speaks for itself.

25       MS. BARCLAY:  Okay.  Withdrawn, Your Honor.

1          THE COURT:  All right.

2  Q.   And then shortly after the victim received these

3  flowers, did he get a phone call?

4  A.   Yes.

5  Q.   And what was the nature of that phone call?

6  A.   It was another threatening phone call that said --

7  Q.   Specifically, if I can --

8          MS. BARCLAY:  Your Honor, if I could show Agent

9  Lemanski Exhibit 1 to refresh her memory as to the phone

10  call?

11          THE COURT:  Yes.

12  Q.   You could just read it to yourself first.

13      Does that refresh your memory?

14  A.   Yes.

15  Q.   And what was that phone call on that day?

16  A.   "Fucking Muslim.  I'm going to kill you."

17  Q.   And the card used the term "Muslim," as well; right?

18  A.   Yes.

19  Q.   And the victim, you've met with the victim?

20  A.   I have.

21  Q.   And did he express to you his belief as to why these

22  flowers were sent and why he was assaulted?

23  A.   Yes.

24  Q.   And what was his belief?

25  A.   That Mr. DeCicco was getting back at him for not being

97

1  -- allowing him to be partners in his dealership with him.

2           MS. BARCLAY:  No further questions, Your Honor.

3           THE COURT:  Any redirect?

4           MR. KENDALL:  Two minutes.  A little more than

5  two, but not much more.

6                    RECROSS-EXAMINATION

7  BY MR. KENDALL:

8  Q.   You talked about phone calls that were described to you

9  by other agents.

10       Do you remember what numbers were involved?

11 A.   Yes.  The actual phone number itself --

12 Q.   You remember the actual phone numbers?

13 A.   I don't as I sit here right now.

14 Q.   You don't know what was done to confirm whose number

15 went to who?

16 A.   I do know.

17 Q.   You do know?

18 A.   Yes.

19 Q.   Okay.  What was done?

20 A.   Toll records were obtained, and subscriber information

21 was obtained, and the witnesses themselves confirmed what

22 their phone numbers were.

23 Q.   Okay.  And do you know the dates and times of the

24 calls?

25 A.   Not specifically.

1  Q.   You referred to a phone call that's referenced in

2  Exhibit 1.

3       There's no toll records for that call, is there?

4  A.   The one that we just spoke of?

5  Q.   Yes.

6  A.   No.

7           MR. KENDALL:  No further questions, Your Honor.

8           THE COURT:  Agent Lemanski, this may have been

9  asked, but what is the nationality or ethnic background of

10 are CW-1?

11          THE WITNESS:  My understanding is that he is from

12 -- is Iranian, and he's not currently a practicing Muslim.

13          THE COURT:  Okay.  If I understood you correctly,

14 Mr. DeCicco has an outstanding tax obligation to the IRS.

15          THE WITNESS:  Yes.

16          THE COURT:  Totaling at least $350,000, and I

17 think you mentioned he paid $3,000 toward that amount; is

18 that right?

19          THE WITNESS:  Recently he's paid $3,000.

20          THE COURT:  All right.  So is the outstanding tax

21 obligation a settled matter, or is it --

22          THE WITNESS:  That 350 is a settled matter.  It

23 has nothing to do with my --

24          My investigation relates to evasion of payment and

25 impeding the IRS for the collection of that liability.

1          THE COURT:  Okay.  So the outstanding tax

2 obligation of at least 350 is the subject of a judgment or

3 an IRS determination.

4          THE WITNESS:  It's assessed -- it's on --

5 technically it's already been assessed.

6          THE COURT:  Okay.  Let me see if I've got anything

7 else.  Okay.  That's it.  Thank you.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Ms. Barclay, any other evidence?

10         MS. BARCLAY:  No, Your Honor.

11         THE COURT:  Mr. Kendall, do you want to present

12 any evidence?  Witnesses?

13         MR. KENDALL:  I reserve my rights with respect to

14 the Jencks issue, Your Honor.

15         Other than that, nothing else.

16         THE COURT:  Okay.  So how do you want to handle

17 that issue?  I assume you're looking for a ruling.

18         MS. BARCLAY:  Your Honor, I actually have --

19         I'm sorry.  It was handed to me while Special

20 Agent Lemanski was testifying.  I actually have the report

21 that Your Honor ordered me to produce, as well as the

22 additional one that was talked about.

23         THE COURT:  All right.

24         MS. BARCLAY:  I'm happy to provide it to Mr.

25 Kendall.

1          THE COURT: All right. Why don't we do this. Why

2 don't you review the reports. If you have, based on the

3 reports, any further questions of Agent Lemanski, she's

4 here, we can recall her and get it resolved.

5          MR. KENDALL: Well, Your Honor, I'm happy to look

6 at those reports and do that aspect of it.

7          There's other Jencks issues, Your Honor, that I

8 did want to raise with the Court. One simple and one

9 bigger. If I may raise the simple one, and then the bigger

10 one may require some briefing.

11          THE COURT: All right.

12          MR. KENDALL: The simple one is we got Agent

13 Lemanski's grand jury transcript as Jencks. In the

14 transcript she at one point stops and reads an excerpt from

15 the transcript of the FBI agent to the grand jury. So she's

16 adopting the prior agent's testimony and reading it. I can

17 give you the transcript --

18          THE COURT: No. That's okay. So she's in the

19 grand jury. She stops. She reads, when you say, "the

20 agent's transcript," what are you referring to?

21          MR. KENDALL: Agent Elio, the FBI agent that's

22 doing the investigation with her.

23          So Ms. Barclay and Ms. Lemanski read the excerpt

24 Q&A of Agent Elio's testimony to the grand jury.

25          THE COURT: All right.

1          MR. KENDALL:  And so I -- we maintain that that is

2  adopted as part of her Jencks.  If it's in her testimony and

3  she's giving it to the grand jury for part of her to

4  describe and narrate what's going on, it's part of her

5  transcript.  We asked the government for a copy of it, but

6  they refused to produce it.

7          THE COURT:  Of the --

8          MR. KENDALL:  Of the excerpt that was read --

9          THE COURT:  Right.

10          MR. KENDALL:  -- during her grand jury --

11          THE COURT:  Well, don't you have it if it's in the

12  --

13          MR. KENDALL:  No.  They don't.  It exists as --

14  you know, it's read, and then it never shows up in the

15  transcript.

