IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-cr-10092-NMG |
| | ) | |
| GARY P. DECICCO, | ) | |
| Defendant | ) | |

**UNITED STATES' OPPOSITION TO
MOTION FOR REVIEW OF DETENTION ORDER BY DISTRICT COURT JUDGE**

The United States Attorney hereby respectfully requests that the Court deny Defendant Gary P. DeCicco's Motion for Review of Detention Order by District Court Judge (Docket No. 34) (the Motion). Defendant was detained because United States Magistrate Judge David H. Hennessy determined, after lengthy evidentiary hearing, that Defendant is a danger to the community, and that no condition or combination of conditions will reasonably assure the safety of the community. Docket Nos. 12, 13. Defendant's Motion is simply a recitation of the same arguments rejected by Magistrate Judge Hennessy on March 22, 2017, and *de novo* review of the record below reveals only that the government has established by clear and convincing evidence that Defendant is a danger to the community, and that no condition or combination of conditions will reasonably assure the safety of the community. Accordingly, the Motion should be denied.

I. **FACTUAL BACKGROUND**

In 2013 and 2014, almost a decade after he sold a vacant lot to CW-1, Defendant made comments to CW-1 and others indicating that he wanted or believed he had a financial interest in the automobile dealership that CW-1 was building on the lot. In August 2014, after CW-1 told Defendant's associates that he did not want Defendant involved in his business, Defendant sent

one of his girlfriends (GF-1) into a flower shop and told her to send flowers and a crystal cross to CW-1. Defendant dictated the message for GF-1 to write on the card: "Congrats Gary – We all know who's place that is. We hope this cross will help you get rid of that MUSLIM PRICK. From all RT. 1 Autodealers." *See* Detention Exhibit 1. Around the same time, CW-1 began receiving harassing phone calls, including a call from a blocked caller who said "fucking Muslim, I'm going to fucking kill you," and another call in which a male told CW-1 that the cross was for him and that he was going to get burned on the cross.

On January 11, 2015, CW-1 was viciously beaten at his automobile dealership and the assault was captured on surveillance video. *See* Detention Exhibit 2. The video shows that the assailant punched CW-1 numerous times, and after CW-1 fell to the ground the assailant picked up a chair and used it to strike CW-1, then kicked CW-1 with a shod foot several times. The video shows CW-1 staggering around the dealership after the attack in obvious distress, and CW-1 suffered injuries to include a broken jaw that had to be wired shut for approximately 40 days.

Investigators ultimately identified CW-2 as the assailant and traced the assault to Defendant after talking to CW-2, CW-3 and CW-4. None of CW-2, CW-3 or CW-4 were given any promises, rewards or inducements in exchange for their cooperation. CW-2 told investigators that he was hired by CW-3 to assault CW-1 for $1,000. CW-3 admitted that he hired CW-2 to beat CW-1 after CW-4, who was a mutual associate of CW-3 and Defendant, asked CW-3 to find someone to beat CW-1 for Defendant. CW-4 admitted that Defendant asked him to find someone to beat CW-1, and CW-4 admitted that he asked CW-3 to arrange the beating. CW-4 also told investigators that, after the beating, Defendant gave him cash which CW-4 gave to CW-2 as payment for assaulting CW-1.

CW-4 is the only person in the chain of events of January 11, 2015 who spoke directly to Defendant about the assault. Defendant told CW-4 that CW-1 was a neighbor of Defendant and that CW-1 had been harassing either Defendant's daughter or his ex-wife. Defendant also told CW-4 that he would pay more for the assault if it was really good, but ultimately Defendant refused to pay more because, according to Defendant, the assault was not good enough.

