**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>GARY P. DECICCO,<br><br>Defendant. | Case No. 17-cr-10092-NMG |

**REPLY BRIEF AND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF GARY P. DECICCO'S MOTION FOR REVIEW OF DETENTION ORDER BY DISTRICT COURT JUDGE**

***LEAVE TO FILE GRANTED ON MAY 24, 2017***

## I. INTRODUCTION

Mr. DeCicco submits this joint reply brief and supplemental memorandum, as well as seven exhibits, as a rebuttal to the government's Opposition to Mr. DeCicco's Motion for Review of Detention Order by District Court Judge ("Motion"), ECF No. 34, and supporting Memorandum and Exhibits, ECF Nos. 35 to 35-17. In particular,

(i) Mr. DeCicco rebuts the government's argument that the Court should not even consider the additional evidence he has submitted. Opp'n 4-6, ECF No. 47. There is no statutory or other basis that supports the government's attempt to avoid confronting the relevant evidence.

(ii) Mr. DeCicco also submits seven newly acquired witness affidavits that challenge the weight of the government's evidence and likelihood of success at trial, and its claims of dangerousness pertaining to the detention determination under 18 U.S.C. § 3142(g).

Without belaboring the arguments that Mr. DeCicco previously made in the Memorandum, Mr. DeCicco reiterates that release on conditions is warranted in this case because:

1. For 26 months the government ostensibly suspected Mr. DeCicco of being involved in the "assault" on CW-1, the alleged victim, but took absolutely no steps to protect CW-1 or any other witness from Mr. DeCicco.[1] After 26 months passed without incident, the government suddenly concluded that Mr. DeCicco was a danger to the community and CW-1. This strategic shift in the government's position should not stand as sufficient reason to incarcerate Mr. DeCicco pretrial.

2. Mr. DeCicco is not a violent man – in his 58 years, he has never been associated with a violent incident either before or after the event alleged in this case. He does not associate with violent people or own weapons. The numerous affidavits submitted by neighbors, lawyers, dentists, family members and business associates on his behalf

[1] The government offered no protection to CW-1 who lived four houses away from Mr. DeCicco for more than two years after the assault. In order to minimize this evidence, the government incorrectly represents in its Opposition that Mr. DeCicco's counsel asked Special Agent Sandra Lemanski ("Agent Lemanski") at the detention hearing only whether she, as opposed to other federal agents, had offered any protection to CW-1. Opp'n 13. Mr. DeCicco's counsel in fact asked Agent Lemanski whether it was correct that in the months since the assault "federal law enforcement took no steps to try to protect [CW-1] from Mr. DeCicco." Tr. March 22, 2017 Hearing 45:17-19, ECF No. 18. Agent Lemanski answered that it was "standard practice" for the federal government to "inform the victim" to "call 911" if feeling threatened. Id. at 45:20-23. Later on, Mr. DeCicco's counsel employed a different angle with Agent Lemanski. He inquired whether CW-1 "ask[ed] the federal law enforcement to take any steps to protect him from Mr. DeCicco." Id. at 46:3-4. Agent Lemanski answered that she could only say that CW-1 did not "ask" her to take any steps. Id. at 46:5.

At the detention hearing, the government provided no examples of specific steps it had taken to protect CW-1. In its Opposition the government does the same thing – it refuses to give any example of protective actions taken by the federal government with respect to CW-1 other than "call 911," while at the same time trying to play word games with defense counsel's cross-examination of Agent Lemanski. The only reasonable conclusion is that the government has no examples to provide because there are none and concedes the significance of this evidence by trying to misrepresent it.

attest to this.[2] Even the single most important government witness against Mr. DeCicco – Jeffrey Prime ("Mr. Prime") a/k/a CW-4 -- has executed an affidavit and states he "would not feel threatened or intimidated in anyway [sic] if [Mr. DeCicco] were released on bail." Ex. 1, Aff. Jeffrey Prime ¶ 4. Mr. Prime equally states that other than the incident alleged in this case, he "ha[s] not known Gary DeCicco to be a violent person." Id. ¶ 3.[3]

