# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 17-10092-NMG |
| GARY P. DECICCO, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## <u>MEMORANDUM AND DECISION ON GOVERNMENT'S MOTION TO DETAIN DEFENDANT PENDING TRIAL</u>

### November 21, 2017

Hennessy, M.J.

By virtue of this Court's order granting Defendant Gary P. DeCicco's motion to reopen his detention hearing, Docket #119, the motion of the United States to detain Defendant pending trial is once again ripe for decision.  The United States seeks detention on the grounds that no condition or combination of conditions will reasonably assure Defendant's appearance as required or reasonably assure the safety of any other person and the community.  For the reasons stated below, I DENY the Government's motion on the ground that Defendant is a flight risk for which conditions could not be fashioned to reasonably assure his appearance.   I GRANT the Government's motion on the ground of dangerousness and therefore order Defendant detained.

### Relevant Factual Background

In March 2017, Defendant was charged by complaint with Hobbs Act Extortion.  <u>See</u> Docket #3.  The supporting affidavit of FBI Special Agent Matthew Elio averred that in about 2005, an individual referred to as CW-1 bought land from Defendant contingent upon Defendant's

1

assistance in obtaining permits to build a car dealership on the land.  Docket #3-1 ¶¶ 5-6.  In 2013, as a result of Defendant's help, the permits were finally obtained and construction began.  Id. ¶ 6. At about that time, Defendant proposed that he become CW-1's partner, explaining how he could finance and promote the car dealership.  Id. ¶ 7.  CW-1 was not interested but told Defendant he would get back to him.  Id.  Thereafter, CW-1 learned that Defendant was telling others that he was going to be CW-1's business partner.  Id. ¶ 8.  In draft blueprints, an architect, at Defendant's direction, labeled a space "Gary's Office"; CW-1 told the architect to remove Defendant's name from the plans.  Id. ¶ 8.  In blueprints prepared in August 2013, the room beside CW-1's office is labeled "Gary's Office." .  See Det. Hrg. Ex. 101.  A subsequent draft of the blueprints reflecting an update "per owner's review" re-labeled that space a "conference room."  See Det. Hrg. Ex. 102. As construction continued, CW-1 heard other rumors that Defendant was the dealership's real owner and CW-1, a front.  Docket #3-1 ¶ 9.  CW-1 told anyone who made such statements that Defendant was not CW-1's partner.  Id.  According to CW-1, this upset Defendant.

On August 4, 2014, a florist delivered to CW-1 at the dealership flowers a glass vase in the shape of a religious cross and a note ("the Note") that read: "Congrats Gary – We all know who's [sic] place that is.  We hope this cross will help you get rid of that MUSLIM PRICK.  From all RT. 1 Autodealers [sic]."  Id. ¶ 10.  "Gary" is Defendant's first name, and CW-1 is of Middle Eastern descent.  Id.  Later that day, CW-1 received a phone call from a blocked number during which the caller said, "Fucking Muslim, I'm going to fucking kill you," and still later, $75 worth of pizza that CW-1 did not order.  Id.  CW-1 reported these incidents to the local police.  Id.

When the police shared with CW-1 a description of the woman who had purchased the flowers, CW-1 told them the description fit Defendant's girlfriend.  Id. ¶ 12.  In response to police

questioning, CW-1 speculated that the Note may have related to CW-1's refusal to accede to Defendant's proposed partnership.  Id.  Defendant's girlfriend admitted that Defendant dictated the Note to her and explained that she ordered the flowers and cross from a florist and had them delivered, along with the Note, to CW-1.  Lemanski Aff., Det. Hrg. Ex. 1.  During the fall of 2014, local police referred the matter to the FBI to investigate possible extortion.  FBI agents interviewed CW-1 on December 28, 2014, at which time CW-1 said he had received threats from Defendant and his associates for refusing to give Defendant part of the dealership.  Docket #3-1 ¶ 13 n.2.

On January 11, 2015, just before 2:00 p.m., CW-1 called 911 from the dealership to report that he had been assaulted.  Id. ¶ 15.  CW-1 suffered a broken jaw that was wired shut for approximately forty days.  Id.  A surveillance video that CW-1 provided to the FBI showed CW-1 alone at the dealership when a hooded individual entered, punched and kicked CW-1, and struck CW-1 several times with the leg of a chair.  Id. ¶ 16.