16          THE COURT:  I don't know that that shows adoption.

17          Let me hear from the government.

18          MS. BARCLAY:  Let me just explain, Your Honor.

19  Special Elio testified in a different grand jury, so Special

20  Agent Lemanski --

21          THE COURT:  I see.

22          MS. BARCLAY:  -- simply re-read his transcript in.

23          And you can see from the transcript of Special

24  Agent Lemanski's testimony, she's actually talking about the

25  tax issue.  She doesn't even --

1      She says nothing about Special Agent Elio's prior

2 testimony.

3      It was just a mechanics of reading the transcript

4 in.  She does not adopt it.

5      And I'm happy to provide the Court with that

6 transcript.

7      THE COURT:  I mean, Mr. Kendall, what's being

8 presented doesn't sound to me like it's adoption.  It sounds

9 like an agent's in there, and while they're in there,

10 they're reading someone else's transcript.  That doesn't

11 strike me as adoption of the --

12      MR. KENDALL:  After she reads it she explains that

13 whatever was discussed in this excerpt that I don't know is

14 -- is what caused the FBI to bring the IRS in and for her to

15 become part of the investigation.

16      I suggest, Your Honor, she's actually adopting it

17 to describe events, and it's her description of events she's

18 giving relying on that transcript.

19      If you like, I can give you the pages so you can

20 read it yourself.

21      THE COURT:  Okay.  I'll take a look at it.

22      MR. KENDALL:  I have it open to page 4 of the

23 grand jury transcript (inaudible).

24      THE COURT:  Yes, you may.

25      MR. KENDALL:  I would suggest it might be helpful

1  to start off here and read a page and a half after.

2       (Pause in the proceedings.)

3             THE COURT:  Okay.  I've read it.  So what I've

4  read was page 4, 5, 6 and in to part of 7.

5             I'm not persuaded that that's adoption.

6             In other words, how is that different than, say,

7  an agent went in the grand jury -- in any proceeding, and

8  testified, "I'm showing you this police report."  He looked

9  at the report and is asked the question:  So it's your

10 understanding that that's why the police investigated Mr. X

11 for committing a crime.

12            I wouldn't see that as the witness adopting the

13 content of the report.  I'm not sure how this is --

14            Is this different?

15            MR. KENDALL:  Yes, Your Honor.

16            THE COURT:  How?

17            MR. KENDALL:  I'm guessing.  I believe the

18 transcript probably refers to some type of telephone --

19            This is a guess, but it probably refers to some

20 type of telephone conversation or admissions about

21 information relevant to the tax collection case.  And

22 immediately after it's read I believe at the top of the next

23 page the agent says and that's why we started our

24 investigation, and that's how we got --

25            I'm paraphrasing it, because you've got my copy.

1  I'll let the words in front of you control.

2          THE COURT:  Is it okay if I read the grand jury?

3          MS. BARCLAY:  That's fine, Your Honor, with

4  respect to just those couple of sentences.

5          THE COURT:  Yeah.  Just these couple.

6      Q    So it was the calls from July 2,

7               2013, that caused the FBI to -- as

8               far as you know, caused the FBI to

9               reach out to you?

10     A    Yes.

11     Q    And in particular Mr. DeCicco's

12              comments about having avoided IRS

13              obligations?

14     A    Yes.

15     Q    And then did you look into --

16          THE COURT:  And it goes on.  Okay.  If that's your

17  argument, I'm denying it.

18          MR. KENDALL:  Okay.  Fine, Your Honor.  I would

19  like at some point that a schedule be set to submit any memo

20  on the Jencks issue.  (Inaudible)

21          THE COURT:  Well, I've made a ruling on that.  You

22  said there was another more complicated issue.

23          MR. KENDALL:  That is, in general, the agent's

24  testimony that she's relied on all sorts of exhibits and

25  documents to put together her affidavit, that she

1 incorporates them in to the conclusions she draws.  We would

2 maintain that's adoption for Jencks purposes.

3          And I think you said earlier it's something you

4 might appreciate a brief on and not just argue it off the

5 cuff right now.

6          THE COURT:  Okay.  So the distinction I'm trying

7 to draw is someone who reviews a document to in anticipation

8 of testimony or anticipation of creating this exhibit as

9 opposed to I've been working on a case for five years and

10 here's my affidavit, and in preparing this affidavit I've

11 reviewed reports this, that, this, that.

12          I don't know that that --

13          Is it the latter that you're talking about?

14          So in other words, if an agent says, "I've

15 personally reviewed documents gathered during this

16 investigation, participated in interviews and obtained

17 information contained in this affidavit from law enforcement

18 colleagues assigned to this case," that that triggers an

19 obligation to turn over everything that's referred to there?

20          MR. KENDALL:  That would be one point I would

21 make, Your Honor.

22          THE COURT:  Okay.

23          MR. KENDALL:  And I think there's probably --

24          THE COURT:  And you're right.  I'll need briefing

25 on it.

1          MR. KENDALL:  Yes.

2          THE COURT:  So --

3          MR. KENDALL:  And then there's more specific --

4          Oh, I'm sorry to interrupt you.

5          THE COURT:  That's all right.  Go ahead.

6          MR. KENDALL:  It's a bad habit of mine.  I

7 apologize.

8          There's also, I think, furthermore specific

9 incorporation later in the affidavit that's more specific

10 than that, and I view them all as a continuum.

11          But I agree with you briefing would be most

12 helpful on this, and so I didn't want to press that argument

13 any further right now.

14          THE COURT:  Okay.  So if you brief it and then I

15 decide it, then what do you want to do?  If there's some

16 change, do you want to come back and reopen this thing, or

17 do you want a ruling and --

18          I'm not sure how you want to do it.

19          In other words, if you think you're coming back

20 and you're going to get additional materials and you're

21 going to have questions, then I'm going to -- I'll suspend

22 the hearing, and I'll reopen it when you have the materials

23 or I've made a decision that you're not entitled to them.

24          MR. KENDALL:  It puts me in the --

25          It puts my client in the quandary of --

1          My fear is that you will detain him until the

2  briefing is done and the issue is resolved.

3          Would it be possible to go forward with the

4  hearing.  We file this memorandum, and if you think it has

5  merit, then we can decide to reopen it if it's been an

6  adverse ruling?  In some ways, depending upon your ruling,

7  it may make some of this moot.

8          THE COURT:  Well, I can't give you a ruling

9  without your briefing on it.  I don't have the law that

10  you're referring to at my fingertips, and it doesn't sound

11  familiar enough that I'd be ready to rely on what I remember

12  or understand.

13          MR. KENDALL:  If I may make a suggestion, Your

14  Honor?

15          THE COURT:  Go ahead.

16          MR. KENDALL:  I'd like to read those two reports

17  that --

18          THE COURT:  Go ahead and do that.

19          MR. KENDALL:  -- Ms. Barclay was going to give me,

20  and I would need to take a minute or two to do that.