On March 17, 2017, Defendant was arrested on a charge of Hobbs Act extortion in violation of 18 U.S.C. § 1951. Docket Nos. 4, 4-1 at ¶ 27, 11. On March 22, 2017, Magistrate Judge Hennessy held a detention and probable cause hearing. In addition to evidence regarding the extortion attempt, the government presented evidence that Defendant and another of his girlfriends (GF-2) submitted materially false affidavits to a mortgage company, ultimately defrauding the mortgage company out of over $600,000. These events occurred between October 2015 and December 2016, while Defendant knew he was under investigation for tax evasion. The government also presented evidence that Defendant had an outstanding, stipulated federal tax obligation of over $350,000 as of September 2016, but instead of paying the IRS, he purchased over $1.3 million in real estate between September 2016 and January 2017. Finally, the government established that Defendant lied about his assets and outstanding tax debt when he was interviewed by Pretrial Services on March 17, 2017.

Defendant's attorney cross-examined IRS Special Agent Sandra Lemanski for several hours but did not present any witnesses at the detention hearing. Magistrate Judge Hennessy ultimately ordered Defendant detained pending trial because he found "by clear and convincing evidence that the defendant is a danger to the community, and that no condition or combination of conditions . . . will reasonably assure the safety of the community." Docket No. 18, at 132.

On April 13, 2017, an Indictment was returned charging Defendant with attempted extortion in violation of 18 U.S.C. § 1951.  Docket No. 23.

## II.  STANDARD OF REVIEW AND THRESHOLD FOR HEARING

After an order of detention issues, the Bail Reform Act offers a defendant two choices: a motion for review of the detention order under 18 U.S.C. § 3145(b), or a motion to reopen the detention hearing under 18 U.S.C. § 3142(f).  *United States v. Reynolds*, 609 F.Supp.2d 108, 110 (D.Me. 2009) (citing *United States v. Rebollo-Andino*, 312 Fed.Appx. 346, 347-48, 2009 WL 565697, *1-2 (1st Cir. Mar. 6, 2009)).  Under Section 3145(b), the District Court reviews a Magistrate Judge's detention order under Section 3145(b) *de novo*, but is not required to conduct a hearing.  *See, e.g., United States v. Tortora,* 922 F.2d 880, 883 n.4 (1st Cir.1990) (standard for district court's review of magistrate's detention findings under Section 3145(b) is *de novo*); *United States v. Rebollo-Andino*, 312 Fed.Appx. 346, 348 (1st Cir. 2009) (district court was not required to convene hearing on defendant's motion for *de novo* review under Section 3145(b)); *United States v. Pierce*, 107 F.Supp.2d 126, 127 (D. Mass. 2000) ("Section 3145(b) of Title 18 does not provide for a hearing as a matter of right and this Court declines to grant one"); *United States v. Foley*, 07-10390-RGS, 2009 WL 458558, *3, n.3 (D. Mass. Feb. 24, 2009) (declining to convene evidentiary hearing).  In contrast, under Section 3142(f), the Magistrate Judge who issued the detention order may reopen the detention hearing "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community."  18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003) ("By its terms, [Section 3142(f)] applies to reconsideration of a detention or

4

release order *by the same judicial officer who entered the initial order*") (emphasis added).

Defendant has styled his Motion as a request for the District Court's review of a detention order under Section 3145(b), but has asked for an evidentiary hearing at which "he intends to present witnesses who have known him for years, and can attest to his peaceful character and the likelihood he will obey his conditions of release," as well as "witnesses who will challenge the strength of the government's case." Docket No. 35, at 2. Because Defendant is essentially asking to reopen the detention hearing, the Motion is properly considered under Section 3142(f), and should have been filed with Magistrate Judge Hennessy.

Regardless of whether the Motion is considered under Section 3142(f) or Section 3145(b), Defendant is not entitled to an evidentiary hearing at which he will present "witnesses who have known him for years," (Docket No. 35, at 2) because such evidence was known to and available to Defendant at the time of the original detention hearing. *See, e.g.*, *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991) (decision not to reopen detention hearing under Section 3142(f) was not erroneous; evidence offered consisted of affidavits from those who knew defendant) (citing *United States v. Hare*, 873 F.2d 796 (5th Cir. 1989)); *Foley*, 07-10390-RGS, 2009 WL 458558, *3, n.3 (no reason to convene evidentiary hearing under Section 3145(b) "absent some new evidence that was unavailable to a defendant at the time of the original hearing"); *United States v. Rodriguez-Adorno*, 606 F.Supp.2d 232, 239 (D.P.R. 2009) (district court should not hear new evidence at detention hearing that does not qualify under Section 3142(f)); *United States v. Bergner*, 800 F.Supp. 659, 661-62 (N.D. Ind. 1992) (in order to be entitled to hearing under Section 3145(b), defendant must meet Section 3142(f) standard). *Cf. United States v. Debrum*, 15-10292, 2015 WL 6134359 (D. Mass. Oct. 19, 2015) (convening evidentiary hearing to receive information regarding defendant's *current* medical condition and