3. The government has a weak federal case. Only CW-1 claims the dispute is over a car dealership. The other three government witnesses involved in carrying out the assault claim the dispute was one between two-middle aged neighbors over a woman. Tr. March 22, 2017 Hearing ("Tr. Hearing") 54, 56, 58, ECF No. 18. At most, the alleged crime in this case is an assault resulting from a dispute about a woman, and not an extortion of CW-1's business interests in a used car dealership. Proceeding with pretrial detention despite this major weakness in the government's case risks holding Mr. DeCicco in pretrial detention for longer than would otherwise be likely had the state pursued and won a case against Mr. DeCicco in state court for assault.

For these reasons and the reasons stated below in this reply brief and memorandum, Mr. DeCicco respectfully requests that the Court revoke Magistrate Judge Hennessy's detention order and release Mr. DeCicco on conditions.

[2] Mem. Supp. Mot. Detention Review District Judge ("Mem."), Exs. 1-10, ECF No. 35-1 to 11; Exs. 1-7.

[3] Mr. DeCicco contests all evidence that purports to claim he caused the assault of CW-1 and he does not concede any aspect of this issue. However, for purposes of this motion, Mr. DeCicco would like to focus the Court's attention on the blatant weakness in the prerequisite for federal jurisdiction – the long-running dispute between the two men was over a woman and other personal conflict, not a business in interstate commerce.

## II. ADDITIONAL EVIDENCE

In addition to the affidavits and documents filed as exhibits with the Memorandum, Mr. DeCicco has recently obtained affidavits from individuals who are crucial witnesses to the government's allegations.[4] These affidavits, described below, significantly weaken the government's case, placing even more in doubt whether the government has sufficient evidence to prove the *federal* crime of extortion and whether the government can clearly and convincingly prove that there are no reasonable conditions of release to ensure the safety of the community.

### a. Evidence from the Government's Main Witness that Mr. DeCicco's Release Would Not Endanger the Community

First, Mr. DeCicco has obtained an affidavit from Mr. Prime whom the government has identified at the detention hearing and in other proffers as CW-4.[5] Mr. Prime is the only person whom the government alleges can tie Mr. DeCicco to organizing the assault on CW-1. Id. The government has proffered that it first interviewed Mr. Prime on March 17, 2017, the date Mr. DeCicco was arrested and made his appearance in Court.[6] Soon after the arrest of Mr. DeCicco, Mr. Prime agreed to cooperate with the government. Aff. Lemanski ¶ 20. Mr. DeCicco's counsel recently contacted Mr. Prime who agreed to submit an affidavit on behalf of Mr. DeCicco. In his

---

[4] Mr. DeCicco also submits letters from his daughters Linda and Victoria, in which they detail their close relationship with Mr. DeCicco over the years. Ex. 3, Linda DeCicco Letter; Ex. 4, Victoria Laurano Letter. After a misunderstanding at the Pretrial Services meeting the morning of the detention hearing, explained in the Memorandum, Mem. 14 n. 8, Magistrate Judge Hennessy had erroneously concluded in his findings of fact at the detention hearing that Mr. DeCicco may not have truthfully stated how close he was to his daughters. Tr. Hearing 136:15-25. These letters dispel this notion. Mr. DeCicco does not believe that the government will dispute the extremely close and supportive nature of his relationship with both of his daughters. Letters from Mr. DeCicco's sisters also provide support to the argument that Mr. DeCicco is truly close to his family. Ex. 5, Karen Allan Letter; Ex. 6, Noelle Spinosa Letter.

[5] See, e.g., Mem., Ex. 11, Aff. Special Agent Sandra Lemanski Supp. Detention ("Aff. Lemanski") ¶ 20, ECF No. 35-12.