The assailant was later identified and confessed that the person referred to as CW-3 offered him $1,000 to assault CW-1.  Id. ¶ 18.  According to the assailant, CW-3 said that a "mobster from Nahant" wanted CW-1 beaten for harassing the mobster's daughter and that CW-3 would tell the assailant when to carry out the assault.  Id.  CW-3 contacted the assailant on January 11 to report that it was a good time to assault CW-1.  Id. ¶ 19.  The assailant later admitted that he told CW-1 during or immediately after the beating that "this would teach CW-1 'how to talk to a lady.'"  Id.

CW-3 (the person who directly hired the assailant) also admitted his involvement in the assault.  Docket #84-1 ¶18.  He said he was hired to arrange the assault by someone referred to as CW-4, who told him that CW-1 had sexually assaulted Defendant's daughter.  Id.  In turn, CW-4 told law enforcement agents at about the time of Defendant's arrest that Defendant recruited him

to find someone who could beat up a person who had said something bad about Defendant's ex-wife or daughter.  Docket #89-1 ¶ 20.  According to CW-4, Defendant agreed to pay $1,000 if the beating was good, and $2,000 if the beating was very good.  Id.  Ultimately, Defendant determined that the beating was worth only $1,000.  Docket #18 at 16.

**Relevant Procedural History**

Defendant was arrested on March 17, 2017.  Docket #9.  The Government moved to detain Defendant on the grounds of dangerousness and risk of flight.  On March 22, 2017, I held a detention and probable cause hearing at which the government elicited testimony from IRS agent Sandra Lemanski and offered exhibits.  See Docket #18.  After hearing oral argument, I issued an order from the bench.  I denied the Government's motion to detain Defendant on the ground of risk of flight, finding that Defendant had proposed conditions that would reasonably assure his appearance as required.  Id. at 132.  However, I granted the Government's motion as to dangerousness, finding that no condition or combination of conditions would reasonably assure the safety of any other person or of the community.  Id.

Defendant moved for review of my order, Docket #34, but later withdrew that motion, Docket #71.  On August 11, 2017, Defendant moved to reopen the detention hearing, filing a supporting memorandum and twenty-six supporting exhibits.  Docket ##83-84.  The United States filed an opposition, Docket #87, and Defendant thereafter filed a reply, Docket #92.  Following oral argument and review of a further submission from the government, on September 6, 2017, I directed Defendant to produce a witness, Philip Baldi, who Defendant argued had been unavailable to testify at the original, March 22 detention hearing.  Based on the government's summary of Mr. Baldi's anticipated testimony, I determined that Mr. Baldi's testimony was relevant to resolving

the motion to reopen.  Docket #97.  On October 5, 2017, Defendant produced Mr. Baldi, and both parties examined him.  The Court heard further argument on the motion to reopen.  See Docket #116.  By Order dated October 13, 2017, the court allowed the motion to reopen.  Docket #119.

On November 3, 2017, the parties presented further evidence and argument at the re-opened detention hearing.  Docket #128.  The United States then submitted a supplemental memorandum and exhibits on November 6, 2017.  Docket #130.[1]  Finally, on November 19, 2017, Defendant filed a response to the government's supplement.  Docket #131.

**Relevant Law**

In order to detain Defendant pending trial under 18 U.S.C. §§ 3141 et seq. (the Bail Reform Act), the Court must find (1) by clear and convincing evidence, that the defendant is a danger to the community; or (2) by a preponderance of the evidence, that the defendant poses a risk of flight.  18 U.S.C. § 3142(f); see United States v. Patriarca, 948 F.2d 789, 792-93 (1st Cir. 1991); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986).  The Court may order Defendant's detention only if it determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142(b) or (c)] will reasonably assure [his] appearance, . . . as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).

The Court must consider the following factors in making this determination:

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ;

(2)     the weight of the evidence against the person;

---

[1] Defendant objects (at least implicitly) to some of this document's contents on the ground that they venture beyond the two subjects on which the government requested leave to make a supplementary filing.  See Docket #131 ¶ 1. Defendant has had ample time to review the government's supplement and has advanced substantive arguments challenging its assertions.  See generally id.  Finding no prejudice to Defendant, I have considered the government's filing in its entirety.