21          THE COURT:  Sure.  Why don't we take a five-minute

22  break, review those.

23          My question to you when I come in will be do you

24  need to call Agent --

25          MR. KENDALL:  Yes, Your Honor.

1          THE COURT:  -- Lemanski again to ask her any

2  questions.

3          MR. KENDALL:  Certainly.

4          THE COURT:  Okay.  Let's take a five-minute

5  recess.

6          THE CLERK:  All rise.

7      (Court recessed from 2:16:34 p.m. to 2:32:14 p.m.)

8                        AFTER RECESS

9          MR. KENDALL:  Oh, I'm sorry.

10          THE CLERK:  The Court is back on the record in the

11  United States vs. Gary P. DeCicco, Criminal Action 17-4063.

12          MR. KENDALL:  I would like a couple of minutes to

13  question Agent Lemanski purely on one of the reports that

14  was given to me.

15          THE COURT:  Okay.  Agent Lemanski, would you take

16  the stand again?  Agent, I just want to remind you you're

17  still under oath.

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Go ahead

20              FURTHER RECROSS-EXAMINATION

21  BY MR. KENDALL:

22  Q.  Agent, I think you testified earlier that CW-4 told law

23  enforcement agents he was the person that made the payment

24  at the Porthole pub in Lynn; is that correct?

25  A.  Yes.

1 Q.   And he made it to the person who was in the hood doing

2 the beating; correct?

3 A.   Yeah, CW-2.

4 Q.   Have you ever seen CW-4 physically?

5 A.   No.

6 Q.   Okay.  Based upon what you learned in this

7 investigation, would you agree with me he's a man in his

8 early fifties?

9 A.   CW-4?

10 Q.   Yeah.

11 A.   I'm actually not sure of his age.

12 Q.   Okay.  Do you have any knowledge of what his age is?

13 A.   I do not.

14 Q.   Okay.  If I were to suggest he's about six feet,

15 six-foot-one; would that be consistent with your knowledge

16 or understanding?

17 A.   I actually have no knowledge or understanding what his

18 size is.

19 Q.   In the report that you reviewed as part of preparing

20 your testimony in your affidavit, CW-2, the guy who did the

21 beating, said that the man who paid him at the Porthole was

22 six-foot-six and in his twenties; correct?

23 A.   That's what that says.

24 Q.   Okay.  So the person who we're relying on as part of

25 this link says he's paid by CW-4, and CW-4's the only person

1  that says he had any contact with DeCicco; correct?

2      CW-2 didn't.  CW-3 didn't.  CW-4's the one that said he

3  had contact with DeCicco.

4  A.  Yes.

5  Q.  Okay.  And he said he's the one that made the payment;

6  correct?

7  A.  Yes.

8  Q.  And the guy who received the payment says he was paid

9  by a guy six-foot-six and in his twenties?

10  A.  That's what that report says.

11          MR. KENDALL:  Your Honor, if I may ask the Court a

12  question?  Just procedural, how to proceed.

13          I believe it will be undisputed with the

14  government that CW-4 was not six-foot-six and not in his

15  twenties.  If Ms. Barclay would stipulate to that, it will

16  end my questioning; otherwise, I'm going to ask the Court if

17  I could call up his Facebook page and show you the

18  photographs of him, and you can draw your own conclusion

19  that I think you'll see he's in his fifties and maybe an

20  inch or two taller than me, around 6 feet.  If Ms. Barclay

21  will stipulate, we don't have to do anything.  If not, I'd

22  like to call up the Facebook page.  The point being it's a

23  major inconsistency in the government's case.

24          THE COURT:  Maybe.  But why don't I --

25          MS. BARCLAY:  Your Honor, --

```
 1              THE COURT:  -- hear you on it.

 2              MS. BARCLAY:  -- I personally don't know, but I'm

 3   happy to consult with the special agent in the back of the

 4   room to find out whether that's true or not.

 5              THE COURT:  Okay.  Take a one-minute recess.

 6              MS. BARCLAY:  Thank you.

 7         (Pause in the proceedings.)

 8              MS. BARCLAY:  Your Honor, the government will

 9   stipulate that he is not in his twenties, --

10              THE COURT:  Okay.

11              MS. BARCLAY:  -- and that he does not appear to be

12   six-foot-six.

13              THE COURT:  Okay.

14              MR. KENDALL:  I believe the government is actually

15   in possession of his date of birth.  Could we ask if they

16   would produce that for us, Your Honor?

17              THE COURT:  No.  I get it.  You brought out an

18   inconsistency.  A CW saying he was six-six and in his

19   twenties.  They're saying that's not CW-4.

20              MR. KENDALL:  Fair enough.  Thank you.

21              THE COURT:  Okay.  Anything else?

22              MR. KENDALL:  No further questions of this

23   witness.

24              THE COURT:  Thank you, Agent.

25              Anything else?
```

112

1          MS. BARCLAY:  No further evidence, Your Honor.

2          THE COURT:  Mr. Kendall, anything else?

3          MR. KENDALL:  This is what I'd ask the Court to

4  consider.  My client very much wants to have a decision on

5  the detention motion.  I'd ask if we could proceed with that

6  now.

7          We'd like to do the research on the Jencks issue.

8  If the Court's instincts are better than mine, we may not

9  file anything.  If I think the research suggests a different

10 course and we have an incarceration decision, I'd like to be

11 able to file a motion to reconsider.

12         But otherwise, Your Honor, if it risks having him

13 sit for a week or so or longer just to get briefing done, I

14 suggest that we could accomplish the same goals without

15 having that happen.

16         THE COURT:  Okay.  So I'll take up the issues on

17 probable cause and detention now.

18         MR. KENDALL:  Okay.

19         THE COURT:  All right?

20         MR. KENDALL:  Thank you.

21         THE COURT:  I'll hear you, Ms. Barclay.

22                        ARGUMENT

23         MS. BARCLAY:  Your Honor, as to probable cause,

24 the government submits that the information contained in the

25 affidavit of Special Agent Lemanski as well as her testimony

1 and the exhibits here today provide probable cause to

2 believe that Mr. DeCicco attempted to extort the victim in

3 violation of the Hobbs Act, 18 USC, Section 1951.

4          There was sufficient evidence on each of the

5 central elements of the crime.  First, Mr. DeCicco attempted

6 to obtain property from the victim.  The victim told

7 investigators several times that Mr. DeCicco wanted a piece

8 of the business, and that other people had told him that Mr.