*current* ability of correctional facility where defendant was detained *after* initial detention hearing to handle defendant's medical needs).

The two articles Defendant appended to his Motion were published in 2016.[1] *See* Docket Nos. 35-6, 35-7. By their own accounts, all of the individuals who have written letters for the Motion were known to Defendant on March 22, 2017. See Docket Nos. 35-1 (neighbor who has known Defendant for 11 years); 35-2 (same); 35-3 (referring to decade of friendship with Defendant); 35-4 (met Defendant fifteen years ago); 35-5 (represented Defendant for fifteen years); 35-6 (met Defendant in 2015); 35-8 (has known Defendant for many years); 35-9 (Defendant has helped organization for many years); 35-10 (has known Defendant for three years); 35-11 (has dealt with Defendant for nearly two decades). In fact, at least one of the letter writers – Attorney James Cipoletta (Docket No. 35-4) – was present in Court for the detention hearing on March 22, 2017. Because the information in the articles and letters was known to Defendant on March 22, the Court should not reopen the detention hearing to allow him to present such evidence. *Dillon*, 938 F.2d at 1415; *Foley*, 07-10390-RGS, 2009 WL 458558, *3; *Rodriguez-Adorno*, 606 F.Supp.2d at 239; 28 U.S.C. §§ 3142(f), 3145(b).

Further, Defendant's vague representation that he will present "witnesses who will challenge the strength of the government's case" does not come anywhere close to meeting his burden of demonstrating that the evidence he intends to present was not known to him at the time of the hearing and has a material bearing on the release issue. *See Rebollo-Andino*, 312 Fed.Appx. at 348 (district court was not required to convene evidentiary hearing without some

---

[1] The government notes that Defendant's involvement with the organizations identified in the articles appears to have commenced *after* he learned he was under investigation for tax evasion in April 2015.

further explanation of defendant's purported "medical conditions"). Accordingly, the Court should decline to convene an evidentiary hearing and should consider detention *de novo* by reviewing the record below. *See, e.g., Pierce*, 107 F.Supp.2d at 127; *Foley*, 97-10399-RGS, 2009 WL 458558, *2-3; *United States v. Hernandez*, 14-10367-RGS, 2015 WL 4448094, *1 (D. Mass. July 20, 2015). *De novo* review of the record, which includes the Affidavit of Special Agent Matthew Elio in support of the Complaint (Docket No. 3-1), the transcript of the detention hearing on March 22, 2017 (Docket No. 18), the police report from August 2014 which includes pictures of the flowers, cross and card (Detention Exhibit 1), the video of the assault (Detention Exhibit 2), and the Affidavit of Special Agent Sandra Lemanski in Support of Pretrial Detention (Detention Exhibit 3), compels the conclusion that Magistrate Judge Hennessy reached on March 22: there are no conditions of Defendant's release that will reasonably assure the safety of any other person and the community.[2]

---

[2] Like the articles and letters described above, the Court should not consider the transcript of Special Agent Lemanski's grand jury testimony (Docket No. 35-15), the interview memoranda dated January 17, 2017 (Docket No. 35-13) and March 13, 2017 (Docket No. 35-17), or the January 19, 2017 email exchange between undersigned counsel and the investigative agents (Docket No. 35-16), all of which Defendant publically filed and referred to in support of his Motion without permission of the Court and without consulting with the government. *See* Docket Nos. 35; 35-13; 35-15; 35-17. These documents were produced *in advance of the detention* hearing pursuant to the Jencks Act, but Defendant did not offer them into evidence at the hearing. Accordingly, they are not part of the record for consideration on *de novo* review.