[6] Id.; Arrest Gary P. DeCicco, ECF No. 5; Elec. Clerk's Notes, ECF No. 9.

affidavit, Mr. Prime, the government's main cooperating witness other than the alleged victim, clearly states the following:

> 3. I have known Gary DeCicco for almost 3 years. Other than the subject event in January 11, 2015, I have not known Gary DeCicco to be a violent person. He has not previously or subsequently spoken of doing violence or threatening anyone.
>
> 4. I would not feel threatened or intimidated in anyway if he were released on bail. I firmly believe that he would completely abide by the conditions of his release and act in a responsible manner.

Aff. Jeffrey Prime ¶¶ 3, 4.

**a. Evidence from a Business Associate of CW-1 and Mr. DeCicco that Mr. DeCicco Did Not Want to be Partners with CW-1 in CW-1's Dealership**

Second, the government's case has an inherent weakness. CW-1, the used car dealer, claims that Mr. DeCicco wanted to extort from him a partial ownership in the used car lot. The three government witnesses involved in carrying out the beating, make no reference to extortion or the used car dealership, and say the beating was retaliation over CW-1's insults to a woman close to Mr. DeCicco. Tr. Hearing 54, 56, 58. The affidavit discussed below corroborates the three government witnesses who claim the dispute between the neighbors was related to a woman, and show the used car dealership was not at issue. CW-1's modest used car dealership is not the type of asset to motivate a Hobbs Act violation, especially by a successful real estate developer such as Mr. DeCicco.

The government claims that CW-1, the used car dealer, said that Mr. DeCicco told CW-1 and others that Mr. DeCicco wanted to or was going to be partners in the dealership, that the architect showed CW-1 a draft plan that "jokingly" had one room titled "Gary's Office," that CW-1 "heard" from others that the dealership was actually Mr. DeCicco's and CW-1 was just a front for him, that CW-1 asked the general contractor who was building the dealership to tell Mr.

DeCicco that he did not want Mr. DeCicco near his place of business, that CW-1 was receiving threats from Mr. DeCicco and "his associates" "related to" CW-1 refusing "to give part" of the dealership to Mr. DeCicco, and, lastly, that CW-1 received a handwritten note that allegedly threatened CW-1 and congratulated "Gary" for being the owner of the dealership. Aff. Lemanski ¶¶ 5-8, 11. Other than the last allegation, the government proffered that, at the time of the detention hearing, CW-1 was the only source of all these allegations that purported to show that Mr. DeCicco had shown interest in the dealership. Id.

The Jencks materials supporting Agent Lemanski's testimony name the general contractor as Peter Varone, Sr. ("Mr. Varone, Sr.").[7]

In the time since submitting the first Memorandum, Mr. DeCicco has obtained the affidavit of Peter Varone, Jr. ("Mr. Varone, Jr."),[8] which contradicts CW-1's allegations about Mr. DeCicco's interest in the dealership. Mr. Varone, Jr. worked with his father as the general contractor. Mr. Varone, Sr. has suffered a work injury and is not easily accessible.[9]

Mr. Varone, Jr. denies that Mr. DeCicco told him or his father that Mr. DeCicco had an interest in CW-1's dealership or that CW-1 ever told him to inform Mr. DeCicco to stay away from the dealership.[10] Mr. Varone, Jr. also recalls that during the construction of the dealership CW-1 "seemed . . . to be obsessed with Gary DeCicco." Id. ¶ 4. Mr. Varone, Jr. explains that CW-1 "constantly criticiz[ed]" Mr. DeCicco about everything from "choice of vehicles, their

---

[7] Mem., Ex. 12, Mem. Interview ¶ 19, ECF No. 35-13.

[8] Consistent with the government's approach, the affidavit that Mr. DeCicco has filed with the Court have the name of CW-1 redacted. Ex. 2, Aff. Peter J. Varone Jr.

[9] The government does not dispute this information since statements of CW-1 corroborate the factual assertion about Mr. Varone, Sr.'s health. Mem. Interview ¶ 14.