(3)     the history and characteristics of the person, including—

    (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).   Finally, the Bail Reform Act prohibits the Court from imposing "a financial condition that results in [Defendant's] pretrial detention . . . ."  18 U.S.C. § 3142(c)(2).

**Analysis**

I apply the factors set forth in 18 U.S.C. § 3142(g) to the evidence and proffers made by the parties.

    1.   Nature and Circumstances of the Offense Charged

I find that the nature and circumstances of the offense charged support detention. Defendant is charged by indictment with extortion in violation of 18 U.S.C. § 1951.  See Docket #23.  The indictment alleges that Defendant attempted to obtain an interest in CW-1's automobile dealership from CW-1 "with his consent induced by wrongful use of actual and threatened force, violence and fear."  Id. at 2.  By its very nature, the offense falls within the scope of Title 18's definition of a crime of violence.  See 18 U.S.C. § 16(a) ("[C]rime of violence means an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . .").  It also is expressly within the Sentencing Guidelines' definition of

a crime of violence.  See U.S.S.G. §4B1.2(a)(2) ("[C]rime of violence means [a felony under federal or state law] that is . . . extortion . . . ."); United States v. DeLuca, 17 F.3d 6, 8 (1st Cir. 1994) (holding that U.S.S.G. § 4B1.2(a)(2) unequivocally states that extortion should be classified as a crime of violence).[2]

However, in this case, the violent nature of the offense goes beyond charging allegations and legal definitions.  The evidence the United States presented shows that Defendant procured a violent assault on CW-1.  CW-1 was assaulted in his place of business, in the middle of the business day, when the assailant was advised that it was a good time to proceed with the assault.  A surveillance camera captured the assault and shows the assailant punching CW-1 before picking up a chair and striking CW-1 repeatedly with a chair leg.  The assailant then kicked CW-1 with his shod foot.  CW-1 required significant medical attention: His jaw was broken and wired shut for approximately forty days.  Yet despite the severity of this beating, according to the government's evidence, Defendant, who offered to pay as much as $2,000 if the beating was "very good," paid only $1,000 because the beating did not meet his premium standard; it was not good enough.  These circumstances—the calculation, recruitment, and violence—convince the Court that while conditions may reasonably assure Defendant's appearance as required, they are insufficient to protect the community from a defendant with the financial resources and associations to inflict physical harm on others.

Defendant's response to this evidence is that while he did procure this violent assault, he did so not to obtain a commercial interest but instead to avenge an inappropriate remark that CW-

---

[2] Defendant and the United States advance competing analyses of Defendant's proper sentencing range under the Guidelines.  Compare Docket #130 at 2 (government's calculations) with Docket #131 ¶ 2 (Defendant's response). Defendant's potential jail sentence impacts a flight risk analysis, but not whether he would pose a danger if released. Because I order Defendant detained on the latter ground only, I need not resolve the parties' dispute on this issue.

allegedly made to or about Defendant's girlfriend or daughters. This argument somewhat misses the mark and really challenges the weight of the evidence, which is discussed below. "[T]he offense charged," see 18 U.S.C. § 3142(g)(1)—i.e., the offense for which the grand jury found probable cause and that is the focus of this inquiry—is extortion. Cf. United States v. Vargas, 804 F.2d 157, 163 (1st Cir. 1987) (finding a grand jury indictment sufficient to establish probable cause for purposes of a detention hearing). Even entertaining Defendant's argument, it fails to undermine the allegation that Defendant procured a violent beating of a person.