9 DeCicco wanted a piece of the business.

10          And also, Your Honor, I think it sort of got lost

11 in the testimony here, but CW-4 actually told investigators

12 on March 17 that when driving by --

13          This is in Special Agent Lemanski's affidavit that

14 when driving by the dealership at issue, Mr. DeCicco said he

15 owns it.

16          In addition, the card in Exhibit 1 corroborates

17 the motive here, Your Honor.  The card mentions the fact

18 that Mr. DeCicco is the true owner of the dealership at

19 issue.

20          Even if there is conflicting evidence of a motive

21 for the beating, and we would argue that -- the only

22 conflicting evidence is what Mr. DeCicco told people to get

23 them to commit the assault; there's no conflicting evidence

24 of the motive for sending the flowers and the card, which in

25 and of itself is a threat and constitutes attempted

114

1  extortion.

2          In this case, Your Honor, there's evidence that

3  the victim believed that he was threatened and beaten by

4  someone for -- in order for Mr. DeCicco to get a piece of

5  his business.  It's the belief of the victim.  And whether

6  that belief is reasonable under the circumstances, that is

7  the standard for Hobbs Act extortion.

8          And with respect to the second element with

9  consent induced by wrongful use of actual or threatened

10 force, violence or fear of the beating obviously, but also,

11 Your Honor, the card is a threat.  And there's no evidence

12 again that that had anything to do with the girl.

13         And the extortion obviously affected interstate

14 commerce, Your Honor, this being a used car dealership.

15         With respect to --

16         Do you want to hear the government on release now?

17         THE COURT:  No.

18         MS. BARCLAY:  Okay.

19         THE COURT:  No, I think I just want to hear on

20 probable cause.

21         Do you disagree on probable cause?

22                    RESPONSE

23         MR. KENDALL:  I contest it, Your Honor, yes.

24         THE COURT:  Okay.

25         MR. KENDALL:  And I think there's a couple of

1 issues.  I think whether or not -- I think --

2          First of all, we dispute that Mr. DeCicco was

3 involved entirely.

4          THE COURT:  Okay.

5          MR. KENDALL:  We're not conceding that.

6          But if you're trying to give the government the

7 benefit of the doubt --

8          THE COURT:  I'm not.  I'm making a probable cause

9 determination.

10          MR. KENDALL:  Right.  Okay.  We certainly contest

11 that.

12          We find that CW-2 is giving something --

13          First of all, the informants are all inconsistent

14 with each other.  A six-foot-six guy in his twenties versus

15 a guy in his fifties who's six-one.  That's a big

16 difference, Your Honor.

17          Second, even if one were to credit those

18 informants, they're all saying the same story.  The beating

19 was over something of a personal dispute, and it had nothing

20 to do with any dealership or business, and that's what it's

21 consistent with.

22          The only person to contest that is the car dealer,

23 but he's the one that said the other suspect, his former

24 employee, was related to the leader of -- was involved with

25 the leader of Al-Qaeda's family.  I suggest that's not a

1  very credible or strong argument, his inference and claim.

2          That, alone, I don't think establishes probable

3  cause.

4          THE COURT:  Okay.

5          MS. BARCLAY:  Your Honor, if I could just clarify

6  one, if Mr. Kendall's done?  --

7          THE COURT:  I don't know.

8          MR. KENDALL:  She may speak, Your Honor.

9  (Inaudible)

10          MS. BARCLAY:  Just in terms of the other suspect

11  being a member of Al-Qaeda, I don't believe that was the

12  other suspect for a phone call as opposed to the actual

13  beating or the flowers.

14          THE COURT:  All right.  I find probable cause.

15  There's not a question of use of force.  I recognize that to

16  some extent I need to rely on the credibility of cooperating

17  witnesses, and there is this distinction about whether

18  someone's six-one or six-six.  That doesn't rule out the

19  possibility that the person who's six-one goes with somebody

20  who's six-six and says, "Here, give him a thousand bucks."

21          But even putting that aside, let's just say it's

22  straight inconsistency there.  The problems that I have with

23  --

24          Or the reason I find the cooperating witnesses to

25  be somewhat reliable is, first of all, every one of them is

1 making a statement against penal interest, and people just

2 don't go around saying I went to a dealership with a hood

3 on, and I beat the tar out of somebody, or I hired somebody

4 to do that, or I made the connection from somebody.  Those

5 are statements that implicate individuals in criminal

6 conduct; and in fact, it creates an exception in the hearsay

7 rule.  Because when people make those types of statements,

8 those statements have a certain level of reliability or

9 credibility.  There's also the testimony that, at least as I

10 understand it, none of these witnesses have been offered any

11 inducements or promises or have been paid money in exchange

12 for their information.  So I credit the testimony that is

13 there.

14          As for the motive, I'm not persuaded.  I do

15 understand that every one of the cooperating witnesses said

16 that they did this because the CW-1, the dealership owner,

17 allegedly sexually assaulted the defendant's girlfriend or

18 daughter, whatever it was.  That has to be placed in a

19 larger context.

20          When I look at the objective evidence in this

21 case, it shows that after the building began on the car

22 dealership and after the car dealership owner communicated

23 to the general contractor and to the architect that he did

24 not want Mr. DeCicco to be involved in the car dealership,

25 the dealer received a card.  There's pretty good evidence as

1 to who that card came from.  The defendant's girlfriend or

2 former girlfriend said that Mr. DeCicco dictated the

3 contents of this card and paid for the flowers that went

4 with the card, and she, in fact, went out and purchased the

5 card.

6        The card congratulates Gary, and it says we all

7 know whose place that is.  That shows that there's an issue

8 here about the ownership or the management of that car

9 dealership.  And then there's the statement, "We hope this

10 cross will help you get rid of that Muslim prick," and the

11 car dealership owner is Iranian or of Middle Eastern decent,

12 and that arguably refers to him.

13        In my view -- and I'm making just a probable cause

14 determination -- there's sufficient evidence there to link

15 the assault to the efforts by the defendant to get some

16 percentage of ownership, if not complete ownership, of the

17 car dealership.  And the car dealership, of course, is in

18 commerce, and that would satisfy that element.

19        I have to say this whole thing that -- the motive

20 was because of the alleged sexual assault of the girlfriend

21 or the daughter doesn't make a whole lot of sense, because

22 if that is not communicated to the victim, how would the

23 victim ever understand that what's being avenged here is

24 inappropriate conduct addressed towards a woman who's

25 associated with Mr. DeCicco?  It doesn't make sense.