### III. ARGUMENT

Under the Bail Reform Act of 1984, detention of a defendant is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government is required to demonstrate, by a preponderance of the evidence, that a defendant poses a risk of flight or, by clear and convincing evidence, that he is a danger to the community. *United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir.1991).

In considering the instant Motion, the Court must determine whether any condition or combination of conditions will reasonably assure "the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).[3] In this regard, it bears emphasizing that the definition of "danger to the community" under the Bail Reform Act extends beyond mere physical violence. As noted by the Senate Judiciary:

> The concept of defendant's dangerousness is described throughout this chapter by the term "safety of any other person of the community." This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.

---

[3] The government maintains that it demonstrated by a preponderance of the evidence at the March 22, 2017 detention hearing that Defendant is a flight risk, and reserves the right to seek review of Magistrate Judge Hennessy's findings.

8

S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also Patriarca*, 948 F.2d at 792 n.2 (danger to community does not refer only to risk of physical violence); *Tortora*, 922 F.2d at 884 (same).

In making this determination, the Court must consider the factors set out in 18 U.S.C. § 3142(g), which include the nature and circumstances of the offense charged; the weight of the evidence against Defendant; Defendant's character, financial resources, past conduct, and criminal history; and the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release. As detailed below, the factors to be considered under 18 U.S.C. 3142(g) compel Defendant's continued detention.

A. Nature and Circumstances of the Offense

Here, the nature of the charge is among the most serious known to our system of justice: Defendant hired someone to viciously beat the victim because Defendant wanted a financial interest in the victim's car dealership. As Magistrate Judge Hennessy noted, "this is a crime of violence; and that's not only a criminal definition, it's what the evidence in this case shows." Docket No. 18, at 133; Det. Ex. 2 (video).

Moreover, Defendant's extortion attempt was not limited to the beating. Conspicuously absent from Defedant's pleadings is any mention of the flowers, cross and card he arranged for GF-1 to send to CW-1 in August 2014. *See* Det. Ex. 1. As noted by Magistrate Judge Hennessy, the flowers and the threat inherent in them (the fact that they were addressed to "Gary," the notion that "We all know who's place that is," the message that "we hope this cross will help you get rid of that MUSLIM PRICK," a clear reference to the victim) are coupled with the assault and convey a serious significant threat to the victim. Docket No. 18, at 133. Significantly, Defendant does not dispute that he arranged the flower delivery or the beating. Instead, he

9

challenges the government's evidence of his motive for harassing, threatening and assaulting CW-1.

  B. Weight of the Evidence

Defendant faces a substantial amount of evidence. The assault was captured on surveillance video and the card, cross and flowers were photographed by the local police on the day they were delivered. *See United States v. Perez-Franco*, 839 F.2d 867, 870 (1st Cir. 1988) (videotaped recording of drug sale was strong weight of evidence supporting pretrial detention). Multiple witnesses will testify against Defendant, including the victim (CW-1), one of Defendant's current girlfriends (GF-1), one of Defendant's former employees and current tenants (CW-4), one of Defendant's associates (CW-3) and the individual who carried out the beating (CW-2). *Cf. Patriarca*, 948 F.2d at 792 (lack of testimonial witnesses, and corresponding lack of threat of witness tampering, supported pretrial release). The statements of CW-2, CW-3 and CW-4 are materially consistent,[4] and those statements are corroborated by phone records reflecting contact between CW-2 and CW-3, between CW-3 and CW-4, and between CW-4 and Defendant on and around January 11, 2015. Moreover, the statements of CW-2, CW-3 and CW-4 were made against their penal interests and in the absence of any promises, rewards or inducements.