[10] Ex. 2, Aff. Peter J. Varone Jr. ("Aff. Varone") ¶ 3.

color and make [or] other personal choices."[11] Id. In particular, Mr. Varone, Jr. states that CW-1 would "repeatedly" criticize Mr. DeCicco's girlfriend, a/k/a GF-1:

> [CW-1] would repeatedly say that [GF-1], Gary's girlfriend, is a "gold digger" who used to work for him. [CW-1] would describe in detail how [GF-1] would seek out rich men and then latch on to them to support her. [CW-1] also said that [GF-1]'s prior husband or partner was a rich man whom she had found and hung on to like she was now doing with Gary DeCicco to pay for her. He would repeatedly say that he knew what [GF-1] was about but Gary thinks they are in love.

Id.

Mr. Varone, Jr.'s description of CW-1's attitude toward Mr. DeCicco's girlfriend is corroborated by CW-1's own statements made to the police in August, 2014, prior to the assault, as related by the reporting officer:

> [CW-1] told me that [GF-1] worked for him years ago and was now dating Gary DeCicco. [CW-1] led me to believe that [GF-1] liked to attach herself to wealthy men who would "take care of her." He also indicated that this was likely not an exclusive relationship as DeCicco had different girlfriends.

Mem., Ex. 13, Saugus Police Report ¶ 6, ECF No. 35-14.

The insults described by Mr. Varone, Jr. are relevant because they corroborate the three cooperating witnesses allegedly involved in the assault that the conflict between Mr. DeCicco and CW-1 was because of a woman. They also explain the allegedly threatening handwritten note, which disparaged CW-1's ownership of his used car dealership, as one insult in a long running exchange of insults and conflicts between long-standing neighbors and not as evidence of an attempt to extort CW-1.[12]

---

[11] CW-1's January 2017 interview with the government supports Mr. Varone, Jr.'s assessment that CW-1 was obsessed with Mr. DeCicco. In this interview initially centered on Mr. DeCicco's connection to the extortion allegation, CW-1 makes allegations about everything and anything related to Mr. DeCicco from cars, motorcycles, boats, to real estate projects and business associates. Mem. Interview ¶¶ 34-40.

[12] This string of insults and disputes also included, according to CW-1, a contractual dispute concerning the asphalting of the parking lot of CW-1's car dealership. Mem. Interview ¶

The Varone, Jr. statement is also especially important because at the detention hearing, the government submitted Agent Lemanski's and Elio's affidavits in which the government claimed that it was "not aware of any information that would adversely affect the credibility of CW-1's information."[13] Mr. Varone, Jr. directly refutes CW-1's extortion-related allegations and the federal agents interviewed him on this topic.

## III. ARGUMENT

18 U.S.C. § 3145(b) governs the review of a detention order by a district court judge and states:

> If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

This review is "de novo." United States v. Tortora, 922 F.2d 880, 883 n.4 (1st Cir. 1990). "To engage in a meaningful de novo review [under Section 3145], the district court must have available the options open to the magistrate." United States v. Maull, 773 F.2d 1479, 1482 (8th Cir. 1985). This provides for an "independent review and analysis of all the evidence" that may include additional evidence that was not presented to the magistrate judge. United States v. Digiacomo, 746 F. Supp. 1176, 1181 (D. Mass. 1990).

---

20. CW-1 alleged to the government that CW-1 had informed Mr. Varone, Sr. and other associates that Mr. DeCicco had breached an old contractual agreement to provide asphalting for the dealership. Id. ¶ 21. Related to this contractual dispute, CW-1 also claimed that after CW-1 voiced his belief that Mr. DeCicco had breached the contract, an individual called on behalf of Mr. DeCicco to tell CW-1 to "stop talking shit about [Mr. DeCicco]." Id.

[13] Aff. Lemanski ¶ 3; Sealed Compl., Ex. 1, Aff. Special Agent Matthew D. Elio ¶ 5, ECF No. 3-1.