        2.    Weight of the Evidence

        I find that the weight of the evidence at least marginally supports detention. CW-1 told local police investigating the Note that Defendant had been pressuring CW-1 to be his business partner, but CW-1 rebuffed Defendant. CW-1's account is corroborated by, among other things, the Note. Sent with the religious cross and flowers, it reads: "Congrats Gary -- We all know who's [sic] place that is. We hope this cross will help you get rid of that MUSLIM PRICK. From all RT. 1 Autodealers [sic]." Docket #3-1 ¶ 10. This choice of words supports extortion. The words focus on ownership of CW-1's business and are consistent with the notion that a battle about ownership existed ("We all know who's [sic] place that is."). The Note identifies the cross as a way to "get rid of" a person, which, in context, is also consistent with a remedy for resolving an ownership dispute. The person is described as a "Muslim," and CW-1 is of Middle Eastern descent. Lastly, even though Defendant concedes he dictated the Note, it is addressed to Defendant himself and was sent to CW-1's dealership, as if to suggest that the dealership was a proper address for Defendant's mail. The blueprints and the amendment to them re-designating a space once called "Gary's Office" a "Conference Room" are also consistent with CW-1's extortion complaint.

Indeed, the government proffered that it was Defendant himself who told the architect to designate the space "Gary's Office" in the August 2013 blueprints.

There is also testimony provided by Philip Baldi, Defendant's associate and business partner in a real estate deal, that on at least one occasion Defendant brought Baldi to the dealership building while it was under construction, and CW-1 was not present. Baldi also testified that Defendant reacted negatively to CW-1's refusal to swap a portion of the dealership's back lot for a small piece of land on the main road that would have improved access to the dealership. Defendant's interest in the access to and construction of the dealership corroborates CW-1.

Finally, the government submitted affidavits from Defendant's daughters that CW-1 never physically or verbally harassed or assaulted either one of them; nor did Defendant's daughters ever tell anyone that CW-1 had done so. Docket ##130-2, 130-3. Defendant's most recent filing explains that, by his telling, CW-1 never bothered Defendant's daughters directly but rather "made disgusting remarks" about them to others. Docket #131 ¶ 4. Defendant further explains that CW-1 could observe his daughters from his home while they used a neighbor's swimming pool, and Defendant points to CW-1's personal history allegedly indicating problems with women. Id. I find that the daughters' affidavits, on balance, do provide at least some support for the charged extortion by undermining Defendant's claim that his motive for the assault was to avenge CW-1's alleged inappropriate statements to or about a woman. Defendant's focus on what CW-2, CW-3, and CW-4 believed was the motive behind the assault simply ignores the fact that Defendant himself is the indisputable source for the cooperators' statements. At this stage, I find the evidence of the extortion sufficiently persuasive and consistent with the notion that Defendant used CW-1's alleged affront—whether or not it actually took place—as a pretext to convince others to carry out

an assault.  This manipulative and violent act supports a finding uggests that Defendant would pose a danger to the community if released.

Defendant next argues that CW-1 is not credible.  To undermine CW-1, Defendant has presented information about CW-1's personal and commercial dealings that negatively reflects on CW-1's credibility and integrity.  This includes a 2010 police report stating that CW-1 threatened to assault a business associate, and an expletive-laced recording of that threat, Det. Hrg. Exs. 103, 104; text messages in which a former employee claimed that CW-1 failed to pay him a final paycheck and was hustling the former employee the same way CW-1 hustled other employees, Det. Hrg. Ex. 108; a complaint brought by the Massachusetts Attorney General in 2004 against car dealerships, including one employing CW-1, for unsavory and dishonest business practices, Det. Hrg. Ex. 110; and evidence suggesting that CW-1 threatened to use his relationship with federal authorities against others, see Docket #84-7 ¶¶ 30-35.  Defendant also presented Baldi's testimony, which included Baldi's assessment of the circumstances surrounding the drafting and delivery of the Note.  Baldi testified that it was one of several pranks intended to harass CW-1, but that he was unaware of anything indicating that Defendant's goal was to obtain an interest in CW-1's dealership.  In Defendant's view, a jury cannot convict without believing CW-1, and Defendant expects to present the jury with many reasons, including those mentioned above, not to do so.