1          But it does make sense that it was told to the

2 CW-2, -3 and -4, because it's the type of statement that's

3 going to get their buy in to something.  Sexual misconduct

4 directed toward a woman is -- it's the kind of conduct

5 that's going to really get somebody raised up and is going

6 to help get people's buy in to break the law, deliver a

7 beating that's going to get -- that's worth a thousand or

8 two thousand, whatever it is.  I suspect that that's why the

9 statement was made.

10          In any case, I find that there's easily probable

11 cause to support the charge in this case.

12          All right.  I'll hear the parties on the question

13 of release or detention.

14          My understanding is the government has moved for

15 detention on both grounds of risk of flight and

16 dangerousness to the community.

17          Ms. Barclay, refresh my recollection.  What are

18 the penalties that the defendant faces if he's convicted of

19 extortion?

20          MS. BARCLAY:  Your Honor, I believe it's 20 years

21 -- 20-year statutory maximum, 3 years supervised release,

22 $250,000 restitution or twice the gross gain or loss,

23 whichever's greater, and I believe it's a forfeiture -- it

24 is a forfeiture predicate, as well.

25          THE COURT:  Okay.  All right.  I'll hear you.

1        MS. BARCLAY:  Your Honor, the government submits

2   that there are no conditions of release, no combination of

3   conditions of release that will reasonably assure the safety

4   of any person or the community or guarantee the appearance

5   of Mr. DeCicco.

6        First, looking at the nature and circumstances of

7   the offense, Your Honor, this is a crime of violence.  Your

8   Honor has seen the video.  It also involves threats of

9   violence.

10        And the weight of the evidence against DeCicco,

11   Your Honor, the assault on the victim is traceable directly

12   back to Mr. DeCicco.  The CWs corroborate each other, and

13   the phone records support his involvement, as well as the

14   card which Your Honor mentioned and the fact that the

15   girlfriend bought that and filled it out at the instruction

16   of Mr. DeCicco.

17        With regard to the history and characteristics of

18   the defendant, I'd point out, Your Honor, that the defendant

19   lied to Pretrial Services during his initial interview.  He

20   said that he had a $16,500 tax obligation.  He currently

21   has, as you heard, over $350,000 tax obligation.  He also

22   refused to provide information to Pretrial Services on his

23   assets.  And Your Honor, as you heard from Special Agent

24   Lemanski, he has significant resources.

25        He committed a essentially fraud on a mortgage

1  company while he was on release -- while he was -- he knew

2  that he was under investigation, Your Honor, for potential

3  tax charges.  He simply can't be trusted not to commit more

4  crimes or to appear here before Your Honor.

5          He has significant financial resources you heard

6  from Special Agent Lemanski, most of which Mr. DeCicco has

7  hidden from the IRS in order to avoid paying tax

8  obligations.  So you've heard from Special Agent Lemanski

9  about those assets she has worked for years to identify, but

10  there are potentially other assets out there that we don't

11  even know about.

12          Mr. DeCicco represents a danger to the community

13  and to the people involved in this offense.  This was a

14  violent assault.  And he also, you know, committed a fraud

15  while on -- under investigation.  We have no reason to

16  believe that he won't continue to commit crimes while on

17  pre-trial release.

18          And with respect to the fact that Mr. DeCicco knew

19  since April 2015, around there, that he was under

20  investigation for tax charges, I'd submit, Your Honor, that

21  now the stakes are much higher.  This is an extortion

22  charge, and the sentence is 20 years, not 5 years.  And so

23  his incentive to flee, you know, has significantly

24  heightened.

25          MR. KENDALL:  May I address it, Your Honor?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1          THE COURT:  Yes.

2          MR. KENDALL:  Our proposal is that he be released

3 on a bond.  I suggest the number $200,000, but if the Court

4 thinks another number is more appropriate, we can certainly

5 address that.  It could be secured by real estate of which

6 there is substantial to do that.

7          He also would move out of the house in Nahant.

8 We've told Pretrial Services we've located another residence

9 in a different town where he can live, so there'll be good

10 physical separation between him and the car dealer.

11          And then other standard conditions could apply.

12          I'd like to address several issues.  First with

13 respect to the Pretrial interview, just so you understand

14 the sequence, Your Honor, Mr. DeCicco was arrested last

15 Friday.

16          I was out of the country.  I was on vacation with

17 my family on Friday.  I could not attend the Pretrial

18 Services interview.  Ms. Gliga, who's an associate of my

19 firm, she's been practicing law about three months, and she

20 finished her clerkship in this courthouse.  She ran over,

21 attended.  She's not experienced, and she couldn't really

22 give him the advice of what to do.  She was present, and Mr.

23 DeCicco were present.

24          He didn't say his tax debt was $16,000.  I believe

25 the report is missing a zero.  He gave a much higher number.

1 He was arrested.  He didn't have records in front of him.

2 He's not trying to --

3          He knows he's been under IRS investigation for

4 over two years.  There's no benefit to him to dispute what

5 is a liquidated agreed-upon settlement amount of what

6 Lemanski testified was 350,000.  But, you know, there's a

7 principal, there's interest, there's various components to

8 it.  He did not misrepresent or say anything.  Because

9 there's a tax investigation going on, he obviously would

10 follow any instructions he got that he shouldn't discuss

11 anything about his finances with the government until his

12 counsel was present.  There's no attempt to hide anything.

13          He has been a legitimate participant in the Boston

14 real estate community for decades.  In fact, he spent over

15 one and a half million dollars buying real estate in his

16 name in the last six months.  That's not somebody who's

17 looking to flee, and that's not somebody who's looking to

18 hide things from the IRS.  Just the opposite.  He's putting

19 it out there.  His name is on it.  They know it.  They can

20 look up the deeds and see his name.

21          His two daughters are here.  They're older

22 teen-age girls; 18, 19 years old.  He has a wonderful

23 relationship with them.  He told Pretrial Services he's in

24 virtually daily contact with them.

25          In addition, he has two sisters that live in the

1  area with their families.  His parents are in Florida.  He

2  has a wide network of friends and business associates that

3  he is a part of here in Massachusetts.  Many of them are

4  partners or associates with him in real estate deals and

5  other types of business associations.

6          There is absolutely no risk of flight, Your Honor.

7  If there was a risk of flight, he wouldn't have spent a

8  million-four or a million-five on those real estate projects

9  in the last six, seven months to take liquid money and tie

10  it up in Boston real estate.  That just shows you the ties

11  he has to this community and his optimism about the future

12  and his future relationship there.

13          So I think the real issue, Your Honor, is is there

14  a risk of physical harm or danger.  What do we know?  We

15  know that for two and a half years the car dealer has been

16  assisting law enforcement in investigating Mr. DeCicco.  Mr.