Defendant asserts that "one of the weaknesses in the government's case" is the fact that CW-2, CW-3 and CW-4 all told investigators "that the assault was ordered because of CW-1's

---

[4] Defendant's allegation that CW-2 did not accurately describe CW-4's height and age (Docket No. 35 at 7-8) is certainly an area for cross examination of both witnesses at trial, but that alone does not detract in any significant way from CW-4's own admission against his penal interest that he delivered $1,000 in cash from Defendant to CW-2 at a pub after CW-2 had beaten CW-1 for Defendant.

10

behavior toward a woman."[5]  Docket No. 35, at 7.  What Defendant omits from his pleadings is the fact that *Defendant himself* planted this "evidence" of his alleged motive for the beating. Defendant told CW-4 that CW-1 had been harassing his daughter or ex-wife.  *See* Docket No. 18, at 16; Det. Ex. 3, ¶ 20.  CW-4 then passed along this "motive" for the beating to CW-3, who in turn passed it along to CW-2.  *See* Det. Ex. 3, ¶¶ 15, 18.  As Magistrate Judge Hennessy stated, it makes sense that Defendant gave this motive to CW-4, because "misconduct directed toward a woman is . . . the kind of conduct that's going to really get somebody raised up and is going to help get people's buy in to break the law, deliver a beating . . . that's worth [$1,000 or $2,000], whatever it is."  Docket No. 18, at 119.  But the fact that *Defendant* told CW-4 that CW-1 had harassed a woman in his life is belied by the evidence that Defendant arranged the beating because he wanted an interest in CW-1's business.  *See*, *e.g.*, Docket No. 18, at 7 (Defendant commented to CW-1 about being partners); Detention Ex. 3, ¶ 6 (Defendant requested that architect put his name on office at car dealership).  The most significant of this evidence is that which is entirely missing from the Motion because Defendant cannot explain it away and does not deny it: the threatening flower delivery with the card arranged and paid for by Defendant, which mentioned Defendant's ownership of the dealership and nothing at all about a woman.  Considering all of the proof, including the physical and documentary evidence and the testimony of GF-1, CW-1, CW-2, CW-3 and CW-4, there is a strong likelihood of conviction.

---

[5] Aside from casting baseless aspersions on CW-1 and pointing out CW-2's alleged errors regarding CW-4's height and age, Defendant identified no other alleged "weaknesses" in the government's case.

C.  History and Characteristics of Defendant

In addition to the violence alleged in this case, Defendant has a history of untruthfulness, and has demonstrated that he cannot be trusted to follow conditions of pretrial release. As an initial matter, Defendant was convicted of four counts of mail fraud in 2004 in the District of Massachusetts. *See United States v. DeCicco*, 439 F.3d 36 (1st Cir. 2006) (upholding conviction for mail fraud based on filing false and fraudulent claims for building loss insurance proceeds). Moreover, after his arrest on March 17, 2017, Defendant lied to Pretrial Services – an arm of the Court – about his assets, his outstanding tax obligation,[6] and his knowledge of Pamela Avedisian's address. Defendant's untruthfulness with Pretrial Services clearly weighs heavily in favor of detention. As Magistrate Judge Hennessy stated:

> . . . being released on pre-trial conditions also requires honesty. It doesn't work if you have a defendant who's going to come really, really close to the line and take advantage of every single opportunity that he has to wiggle out of something. Supervision doesn't work. It's a partnership. And the partnership suffers when there's not that kind of relationship there.

Docket No. 18, at 138.

Further, there is substantial evidence that Defendant and GF-2 lied to a mortgage company in November and December 2016, defrauding that mortgage company of over $600,000 by short selling a real property where Defendant's ex-girlfriend and daughter have lived for years. See Docket No. 18, at 17-22; Det. Ex. 3, ¶¶ 24-48. Defendant's argument that the mortgage company made more money from the fraudulent short sale than it would have from a foreclosure sale entirely misses the point, as noted by Magistrate Judge Hennessy. *See* Docket

---

[6] Even if, as Defendant alludes (Docket No. 35, at 9 n.5), Defendant told Pretrial Services that the tax obligation was $160,000 instead of $16,000, he still underrepresented the obligation by almost $200,000. The $350,000 obligation is not in dispute. Docket No. 35, at 35 n.5.