Ignoring this, the government insists that the simple fact that Mr. DeCicco presented additional evidence for the district court judge's consideration upon review of the detention order requires Mr. DeCicco to first seek review of the detention order directly from the magistrate judge under the "new evidence" provision of 18 U.S.C. § 3142 (f). Opp'n 5. Section 3142(f) provides that:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

In the alternative, the government argues that a district court conducting a 18 U.S.C. § 3145(b) review of additional evidence should either follow the more stringent Section 3142(f) standards or limit itself to a review of the record before the magistrate judge. Opp'n 5-7. The government tries to demonstrate that the additional evidence submitted by Mr. DeCicco, such as affidavits by neighbors, friends, business associates and copies of news media, is not "new" under this standard. Id.

The government's rigid proposal runs against two compelling considerations. The first one is that Section 3145(b) allows a district court to hold an evidentiary hearing and consider additional evidence without mandating the remand of the defendant's motion to the magistrate judge for a preliminary Section 3142(f) review. See United States v. Phillips, 732 F. Supp. 255, 258-59 (D. Mass. 1990) (concluding that "independent review" under Section 3145 (b) allows but does not require a "de novo detention hearing," and holding hearing for the parties to present their arguments and offer any additional evidence they may have); see also United States v. Cisneros, 328 F.3d 610, 614, 616, 617 (10th Cir. 2003) (holding that, under the similarly worded Section 3145(a), a district court judge could review the magistrate judge's order on the

government's motion and "consider new evidence from the parties," after concluding that Section 3142(f) could not have been the basis for the government's detention review request). In essence, Sections 3145(b) and 3142(f) provide distinct review alternatives for defendants challenging an initial detention determination by a magistrate judge. See United States v. Cannon, 711 F. Supp. 2d 602, 607 (E.D. Va. 2010).

Courts in this district have also routinely exercised their discretion and allowed evidentiary hearings for defendants appealing an initial detention order to the district court under Section 3145(b). See, e.g., United States v. Debrum, No. 15-10292-NMG, 2015 U.S. Dist. LEXIS 141777, at *13 (D. Mass. Oct. 19, 2015) (O'Toole, J.) (holding evidentiary hearing to consider additional evidence); United States v. Merrill, No. 14-04172-DHH, 2014 U.S. Dist. LEXIS 82323, at *11 (D. Mass. June 17, 2014) (Hillman, J.) (revoking Magistrate Judge David Hennessy's detention order after considering additional evidence adduced by defense counsel at evidentiary hearing held by district court); United States v. Shea, 749 F. Supp. 1162, 1165 (D. Mass. 1990) (Keeton, J.) (reviewing all evidence presented in front of the magistrate judge and the additional evidence presented at a hearing conducted by the district court); United States v. Digiacomo, 746 F. Supp. 1176, 1181 (D. Mass. 1990) (Wolf, J.) (same).

The second compelling consideration is that district courts considering this additional evidence did not require the moving party to present only evidence not known to the movant at the time of the hearing under Section 3142 (f), as the government suggests they should have. See Opp'n 5. Some of the evidence considered by the district courts included testimony by siblings, media articles preceding the initial detention hearing, or other information that would not be up for review according to the government's position on Section 3145(b) review limitations, Opp'n 6. See Debrum, No. 15-10292-NMG, 2015 U.S. Dist. LEXIS 141777, *13 (considering, among

others, an affidavit submitted following the initial detention hearing attesting that the defendant charged with offenses related to online communication with a minor had not had access to the internet since before his arrest)[14]; Digiacomo, 746 F. Supp. at 1186 (the district court considered at hearing testimony by defendant's brother that he would pledge his assets to support his brother's conditional release); see also United States v. Parahams, No. 3:13-CR-005 JD, 2013 U.S. Dist. LEXIS 25105, *15 (N.D. Ind. Feb. 25, 2013) (considering clippings from local media website on the night before defendant was arrested).