Citing United States v. Rodriguez-Adorno, 606 F. Supp. 2d. 232, 237 (D.P.R. 2009), the government replies that even if CW-1 may be impeached, it is not the role of a detention hearing to serve as a de facto mini-trial in which the likelihood of conviction is debated.  At the same time, however, where, as here, a key part of the evidence is witness testimony, the credibility of the chief witness is germane to the weight of the evidence.  Accordingly, I consider the evidence and

suggestion that CW-1 is subject to impeachment, and that a jury will be asked to carefully scrutinize CW-1's testimony.  Nevertheless, because the Note, blueprints, Defendant's enduring interest in the construction of the dealership, and the affidavits of Defendant's daughters corroborate CW-1, I find that the weight of the evidence at least marginally supports detention.[3]

### 3.   Defendant's History and Characteristics

Defendant's history and characteristics, on balance, support detention on grounds of dangerousness, but not risk of flight.  The record shows that Defendant has lived the majority of his life in Massachusetts and attended two years of college at UMass Boston.  Defendant also has significant business and family ties to Massachusetts.  He holds considerable real estate interests in Massachusetts valued in the millions of dollars, though the government proffers, and it is not disputed, that these interests are held by personal and corporate nominees.  Businesses and attorneys with whom Defendant has worked are located in Massachusetts.  Defendant's principal source of employment is the Atlantis Marina in Winthrop, of which Defendant is the sole owner, valued at approximately $3.5 million.  Defendant's family ties include his two adult daughters who reside with their mothers in residences Defendant owns in Nahant.  Defendant's two sisters also reside in Massachusetts.  Defendant has one brother who is incarcerated and with whom he has no contact.  Defendant's parents reside in Florida, where Defendant owns a condominium and a

---

[3] Defendant's latest filing also urges that the Court must discount the government's interpretation of phone records and of the cooperating witnesses' credibility because the government has not fully disclosed all of the cooperating witnesses' statements in this case.  See Docket #131 ¶ 3.  As for the phone records, they serve to corroborate each link in the chain connecting Defendant to CW-2, CW-3, and CW-4.  As for the witnesses' credibility, Defendant offers no law instructing that the Court can consider the prosecution's view at this procedural stage only if the government has fully disclosed all of the witnesses' statements.  As stated in the Court's verbal order at Defendant's first detention hearing, the evidence supports the cooperating witnesses' credibility.  See Docket #18 at 116-17.  Namely, by implicating themselves in criminal conduct, CW's 2, 3, and 4 have made statements against their own penal interests and have done so without any inducement or promise in exchange for their cooperation.  Id.  I therefore credit their testimony.  See id.

pleasure boat.  Given Defendant's interests and family in Massachusetts, I find that conditions can be fashioned that will reasonably assure Defendant's appearance as required.

Defendant's criminal history neither supports nor undermines detention to protect the community.  It dates back more than twelve years.  In 2000, Defendant was charged federally with arson and fraud, but he was convicted in 2005 of fraud only.  Defendant has proffered that there were no compliance issues during both pretrial release and service of his non-jail sentence. However, Probation proffered that, while there were no violations of supervision, Probation had to "chase down" Defendant to secure his compliance.  In 1998 and 1999, the mother of one daughter obtained civil restraining orders against Defendant.  Those orders were not violated.

Other evidence reflecting violence supports a dangerousness finding.  Baldi testified that Defendant boasted to Baldi that he put a gun down someone's throat while in high school or college, Docket #120 at 49;[4] that Defendant had someone beaten up to make sure the victim did not show up for a court proceeding against Defendant's brother, id.; and that Defendant knew and could call upon members of the Lynn chapter of the Hell's Angels outlaw motorcycle gang, id.  In addition, describing Defendant's reaction when CW-1's general contractor complained to Defendant that CW-1 owed the contractor money, Baldi testified that Defendant asked, "Why don't you have [CW-1] beat up?"  After the general contractor dismissed the idea, Defendant told Baldi the general contractor "is too big a pussy to do something like that."  Docket #120 at 11.

The government also offered a 2015 police report that alleges Defendant threatened a tenant of a building, 58 Pulaski Street in Peabody, in which he has an ownership interest.  Docket

---

[4] More precisely, Baldi's testified that Defendant "may have" told Baldi this.  Based on my observation of Baldi throughout his testimony, I interpret "may have" as Baldi's way of dismissing the significance of what Defendant did, in fact, say, not that Baldi was unsure whether or not Defendant said this.