17  DeCicco has known about his role in that for some period of

18  time.

19          We also know that when the car dealer complained

20  to the Saugus Police and then the FBI in 2014, they took no

21  steps to protect him or have security or whatever.  When the

22  assault occurred in January 2015, Agent Lemanski said they

23  told him to call 911 if anything further happened.

24          The supposed victim is living four doors down from

25  Mr. DeCicco for two years and two months.  Nobody takes any

1  steps to have security protection or whatever else.  All the

2  while Mr. DeCicco knows he's under investigation and the

3  person that's facilitating the investigation.

4          If that situation was good enough for federal and

5  law enforcement for two years and two months, I think what

6  we're offering the Court is certainly good enough to assure

7  that there'll be no violence or problems.

8          We'll get him out of this town.  We'll get him in

9  a different location.  We'll post security so there's a

10  financial incentive for supervision.

11          And most importantly, Your Honor, you can see from

12  Lemanski's affidavit, the last couple of pages listing out

13  all the real estate projects he's in, if the Court contains

14  him, there's going to be millions of dollars of real estate

15  that's just going to collapse.  He's the guy that runs it.

16  He's not part of a big -- He's the one person who gets

17  people or individuals in different deals that he organizes

18  or manages, but there's no office, there's no bookkeeper,

19  there's no sort of ongoing entity.

20          Your Honor, I would suggest, what are we talking

21  about here?  The IRS testifies that the liquidated amount

22  that he's fallen behind in payment on was $350,000.  The

23  mortgage fraud that they're talking about, the bank made

24  more money by buying it from him than -- selling it to him

25  than they would have gone through a foreclosure.  He gave

1  the bank the best deal they could.

2           In addition, there's a very ambiguous affidavit

3  that is a subject to interpretation.  He was looking at the

4  relationship current; but in fact, he had broken up with the

5  girlfriend, and things had been separating for a period of

6  time.

7           Your Honor, the only issue, I suggest, is one of

8  danger to, in particular, CW-1.  You've got two years and

9  two months of federal law enforcement's admission that they

10 didn't have to take any steps to protect CW-1 from Mr.

11 DeCicco or to do anything to prevent any retaliation from

12 him.

13          Given all that's gone on and the steps that the

14 Court can impose, there's absolutely no reason to detain

15 him, Your Honor.

16          THE COURT:  It's your motion, I'll give you the

17 last word if you have anything to add.

18          MS. BARCLAY:  Your Honor, I don't believe there

19 was any evidence that Mr. DeCicco knew that CW-1 had linked

20 the beating to Mr. DeCicco until -- and there was no

21 evidence that Mr. DeCicco knew that there was a federal

22 investigation of the extortion until I believe Special Agent

23 Lemanski said at the beginning of February of this year.  So

24 he hasn't known about it.

25          I'd also point out, Your Honor, that according to

1  the affidavit, CW-4 who's the one link between -- the actual

2  link, direct link, to Mr. DeCicco; he was not approached

3  until March 17, 2017.  And Your Honor, that's the date on

4  which Mr. DeCicco was arrested.

5           So with regard to safety of CW-1 and the

6  government -- or law enforcement not taking any steps, first

7  of all, there's no -- there's been no testimony that was not

8  --

9           Special Agent Lemanski was not directly involved

10 with CW-1, and she wasn't able to provide any information

11 about what steps he was -- what advice he was given or

12 anything like that about laying low or anything like that.

13          But the fact of the matter is this investigation

14 was secret and not overt until very recently.

15          And with respect to the real properties, Your

16 Honor, I guess -- you know, to the extent that Your Honor

17 would even consider having a bond secured by real estate,

18 321 Nahant Street is obviously subject to forfeiture,

19 because we consider that a wire fraud, and everything else

20 that Mr. DeCicco owns would be subject to tax liens.  So,

21 Your Honor, I don't think that's going to secure his

22 appearance given that he's likely to not have a lot of

23 equity in those properties.

24          And I would point out that there's only one

25 property actually in his name.  I think Mr. Kendall said

1 that he bought all these properties in the last six months

2 in his name.  Only 321 Nahant street's actually in his name.

3 The rest are in the names of LLCs.

4          MR. KENDALL:  Your Honor, may I address a couple

5 of the factual issues my sister has raised?  I don't think

6 she's done justice to the record, and I'll be very quick.

7          THE COURT:  It's almost three o'clock.  I have

8 people waiting for more cases.

9          MR. KENDALL:  A man's freedom is at issue, Your

10 Honor.  If I could just have five minutes?  That's all I

11 ask.

12          THE COURT:  Go ahead.

13          MR. KENDALL:  What we're proposing to secure as

14 the real estate is Atlantis Marina, a business he owns.  The

15 value's three and a half million dollars.  I proposed it

16 already to Pretrial Services.

17          The amount of taxes that they're talking about is

18 a $350,000 dispute.  Any one of the pieces of real estate at

19 issue here would easily satisfy that, Your Honor.

20          So the Atlantis Marina, I have a photograph from

21 the website if that would be helpful to the Court.  You can

22 look it up yourself on the website if you want to see for

23 yourself.  It is a substantial piece of waterfront property

24 in Winthrop.  It was a business that he owns that he

25 reported to Pretrial Services.  His role in it --

1        And it all can be confirmed, you know, by the

2 various (inaudible) that the government has.

3        If I could just hand you up the website for it?

4        That will provide more than enough financial

5 security to ensure his appearance, Your Honor.

6        With respect to his knowledge about the

7 investigation, there's two points that were made during the

8 hearing.  The first was the conversation with Charlie

9 Lightbody.  When the car dealer complained to Charlie

10 Lightbody that DeCicco beat him, Lightbody said, well, he

11 knows you're an informant against him, or he knows the

12 reason he's under investigation with the IRS is because of

13 you.

14        Second, they subpoenaed Mr. DeCicco's current

15 girlfriend about the purchase of the flowers.  There aren't

16 too much secrets going on here about the investigation, Your

17 Honor.  He's known about it.  I was retained in this case

18 back in April of 2015.  He knows he's been under

19 investigation for two years, at least.

20        I suggest more than two years have gone by.

21 There's been no incident or whatever with the car dealer.

22        You can easily fashion conditions of release so he

23 can work, be with his family, continue his employment.

24        If the IRS really wants to collect their money,

25 they want his real estate deals to continue and not

1 collapse.

2         Thank you very much, Your Honor.

3         THE COURT:  When was the girlfriend interviewed?

4         MS. BARCLAY:  Last week.

5         THE COURT:  All right.  If you're here on the

6 three o'clock, it's going to be about 20 minutes; and if

7 you're here on the 3:30, it's going to be around 3:45.