12

No. 18, at 137 ("It doesn't matter to me that the bank got $649,000 and not 1.1 million or less than that. . . The point is on an affidavit in this case the defendant gave what is in the Court's view a materially false statement."). The fact of the matter is, had the Defendant and GF-2 just made the mortgage payments on the property instead of conducting the fraudulent short sale, the mortgage company would not have lost *any* money.

Finally, Defendant – by agreement – owed the IRS approximately $350,000 as of September 2016. Instead of paying off that debt, he spent over $1.3 million between September 2016 and January 2017 on real property. Defendant clearly cannot own up to his legal obligations, and cannot be trusted to comply with pretrial release conditions.

D. Nature and Seriousness of the Danger

Defendant poses a danger to CW-1, to the other witnesses in this case, and to the community. With respect to CW-1, Defendant asserts that Magistrate Judge Hennessy "failed to consider in his detention decision . . . the government's laissez faire attitude regarding the element of dangerousness during its 26 month investigation of the assault of CW-1." Document No. 35, at 14. In support of this argument, Defendant cites only the testimony of IRS Special Agent Lemanksi that she took no steps to protect CW-1 from Defendant.[7] *Id*, at 7, 14-15. However, as Defendant notes, CW-1 had a relationship with the FBI, not the IRS, and Defendant's counsel never asked Special Agent Lemanski whether other agents may have taken steps to protect CW-1 from Defendant.

---

[7] In April 2015, Defendant's counsel was told only that there was an IRS investigation of Defendant for possible tax evasion. Investigators had not even identified CW-2 in April 2015, and did not definitively link the extortion to Defendant until December 2016 when CW-3 admitted that CW-4 hired him to arrange the beating for Defendant.

Moreover, there was evidence presented at the detention hearing that the extortion investigation was entirely covert until January 31, 2017, and that Defendant did not learn about the extortion investigation until February 2017. Docket No. 18, at 23. CW-2 did not know the name of CW-1 or Defendant, and because he remained in prison after he admitted his involvement in the assault in November 2015, he posed little risk to CW-1. CW-3 likewise posed little risk to CW-1, because CW-3 also did not know the name of CW-1, immediately cooperated with investigators and admitted his involvement in the assault in December 2016, and repeatedly expressed concern for his own safety *vis a vis* Defendant. Docket No. 3-1, ¶ 20. Finally, while CW-4's identity was known to law enforcement before Defendant's March 17 arrest, they did not approach CW-4 until Defendant was in custody because CW-4 was Defendant's employee and tenant of Defendant, and approaching CW-4 would have posed a significant risk to CW-1.

The danger to the community includes not only violence, which Defendant has the resources to arrange through others, but also Defendant's dishonesty. Defendant has demonstrated that he will lie when it suits him, whether it is a lie to Pretrial Services to prevent anyone from contacting GF-2 before they get their stories straight, a lie to a mortgage company to get out from under a $1 million plus mortgage for only about $600,000, or a lie to CW-4 in order to convince him that he should arrange the beating of CW-1 to avenge some wrong done to a woman. Defendant simply cannot be trusted not to continue his established pattern of deceit on pretrial release.

Defendant is facing a 20-year sentence. The stakes are very high for Defendant, and his violent nature and dishonesty will lend itself to witness intimidation, obstruction of justice and additional instances of fraud. Accordingly, he should remain detained pending trial.

## IV. CONCLUSION

For all of the foregoing reasons, the government respectfully submits that no condition or combination of conditions of Defendant's pretrial release will reasonably assure the safety of other persons and the community. Accordingly, the Motion should be denied without a hearing.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By: */s/Kristina E. Barclay*
Kristina E. Barclay
Assistant U.S. Attorney

Date: May 8, 2017

### CERTIFICATE OF SERVICE

I hereby certify that this document filed electronically on this date will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristina E. Barclay*
Kristina E. Barclay
Assistant United States Attorney

May 8, 2017