The First Circuit case that the government cites at page 5 of its Opposition to support the claim that Section 3142(f) standards should apply to the review of additional evidence under Section 3145(b) is inapposite. United States v. Dillon, 938 F. 2d 1414 (1st Cir. 1991) concerns itself with a defendant's appeal following the reopening of a detention hearing with the magistrate judge under Section 3142(f) and a subsequent review by a district court, after a district court had already reviewed the magistrate judge's initial detention order. 938 F. 2d at 1414-15. Naturally, in Dillon, the First Circuit concludes that the moving party must meet 3142(f) requirements when reopening a detention hearing under Section 3142(f), following the completion of the first review process under Section 3145(b). Id. at 1415. This has nothing to do with Mr. DeCicco's request for review in this case, which concerns a direct review by the district court of an initial detention order. The government also cites United States v. Foley, 07-10390-RGS, 2009 WL 458558 (D. Mass. Feb. 24, 2009) in support of this argument. Opp'n 5. Foley, however, primarily stands for the proposition that district courts may choose not to hold an evidentiary hearing where the additional evidence adduced by the moving party is not

[14] Detailed information on the precise evidentiary submission in this case is available upon review of the docket. Suppl. Mem. Joseph Debrum Emergency Mot. 8, ECF No. 28 and Suppl. Mem. Joseph Debrum Emergency Mot., Ex. E, ECF No. 28-5, United States v. Debrum, No. 15-10292-NMG, 2015 U.S. Dist. LEXIS 141777.

sufficiently compelling to convince the district court judge of its utility. Foley, 07-10390-RGS, 2009 WL 458558, *6 (district court judge denied the defendant's request for an evidentiary hearing after adopting the magistrate judge's credibility findings with respect to certain witnesses who testified at the hearing, considering the defendant's admission recanting untrustworthy and deeming additional physical evidence uncorroborated).[15]

The additional evidence submitted by Mr. DeCicco is, however, relevant to the Court's detention review decision. In particular, Mr. Varone, Jr.'s affidavit takes away from the weight of the government's evidence that Magistrate Judge Hennessy had concluded supported detention at most "in a marginal way." Tr. Hearing 136. This affidavit rejects the government's allegations supported by a single source, CW-1, that Mr. DeCicco expressed an interest in partnering up with CW-1, talked about this with his associates or that CW-1 rejected Mr. DeCicco's invitation to partner up. Aff. Varone ¶¶ 3-4. The allegations that connect Mr. DeCicco

[15] The government also cites in support of this argument two cases from other districts that are not binding on this Court's decision. One of the cases explicitly concludes that additional evidence considered during a Section 3145(b) must meet Section 3142(f) review standards. United States v. Bergner, 88 F. Supp. 659, 661-62 (N.D. Ind. 1992). More recent case law in that district shows however that the respective court's conclusion has not been widely adopted even among peer courts. See Parahams, No. 3:13-CR-005 JD, 2013 U.S. Dist. LEXIS 25105, *4 (district court concluded that an evidentiary hearing was warranted because it afforded defendant the opportunity to discuss in more detail legal authority cited in initial brief and submit two additional exhibits, one of which consisted of media clippings preceding the defendant's arrest).

The other case cited by the government, from the District of Puerto Rico, seemingly adopts Bergner's conclusion broadly although it concerns itself with a detention review motion filed by the defendant under both Sections 3142(f) and 3145. See United States v. Rodriguez-Adorno, 606 F. Supp. 2d 232, 237 (D.P.R. 2009); Mot. DeNovo Hr'g re Detention Likelihood Gov't Will be Unable Prove Fed. Jurisd., Rodriguez-Adorno, 606 F. Supp. 2d 232 (D.P.R. 2009) (No. 1:07-248). Case Augustin Rodriguez-Adorno, ECF No. 351. The Puerto Rico court's concern also related less to the newness of the defendant's additional evidence, which the court considered was new, and more to its materiality because it concerned only the defendant's *interpretation* of certain evidence against him. Rodriguez-Adorno, 606 F. Supp. 2d at 239. In essence, the court in Rodriguez-Adorno considered the additional evidence but was unpersuaded by the quality and nature of the evidence to allow an evidentiary hearing.

to an interest in CW-1's used car dealership are the government's sole gateway to a federal charge, and hence essential to the government's case. Upon consideration of this evidence, the balance no longer supports detention even "in a marginal way."