#130-4.   The tenant reported to police that Defendant had been pressuring him to break his lease because Defendant could collect a higher rent on the same space from a new tenant.   Id.   When the tenant said he intended to remain until the lease expired, Defendant accused the tenant of stealing electricity.   Id.   After Defendant, Baldi, and an electrician inspected the tenant's electrical connection and found no evidence of theft, Defendant allegedly gave the tenant two options: "Leave immediately, or I am going to fuckin' kill you and your family.  I should rip your fuckin' head off right here."   Id.   Defendant also allegedly stated that he was "too smart to hit" the tenant himself.   Id.   When contacted by police, Defendant and Baldi both denied that Defendant threatened the tenant.   Id.   The police were unable to contact the electrician.   Id.

Defendant urges the Court to discredit this police report.   See Docket #131 ¶ 5.  He notes that Baldi, identified as an eyewitness to the incident, corroborated Defendant's denial that he threatened the tenant.   See id.  Defendant stresses that Baldi, now a government cooperator, never mentioned this incident in his testimony at the October 5, 2017 hearing; nor has the United States suggested that Baldi's account of the incident has changed.   While Defendant is correct, the focus of that hearing and Baldi's testimony was whether or not to grant Defendant's motion to reopen the detention hearing, and not the ultimately detention issue.   This may explain the fact that neither party elicited testimony about the incident.   However, even on this record, I am not prepared to dismiss the tenant's complaint.   First, I find it somewhat unlikely that the tenant would have gone to the police if, as Defendant and Baldi claimed, the tenant was stealing electricity.   Second, Baldi was Defendant's co-owner of the building in which the tenant leased space; he had an interest in denying the tenant's account, and an interest in forcing the tenant to evacuate.   Indeed, as discussed

below, Baldi joined Defendant in preparing false rent rolls for the building in order to securing

bank financing. Thus, despite Defendant's arguments, I give some credence to the tenant's report.

Next, historical information and evidence bearing on Defendant's honesty and willingness

to discharge his own obligations also support detention. The government noted that despite

owning millions of dollars in real property, Defendant holds only one property (one of his two

residences in Nahant) in his own name. Docket #18 at 23-24. Valuable personal property, the

purchase and ownership of which might trigger tax consequences, also is not in Defendant's name,

including two Lamborghinis and two Porsche automobiles. Id. at 25. According to the IRS agent

who testified at the detention hearing, Defendant holds these luxury sports cars in the name of an

automobile dealership—though Defendant paid for them and owns them—in order to conceal his

ownership and avoid tax consequences. Id. at 26.

The evidence also shows that Defendant signed a materially false affidavit. Defendant

purchased a residence at 321 Nahant Road in 2004 but held it in his then-girlfriend's name.

Defendant has a daughter with this girlfriend, and both Defendant and the girlfriend are involved

in LLCs that nominally own some of Defendant's real property. In December 2016, Defendant

purchased this property in a short sale for approximately $610,000, well below an outstanding

mortgage on the property of $1.1 million. In connection with the sale, Defendant signed an

affidavit averring that he had no family or business relationship with the seller—his ex-girlfriend

and the mother of one of his daughters. The closing attorney refused to proceed with the sale

unless Defendant disclosed his family and business relationship with the seller. Defendant found

another attorney who closed the transaction.

Defendant challenged the allegation that his short sale affidavit was false by arguing that at the time of the affidavit, he was no longer in a relationship with his ex-girlfriend and thus answered truthfully.  Defendant emphasized that the affidavit used the present tense verb "are." This is a fine distinction, and while perhaps grammatically accurate, it ignores the facts that Defendant and the ex-girlfriend have a child together and that the ex-girlfriend serves as a nominee or officer for LLCs holding property that Defendant owns.  Moreover, it ignores the affidavit's clear purpose to enable a bank to determine the possibility of collusion between parties who are known to each other and not operating at arm's length.

Baldi testified that he and Defendant created false rent rolls in order to induce a bank to loan money in connection with a Peabody real estate transaction.  Id. at 47.  Other testimony also established that Defendant has an outstanding IRS obligation of $350,000; and while this obligation was outstanding, Defendant paid the IRS $3,000 but purchased over $1 million in real property held in others' names.  According to the Pretrial Services Report, Defendant falsely said the amount of this tax obligation was $16,500.  The Pretrial Services Report disclosed that Defendant did not know the address in Massachusetts of one of his daughters, yet it also reported that Defendant is very close to both of his daughters and sees them every day.