8         MR. KENDALL:  Your Honor, I believe she was in

9 last week, but she was subpoenaed a good time prior to that.

10 I don't know how many weeks prior.

11         MS. BARCLAY:  She was subpoenaed earlier, Your

12 Honor.  She was not informed of the subject matter on which

13 we were going to talk to her until last Thursday.

14         THE COURT:  All right.  Okay.  The defendant is

15 before the Court on the basis of a criminal complaint

16 charging him with extortion in violation of 18 USC 1951.  If

17 convicted, he faces up to 20 years in jail.  The government

18 has moved to detain the defendant on the grounds of that he

19 is an unacceptable risk of flight and a danger to the

20 community.

21         The applicable law is as follows.  In order to

22 detain a person pending trial under the Bail Reform Act, the

23 judicial officer must find by clear and convincing evidence

24 that the defendant is a danger to the community or by a

25 preponderance of the evidence that the defendant poses a

1  risk of flight.  The judicial officer may then detain the

2  person pending trial only if the judicial officer determines

3  that no condition or combination of conditions will

4  reasonably assure the appearance of the person, as required,

5  and the safety of any other person and the community.

6          In making the determination as to whether there's

7  such a condition or a combination of conditions, the Court

8  is required to consider the factors that are set forth in 18

9  USC 3142(g).  They are:

10         The nature and circumstances of the offense

11 including whether it is a crime of violence;

12         The weight of the evidence against the person;

13         The person's history and characteristics -- their

14 ties to the community, employment history, financial

15 resources, past conduct;

16         Whether at the time the person was on probation,

17 parole or some other type of supervision;

18         And finally, the nature and seriousness of the

19 danger to any person or the community that would be posed by

20 the person's release.

21         The defendant has proposed release on what I would

22 call a significant package.  It is a bond in the amount of

23 $200,000 secured by the Atlantis Marina which has been

24 represented to me -- and I'll accept this for purposes of my

25 determination this afternoon -- to be valued at $3.5

1  million.  This is a piece of property that is in the

2  defendant's name.  The defendant would move from his current

3  address which would take him away from CW-1, and the other

4  kind of standard conditions of release to the extent that

5  they are applicable.

6           In making my determination I've considered the

7  affidavit of Special Agent Sandra Lemanski; the affidavit of

8  Matthew Elio, the Special Agent whose affidavit was in

9  support of the criminal complaint; the Pretrial Services'

10 report; and the exhibits that were offered today.

11          I find that the conditions that are being proposed

12 --

13          Let me put it a different way.

14          That the government has failed to show by a

15 preponderance of the evidence that the defendant poses a

16 risk of flight that cannot be addressed by the conditions

17 that are being proposed.  I think there's sufficient and

18 would reasonably assure the defendant's appearance as

19 required.

20          I also find by clear and convincing evidence that

21 the defendant is a danger to the community, and that no

22 condition or combination of conditions will reasonably

23 assure the defendant's -- will reasonably assure the safety

24 of the community, and so I'm going to grant the government's

25 motion and order the defendant detained.

1        Let me address briefly the factors that I've

2    considered in support of this.

3        The first is the nature and circumstances of the

4    offense charged.  This is a crime of violence; and that's

5    not only a criminal definition, it's what the evidence in

6    this case shows.  A video was presented.  The victim in this

7    case was at his place of business during business hours, and

8    the person later identified as CW-2 went in to the

9    dealership and physically assaulted this individual and was

10   paid a thousand dollars for it.  The portion of the video

11   that I watched was maybe 45 seconds long.

12        It's hard to evaluate how serious an assault it

13   was, but it was clearly the use of violence, and so I find

14   that to be a factor, and an important one, in the

15   determination that the defendant needs to be detained on

16   grounds of dangerousness.

17        I couple with that the flowers and the threat that

18   is inherent in them.  The fact that they were addressed to

19   Gary, the notion that we know who really owns this car

20   dealership, statements that were made in the context of the

21   owner resisting attempts by the defendant to make himself a

22   partner in the business, a person of Iranian decent, who

23   makes -- gets mentioned in that note being told that we hope

24   this cross and flowers or whatever it is helps you get rid

25   of that Muslim prick, a clear reference to the victim, and

1  in the Court's view a message that was intended to convey

2  exactly that.

3          It's interesting that that message came in early

4  August of 2014, and then about five months later the

5  defendant -- excuse me -- the victim's assaulted at the

6  business by the CW.

7          I turn to the weight of the evidence against the

8  defendant.  I find this factor neither supports nor detracts

9  from detention in this case.

10          There is clearly a serious assault, but I do

11  recognize, as Mr. Kendall has pointed out through his

12  cross-examination, that the cooperating witnesses are going

13  to be subject to cross-examination about their motives,

14  their incentives to cooperate, their credibility.

15          I know from the affidavit of Special Agent Matthew

16  Elio that some of the cooperators have criminal histories

17  that would make them -- that would cause a fact finder to

18  question their reliability.

19          On the other hand, I consider the fact, as I

20  mentioned, in making the probable cause determination that

21  each of these cooperators have made a statement against

22  their own penal interest in this matter.  And that is

23  something that really has to be considered carefully,

24  because as I indicated before, people do not walk around

25  saying, you know, I committed this crime, or I was involved

1 in that, especially in a crime of violence, and especially

2 when they are confronted with agents from the FBI,

3 Massachusetts State Police and IRS.  It's not a jailhouse

4 confession to someone.

5          So, and then there --

6          I mean, there is the evidence that exists outside

7 of the cooperating witnesses, and it's pretty good evidence.

8 It's not absolutely overwhelming, but there is the note and

9 the flowers.  There's no question that there was an assault.

10          And then there's this -- it was referred to in

11 Agent Elio's affidavit a conversation on January 31st of

12 2017 where CW-3 met with a person described in the affidavit

13 as co-conspirator 1, and according to Agent Elio during this

14 meeting, which was audio recorded, CW-3 handed

15 co-conspirator 1 Agent Elio's business card and told

16 co-conspirator 1, that, quote, "They were fucked because

17 they're fucking -- they fucking nailed.  Gary paid for it to

18 get done and shit."

19          And the co-conspirator 1 responded, "How do they

20 know that?"

21          And then later on in the conversation said, "I'll

22 talk to Gary.  I've been doing work up at Polaski," and

23 co-conspirator 1 would be seeing him there.

24          And that's a statement when, at least at the time,

25 co-conspirator 1 did not know he was being recorded, did not

1  know that the agents were listening or going to be listening

2  to this recording, and makes a statement that seriously

3  implicates the defendant in this offense.