Mr. Prime's affidavit also goes directly to the question of dangerousness. The government had proffered that CW-3, one of the other individuals allegedly involved in the assault on CW-1, "has on several occasions expressed concerns for his safety." Aff. Lemanski ¶ 17; Opp'n 14. CW-3 is a career criminal who has never met Mr. DeCicco. Aff. Lemanski ¶¶ 17-19. According to the government, Mr. Prime gave CW-3 instructions to organize the assault and CW-3 had no contact with Mr. DeCicco. Tr. Hearing 12-14. Hence, Mr. Prime's testimony and cooperation has more value to the government's case than CW-3's and may be more detrimental to Mr. DeCicco than CW-3's. Mr. Prime, however, expresses no concern for his safety, if Mr. DeCicco were to be released, and considers that Mr. DeCicco would abide by any conditions of release imposed by the Court. Aff. Jeffrey Prime ¶ 4.

The other letters submitted with Mr.DeCicco's initial Memorandum equally chip away at the cloud of suspicion that the government generated at the detention hearing about Mr. DeCicco's character. This cloud of suspicion obscured an essential fact: that in his 58 years of life Mr. DeCicco has not been associated with any instances of violence other than the assault alleged in this case. He does not have violent associates. He does not own or use weapons. Hence, consideration of this evidence by the Court directly supports Mr. DeCicco's argument that there are conditions of release that would reasonably assure the safety of the community.

Lastly, were the Court inclined to require that additional evidence be "new" to merit consideration, Mr. DeCicco submits that the evidence presented to the Court satisfies this standard. Mr. DeCicco was arrested only five days before his March 22, 2017 detention hearing.

Mr. DeCicco received copies of testifying Agent Lemanski's affidavit and Jencks material only a day before the detention hearing. These materials helped Mr. DeCicco identify some of the key witnesses in the case, who otherwise were not named in the documents previously submitted by the government to the Court or at the detention hearing. Locating and obtaining affidavits from these witnesses, including government cooperating witnesses such as Mr. Prime, and other witnesses could not realistically happen overnight in time for the detention hearing. This situation is very different from that of the district court in Dillon, for example, where the district court judge conducting a review of a Section 3142(f) detention decision by the magistrate judge, considered that the additional evidence was "known to the movant at the time of the hearing" because the defendant had ample time to present the additional letters and affidavits from people who knew the defendant, including family, at the prior Section 3145(b) hearing held 17 days after the defendant's arrest. See Dillon, 938 F. 2d at 1415. Mr. DeCicco submits that most of the information contained in these affidavits was not "known" to him prior to the March 22, 2017 detention hearing under any reasonable interpretation that could afford Mr. DeCicco a chance at a full defense of his liberty rights, as intended by the Bail Reform Act.

## IV. CONCLUSIONS

For the reasons presented in Mr. DeCicco's moving papers, supporting documents and here, Mr. DeCicco respectfully request that the Court allow Mr. DeCicco's Motion.

Dated: May 24, 2017

Respectfully submitted,

GARY P. DECICCO

By his counsel,

/s/ Michael Kendall

Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra I. Gliga (BBO # 694959)
alexandra.gliga@whitecase.com
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9300

**CERTIFICATE OF SERVICE**

I, Michael Kendall, hereby certify that the above document was filed on the date appearing in the header of this page through the ECF system, which will send true copies of the document to the attorneys of record for each party.

/s/ Michael Kendall
Michael Kendall