The evidence and information summarized above support detention on dangerousness grounds.  Most troublingly, they reflect Defendant's willingness to resort to violence to protect his interests.  I credit and find particularly relevant Baldi's testimony that when the general contractor had trouble collecting payment from CW-1, Defendant casually suggested that the contractor should have CW-1 beaten up and then criticized the contractor for lacking the fortitude to do so. This testimony, largely volunteered by Baldi, is undisputed.  Second, Defendant's suggestion that

the contractor beat up CW-1 is contemporaneous with Defendant's alleged extortion of CW-1. The allegation that Defendant threatened his tenant in 2015 is also contemporaneous.

The other category of information—Defendant's history and characteristics—shows that Defendant has little regard for his obligations and even for his own word. Information in the Pretrial Services Report calls into question Defendant's honesty. I reject Defendant's representation that he did not know the address in Massachusetts of a daughter whom he reported seeing every day. In fact, as the Court understands the evidence, the daughter lives in a Nahant residence that Defendant owns. I draw the same conclusion about the report's statement that Defendant's tax obligation was $16,500. Although Defendant's attorney argued that, through no fault of Defendant, the number was missing a zero, even at $165,000, I am not persuaded that Defendant did not affirmatively misrepresent his IRS debt. To the contrary, the evidence presented shows that Defendant is acutely aware of his wealth and goes to great lengths to protect it and avoid paying taxes. Similarly, Defendant's failure to pay his tax obligation is not a case in which Defendant could not pay an outstanding and acknowledged debt to the IRS. Far from it, while this obligation was pending, Defendant purchased over $1 million in real estate in Massachusetts and Florida and used nominees to hold the title of those properties, presumably to avoid his tax obligations. All of this is important to the Court's determination because Pretrial Services cannot successfully supervise Defendant if he is dishonest and unwilling to acknowledge and discharge his obligations.

In these circumstances, Defendant simply cannot be counted on to comply with conditions -- and the condition that he not threaten or assault others, directly or indirectly, is simply too critical

of a condition to leave to the risk of non-compliance -- given Defendant's history and characteristics.[5]

### 4.   Nature and Seriousness of Danger to Any Other Person if Released

This last factor also supports detention; indeed, it was central to the Court's original detention determination.  The danger posed by Defendant's release is captured by the incident at the heart of the allegations and evidence in this case.  It is largely undisputed that Defendant paid for the assault to be committed.  The evidence also shows Defendant's ability to manipulate others to support his use of violence.  It suggests that Defendant invented a story that CW-1 made a crude or inappropriate remark, gesture, or overture to or about one of his girlfriends or daughters in order to get others (at least three individuals) to buy into committing the assault on CW-1 for Defendant. Defendant's manipulative character makes him an unacceptable danger.  It means that ordinary methods of pretrial supervision will not protect the community precisely because Defendant has the wherewithal to circumvent supervision and recruit and finance others to act for him.

Finally, the evidence shows that Defendant's threshold for violence is high.  Here, despite a beating of CW-1 that resulted in a broken jaw that had to be wired shut for some forty days, in Defendant's estimate, the beating was not "really good" and so warranted a payment of $1,000 instead of $2,000.  Hence, I believe Defendant poses a significant danger to anyone who may threaten his interests or the interests of those close to him.  Release, even on strict conditions, simply places too much risk to the safety of the community and others to release Defendant on conditions.  I therefore adopt the recommendation of Pretrial Services.

---

[5] Defendant was not on probation, parole, or other court release or supervision at the time of the offense or his arrest. See 18 U.S.C. § 3142(g)(3)(B).

**Conclusion**

For the foregoing reasons, the government's motion to detain Defendant on the ground that no condition or combination of conditions will reasonably assure Defendant's appearance as required is DENIED.   The government's motion to detain Defendant on the ground that no condition or combination of conditions will reasonably protect any other person and the community is GRANTED.[6]


/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[6]   Defendant is hereby advised of his right to seek review of this order pursuant to 18 U.S.C. § 3145(b).