4        So I consider all those facts.  That's not a

5  complete recitation of the facts.  Recognizing that there

6  are some weaknesses in the government's case, I find that at

7  least in a marginal way the strength of the evidence

8  supports detention.

9        Let me turn to history and characteristics.  In

10  the defendant's favor he is a lifelong resident.  His family

11  is here other than his parents who are in Florida.  The

12  defendant's business is here, other than a $400,000

13  condominium in Miami Beach or wherever it is in Florida.

14  Defendant has very significant ties.

15        If I understood the Pretrial Services report, I

16  was bothered by the fact that discussing family ties the

17  defendant said he has daughter Linda age 18 with Pamela

18  Avedisian who resides in an unknown address in

19  Massachusetts, and then the defendant goes on to say how

20  close his relationship is with his daughter and how he

21  maintains close contact with her.  It doesn't quite make

22  sense that he wouldn't know her address -- or Pamela

23  Avedisian's address in Massachusetts.  I don't know if

24  that's an instance of holding back information or not, but

25  it's something that I do consider.

137

1          But as a general matter, the defendant has ties to

2    this community.

3          My understanding is there's not a drug history, an

4    alcohol history, or record concerning failures to appear in

5    court.  And of course, at the time of the conduct that's

6    under investigation, I'm referring just to the extortion,

7    the defendant was not on probation or parole.

8          I will say one of the big concerns I have is the

9    defendant's lack of candor in the affidavit that was signed

10   in it's either November or December.  It's the one in which

11   he says he does not have a family or business relationship

12   with Girlfriend 2.

13         Look, I understand that the word "are" refers to

14   the present tense, but come on.  Let's be -- let's be real

15   here.  We know why that rule is there.  It's so that a

16   financial business that is reviewing a transaction can

17   determine, you know, is there a prior relationship there, do

18   we need to be concerned about collusion, are we getting

19   taken on this thing.

20         I don't know whether the bank got taken or not.

21   It doesn't matter to me that the bank got $649,000 and not

22   1.1 million or less than that.  That's not the point.

23         The point is on an affidavit in this case the

24   defendant gave what is in the Court's view a materially

25   false statement.  It's a statement that caused a lawyer to

1 withdraw when the defendant refused to sign a rider or

2 something that would clarify this information.  But, you

3 know, from just a common sense point of view, it's a

4 dishonest statement that was made to a financial institution

5 when the defendant knew they were going to be relying on it

6 for something that's very important.

7          Why do I make a big deal about this?  Because

8 being released on pre-trial conditions also requires

9 honesty.  It doesn't work if you have a defendant who's

10 going to come really, really close to the line and take

11 advantage of every single opportunity that he has to wiggle

12 out of something.  Supervision doesn't work.  It's a

13 partnership.  And the partnership suffers when there's not

14 that kind of relationship there.  I don't have confidence

15 when I look at that or when I look at the statement in the

16 Pretrial Services, "I don't know where she lives," this is

17 the daughter I have contact with every single day, it's kind

18 of like -- I don't get it.

19          MR. KENDALL:  Your Honor --

20          THE COURT:  As for --

21          I'm not being interrupted, and I'm not hearing

22 argument.  Don't say another word.

23          I'm going to tell you something else too.  You owe

24 the IRS 3.5 or whatever it is.  $350,000 in you're

25 outstanding $1.6 million on real property in September of

1  '16, November of '16, and January of '17.  That strikes me

2  as someone who has a problem owning up to their obligations.

3          And again I take that back to the context of

4  pre-trial supervision.  It doesn't work if you're not going

5  to own up, recognize what your obligations are, and follow

6  through on them.

7          So while I recognize the defendant has really

8  substantial ties, and it's why I find he's not a risk of

9  flight, I factor it in to the determination as to whether is

10  he a danger to the community.

11          It brings me to the last factor; and that is, the

12  nature and seriousness of the danger.  There are two things

13  that I want to address here.  One is my best reading of the

14  record is the defendant did not know that the CW was

15  cooperating on this extortion matter on the assault until

16  January 31, 2017, when a person identified as co-conspirator

17  1 said, "I'm going to talk to Gary up at Polaski and I will

18  let him know."  And even if -- assuming that that did it at

19  all, the statement that was made to Mr. Lightbody is he

20  knows the IRS is looking at him because of the cooperating

21  witness 1.  That, in the Court's view, has nothing to do

22  with the alleged extortion in this case and the assault that

23  took place.

24          I mean, it would be reasonable for a person to

25  think the IRS is not investigating assaults and extortion,

1 and that's the record that I have.  The best evidence that I

2 can read from this record is that if the defendant found out

3 that the cooperating witness was cooperating in the

4 extortion case or that the extortion case was even coming,

5 it's very recent history, within the last six to seven

6 weeks.

7         Here's the other thing that I want to mention, and

8 it's important in this calculus; and that is, the defendant

9 has the financial wherewithal and the ability to get other

10 people to do his dirty work.  That's, in fact, what this

11 case, at least the extortion, is about.  And it can easily

12 happen that the defendant is on release, never goes near the

13 cooperating witness or anybody else, but doesn't have to,

14 because there are other people who can do those things, and

15 he can whip them up into doing those things with offers of

16 money and statements that so-and-so sexually harassed his

17 daughter or his girlfriend.

18         And that gives me concern, because that goes to

19 the ability to supervise the defendant and the danger that

20 he poses.

21         I'm not going to belabor it more than I have.  I

22 don't find the defendant's a risk of flight.

23         I think on a careful assessment of the evidence

24 that's before the Court, it's both clear and convincing

25 evidence that the defendant is a danger, and I'm not

1 satisfied that what's being proposed protects the community

2 from that danger, and so I'm going to order the defendant

3 detained.

4          Mr. DeCicco, would you stand?

5          Another judge can look at this same information

6 and come to different conclusions.  The package that has

7 been proposed is a significant one.  You have the right to

8 seek review of my order, and you are hereby notified of

9 that.

10          Anything from the government?

11          MS. BARCLAY:  Nothing further, Your Honor.

12          THE COURT:  Mr. Kendall?

13          MR. KENDALL:  Nothing further, Your Honor.

14          THE COURT:  We're in recess.

15      (Court adjourned at 3:21:10 p.m.)

16

17

18

19

20

21

22

23

24

25

142

```
1                         CERTIFICATION

2        I, Judy Bond, a court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   electronic sound recording of the proceedings in the

5   above-entitled matter.

6

7

8   _____    March 25, 2017
    Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**